**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHELLE TRUSSELL, *as Administrator ad Prosequendum of the Estate of Jennifer A. Ross, and as Guardian of minors L.R.K. and B.A.K.,*<br><br>Plaintiff,<br><br>v.<br><br>MONMOUTH COUNTY, *et al.*,<br><br>Defendants. | Civil Action No. 24-00151 (GC) (RKS)<br><br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon the Motion to Dismiss Plaintiff's Complaint (ECF No. 1 ("Complaint")) for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") filed by Defendants Monmouth County, Monmouth County Sheriff Shaun Golden, Monmouth County Executive Undersheriff Theoadore Freeman, Warden Victor Iannello of the Monmouth County Correctional Institution ("MCCI"), Corrections Officer Dylan J. Connell, Corrections Officer Randi Patterson, and John and Jane Doe Corrections Officers 1-10 ("Motion to Dismiss").[1]  (ECF No. 14.)  The Complaint was filed by Michelle

---

[1]  The Court refers to Golden, Freeman, and Iannello as "the Policymaker Defendants;" the John and Jane Doe Corrections Officers 1-10 as "the John and Jane Doe Corrections Officer Defendants;" Connell, Patterson, and the John and Jane Doe Corrections Officer Defendants as "the Corrections Officer Defendants;" and all individual moving Defendants as "the Individual County Defendants."  Collectively, all moving Defendants (the Individual County Defendants and Monmouth County) are referred to as "the County Defendants."

Trussell, as the Administrator *ad Prosequendum* of the Estate of Jennifer A. Ross ("Jennifer"), and as Guardian of minors L.R.K. and B.A.K. ("Plaintiff"). (ECF No. 1 ¶ 20.)  Plaintiff responded to the County Defendants' Motion to Dismiss (ECF No. 25), and the County Defendants filed a reply (ECF No. 26).  Furthermore, on December 6, 2024, the Court entered a Stipulation and Order Supplementing Plaintiff's Complaint.  (ECF No. 44 at 1-2 ("December 6, 2024 Stipulation and Order"); *see also* ECF No. 43 at MCSO000625-MSCO000626 ("Exhibit A").)  The Court also ordered Plaintiff and the County Defendants to submit supplemental briefing addressing the recent decision in *Young v. Monmouth County*, Civ. No. 25-4975, 2025 WL 354447 (D.N.J. Jan. 31, 2025), which they have filed.  (ECF No. 55; ECF Nos. 58-59.)   On March 6, 2025, the Court entered another stipulation in which Plaintiff and the County Defendants agreed that certain additional information would be incorporated into the Complaint. (ECF No. 61 ("March 6, 2025 Stipulation and Order").)

The Court carefully reviewed the parties' submissions and heard oral argument on November 20, 2024. (ECF No. 39; ECF No. 45.)  For the reasons set forth below, and other good cause shown, the County Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Complaint[2]

In her Complaint, Plaintiff names as Defendants: Monmouth County, which owns, operates, manages, and controls the MCCI; Golden, who has served as the Sheriff of Monmouth County since 2010; Freeman, the Executive Undersheriff of the Monmouth County Sheriff's

---

[2]      On a motion to dismiss, the Court accepts as true all well-pled facts in the Complaint. *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) (quoting *Umland v. PLANCO Fin. Servs. Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)).

Office; Iannello, who became the Warden of the MCCI on November 30, 2021 (after having previously served as the Acting Deputy Warden); Connell, a corrections officer at the MCCI; Patterson, another MCCI corrections officer; Bonnie McKittrick, a licensed practical nurse and employee or agent of CFG Health Systems, LLC ("CFG"), who worked at the MCCI at the time of Jennifer's detention; CFG, a contractor providing medical and behavioral health services at the MCCI; John and Jane Doe Corrections Officers 1-10; and John and Jane Doe CFG Agents 1-5.[3] (ECF No. 1 ¶¶ 24-33.) The Policymaker Defendants are sued in both their official and individual capacities, and the Corrections Officer Defendants are named in their individual capacities. (*Id.*)

### i.    Jennifer's Overdose

In her Complaint, Plaintiff alleges that Jennifer was arrested on September 17, 2022 by Monmouth County Sheriff's officers on warrants for failure to appear on scheduled dates in the Monmouth County Drug Court and the Highlands Municipal Court. (ECF No. 1 ¶ 34.) That evening, Jennifer was transported to the MCCI, where she was processed and detained. (*Id.* ¶ 35.) She had no drugs in her possession when she entered the facility; however, she had needle marks on her right arm, which were seen by Patterson. (*Id.* ¶¶ 36-37.) As a result of the intake process, Jennifer was placed on the Clinical Opiate Withdrawal Scale and Clinical Institute Withdrawal Assessment ("COWS/CIWA") protocol and prescribed detoxification medication to ease her withdrawal symptoms. (*Id.* ¶ 37.)

According to MCCI records, Jennifer had a history of drug dependency and substance use disorders and was suffering from drug withdrawal, anxiety, and exhibiting signs of depression. (*Id.* ¶¶ 37-38, 63.) The corrections officers responsible for monitoring Jennifer allegedly knew or should have been informed of her documented medical conditions. (*Id.* ¶ 38.) New Jersey

---

[3]    CFG, McKittrick, and John and Jane Doe CFG Agents 1-5 are referred to "the CFG Defendants."

Department of Corrections regulations dictate that detoxification occur under medical supervision. (*Id.* ¶ 61 (citing N.J. Admin. Code § 10A:31-13-26).) MCCI policies and procedures similarly require that corrections officers monitor detoxing detainees by using video equipment and conducting physical checks every fifteen minutes. (*Id.*) However, Monmouth County, the Policymaker Defendants, and John and Jane Doe Corrections Officers allegedly failed to place Jennifer in a sufficiently secure and protective setting or under any special medical watch. (*Id.* ¶¶ 39, 62-63.) Instead, she was placed in a cell with other detainees who had been charged with drug offenses. (*Id.* ¶ 64.)

The Individual County Defendants failed to adequately monitor Jennifer, her cellmates, and other detainees, and, as a result, someone within the facility was able to provide a fentanyl-laced drug to Jennifer. (*Id.* ¶¶ 65-66.) On September 20, 2022, Jennifer ingested the drug "cocktail." (*Id.* ¶ 67.) As a result of the Corrections Officer Defendants' failure to closely monitor Jennifer as mandated by the facility's policies and procedures regarding constant video monitoring and fifteen-minute cell checks, "Jennifer's overdose went undetected for an unreasonable period, which delayed an adequate response and urgent life-saving measures." (*Id.* ¶¶ 68, 70.) Furthermore, Monmouth County and the Policymaker Defendants failed to promulgate and/or implement adequate policies and procedures for conducting such monitoring. (*Id.* ¶ 69.)

McKittrick responded to Jennifer's cell during the overdose, but she allegedly "did not follow established medical protocols to revive Jennifer." (*Id.* ¶ 71.) The Corrections Officer Defendants and John and Jane Doe CFG Agents 1-5 were on-site and had an opportunity to intervene and provide Jennifer with life-saving treatment but failed to do so. (*Id.*) Specifically, McKittrick administered two doses of Narcan, but the Corrections Officer Defendants and John and Jane Doe CFG Agents 1-5 did not administer any additional doses. (*Id.* ¶¶ 74-75.) Narcan,

4

which acts as an antidote to an opioid overdose, typically begins working within two to three minutes even when a patient is unresponsive and not breathing. (*Id.* ¶ 72.) There is no limit on the number of Narcan doses that can be safely administered, and CFG policy requires its personnel to reassess the patient after each dose and to administer subsequent doses if he or she shows a minimal or no response. (*Id.* ¶¶ 72-73.) Furthermore, Monmouth County and the Policymaker Defendants failed to promulgate and/or implement appropriate policies governing how MCCI staff should respond to an overdose and failed to train and supervise the staff on how to respond. (*Id.* ¶ 78.)

Jennifer died from mixed drug toxicity (fentanyl and morphine). (*Id.* ¶ 76.) No one was ever arrested or charged with distributing the drugs causing her death. (*Id.* ¶ 81.) She is survived by two young sons, L.R.K. and B.A.K. (*Id.* ¶ 89.)

   ii. **Alleged Drug Smuggling, Drug Distribution, and Drug Use at the MCCI and the Heightened Risk of Overdose**

According to Plaintiff, both before and during Jennifer's detention, illicit drugs were available to detainees at the facility in several ways:

   a. Detainees were not adequately searched for drugs when admitted into the Facility.

   b. Drugs were sold or traded inside the Facility for money, food, or favors.

   c. Drugs were smuggled into the Facility through the mail in different ways. For instance, envelopes soaked in drugs addressed to detainees were permitted to enter the Facility and were then smoked by detainees. Detainees also arranged to have co-conspirators send contraband to them using what appeared to be a letter from an attorney. This allowed detainees to open the envelopes outside the presence of corrections officers.

   d. Drugs were smuggled into the Facility by MCCI staff, who then conspired with detainees to distribute them.

(ECF No. 1 ¶ 41.) Detainees who were prescribed detoxification medications would sell them to other detainees, and they also lit and inhaled drug-coated papers. (*Id.* ¶ 42.) As a result, "[i]n the fall of 2022, the possession and distribution of drugs were parts [sic] of daily life in the Facility." (*Id.*)

A July 31, 2018 article appearing in the Asbury Park Press quoted Golden and stated that, "[a]ccording to jail officials, some 76% of inmates in county jails face addiction." (*Id.* ¶ 60 (citing Ken Serrano, *Recovery Coaches Head to Jail to Help Monmouth County Detainees with Addictions*, Asbury Park Press (Jul. 31, 2018), https:www/app.com/story/news/2018/07/31/recovery-coaches-head-jail-help-detainees-addictions/868087002/)).) The article also noted that inmates charged with drug offenses are particularly vulnerable to overdoses because withdrawal comes with a lower drug tolerance. (*Id.*). Citing to several other articles, the Complaint alleges that the heightened risk of inmates, especially inmates with substance use disorders, suffering an overdose and death was well known to both the general public and persons working in correctional facilities. (*Id.* ¶ 60 (citing Eliana Kaplowitz et al., *Fentanyl-related Overdose During Incarceration: A Comprehensive Review*, 9 Health & Just. J. 13 (2021), https://healthandjusticejournal.biomedcentral.com/articles/10.1186/s40352-021-00138-6); *Overdose Deaths and Jail Incarceration: National Trends and Racial Disparities*, Vera Inst. of Just., https://www.vera.org/publications/overdose-deaths-and-jail-incarceration/national-trends-and-racial-disparties (last visited Jan. 9, 2024); *Criminal Justice DrugFacts*, Nat'l Inst. On Drug Abuse (June 2020), https://nida.nih.gov/publications/drugfacts/criminal-justice; Beth Schwartzapfel & Jimmy Jenkins, *Overdose Deaths in State Prisons Have Jumped Dramatically Since 2001*, NPR (Jul. 15, 2021, 6:00 AM), https://www.npr.org/2021/07/15/1015447281/overdose-deaths-state-prisons-increase).)

In 2017, Freeman co-authored an article citing incidents in which detainees smuggled drugs into the MCCI. (*Id.* ¶ 56.) The smuggling resulted in the deaths of two detainees from drug overdoses and lawsuits against Monmouth County. (*Id.*)

From January to May 2020, MCCI detainee Taques Hall, other detainees, and MCCI employee Ryan Steinmetz ran a drug smuggling conspiracy at the facility, distributing over 100 doses of Suboxone (an opioid). (*Id.* ¶ 45.) Steinmetz smuggled the drugs and other contraband to detainees, who hid strips of Suboxone and marijuana in food items to distribute and sell the contraband to other detainees. (*Id.* ¶ 46.) Between August 1, and September 3, 2021, an MCCI correctional officer (Bryant Mack) likewise conspired with Hall and other detainees to distribute controlled dangerous substances. (*Id.* ¶ 47.) Mack smuggled ADB-BUTINACA, a cannabinoid drug, into the MCCI using potato chip bags and then gave the items to Ladonn Brown, a detainee food server. (*Id.*) Brown gave one bag to Hall. (*Id.*) Publicly available documents show that a September 4, 2021 search of Brown's cell uncovered thirteen suspected Suboxone pills, marijuana, a bottle of K2 spray with the label "Blunt life," and contraband packaging. (*Id.* ¶ 48.) A search of Hall's cell on the same day found fifty-one light green whole pills, ninety light green half pills and twenty orange pills suspected to be Suboxone, more than half a pound of synthetic marijuana, two bottles of K2 synthetic marijuana, and packaging materials and scales. (*Id.*)

In another publicized incident, MCCI detainee Alvino Hinton admitted that, on April 17, 2022, he smuggled fentanyl-laced heroin into the facility. (*Id.* ¶ 49.) He gave the drugs to another detainee, David Egner. (*Id.*). Suffering from acute heroin/fentanyl poisoning, Egner was taken to CentraState Medical Center, where he died three days later. (*Id.*) A subsequent search uncovered thirty-six wax folds of suspected fentanyl in Hinton's underwear. (*Id.* ¶ 50.) NJDOC regulations require every adult correctional facility in the state to report deaths in custody to the department.

(*Id.* ¶ 51 (citing N.J. Admin. Code § 10A:31-13.31).)  Egner's death was not reported to the NJDOC, thereby concealing the true extent of the drug problem at the MCCI.  (*Id.* ¶ 53.)  On August 17, 2022, Hinton was criminally charged with causing Egner's death.  (*Id.* ¶ 54.)

In 2022, another pretrial detainee suffered a drug overdose in the MCCI and was treated at a local hospital.  (*Id.* ¶ 43.)  When the detainee returned to the facility, no MCCI official questioned him about the source of the drugs.  (*Id.*)  On or about July 24, 2023, a female detainee overdosed on drugs that were smuggled into the facility by other detainees.  (*Id.* ¶ 58.)

In the December 6, 2024 Stipulation and Order, the County Defendants and Plaintiff agreed that "MCSO-000625 and MCSO-000626 (attached hereto as Exhibit A) are incorporated into Plaintiff's Complaint (ECF No. 1) for purposes [of] Monmouth County Defendants' pending motion to dismiss (ECF No. 14) and may be considered by the Court in ruling on that motion." (ECF No. 44 at 1 (emphasis omitted).)  Exhibit A consists of a redacted spreadsheet listing inmate deaths that occurred and Narcan dosages administered in the MCCI in 2022 and 2023.  (ECF No. 43 at MCSCO000625-MSCO000626.)  MCSO000625 provides the following data for 2022:



(*Id.* at MCSO000625.)  In short, in 2022, there were nine inmate opioid overdoses at the MCCI, including Jennifer's and Egner's overdoses, which were treated with Narcan.  Two of the nine overdoses (Jennifer and Egner) were fatal.  In addition, three of the nine overdoses (Egner's fatal overdose in April 2022, the August 2022 overdose, and a third overdose on September 1, 2022) occurred before Jennifer overdosed on September 20, 2022.

According to the second page of Exhibit A, in 2023, there were no deaths and six drug overdoses requiring the administering of Narcan:

Deaths - Attempted Suicides - Narcan 2023

| Deaths: Name | DOB | Date of Incident | Location | Cause | Status at Time of Death | Incident Report # | Notes | NJDOC Reportable |
|---|---|---|---|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A | N/A | | N/A | N/A |

| Attempted Suicides: Name | DOB | Date of Incident | Location |
|---|---|---|---|
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |

| Narcan Use: Name | DOB | Intake Date | Date Narcaned | Location | Doses | | | Notes |
|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | 1/26/2023 | 1/29/2023 | F1-106 | 2 | CFG Medical | sent to CSMC | |
| ▮ | ▮ | 4/27/2021 | 2/24/2023 | J1-106 | 3 | CFG Medical | sent to CSMC | |
| ▮ | ▮ | 3/5/2023 | 3/9/2023 | A1-207 | 2 | CFG Medical | sent to CSMC | |
| ▮ | ▮ | 9/27/2022 | 7/15/2023 | F1-308 | 4 | CFG Medical | CSMC (inpatient) | |
| ▮ | ▮ | 7/31/2023 | 7/31/2023 | A1-110 | 3 | CFG Medical | sent to CSMC | |
| ▮ | ▮ | 1/27/2023 | 10/29/2023 | F2-206 | 1 | CFG Medical | sent to CSMC | |

(*Id.* at MCSO000626.)

In the March 6, 2025 Stipulation and Order, Plaintiff and the County Defendants agreed that the following information "is incorporated into Plaintiff's Complaint" for purposes of the County Defendants' pending Motion to Dismiss:

> 1.    On January 23, 2022, a detainee in the Monmouth County Correction Institution ("MCCI") was taken to the Emergency Department of CentraState Medical Center.  The CFG record reflects—"39 year old male presented at CentraState Medical Center on 1/23/2022 for evaluation of syncope and altered mental status. Patient with PMH of polysubstance abuse and Hep-C, collapsed in jail and given Narcan without effect. CT of head was unremarkable, troponins negative, drug screen positive for fentanyl, opiates and cocaine, WBC-11.7, Covid negative, and CXR clear." (CFGHS 001420).

> 2. According to CFG's records, on December 13, 2022, a detainee in the MCCI died of an overdose in the MCCI's infirmary. (CFGHS 001343).

(ECF No. 61 at 2.)

In her Complaint, Plaintiff claims that Monmouth County and the Policymaker Defendants knew of the open and notorious smuggling and distribution of drugs by detainees, MCCI staff, visitors, and through the mail; the use of smuggled drugs by detainees in the MCCI; the nature and extent of the serious dangers presented by such drugs to the health and well-being of detainees, especially drug-dependent detainees; and previous drug overdoses and deaths in the facility. (ECF No. 1 ¶¶ 83-84.) But Monmouth County and the Policymaker Defendants "took wholly inadequate measures to stem the flow of drugs" and to investigate, deter, and stop such behavior. (*Id.* ¶ 83.)

The Individual County Defendants violated federal and state law and breached their duties by permitting or acquiescing in the following practices:

> a.  The failure to properly screen detainees for illicit drugs on admission into the Facility;
>
> b.  The failure to properly monitor, supervise, and house detainees with known substance use disorders, and to create and implement policies to do so;
>
> c.  The failure to perform cell checks on a regular basis to ascertain and ensure the health and safety of detainees;
>
> d.  The failure to properly monitor and/or review security cameras to determine whether detainees had possession of drugs and/or were distributing drugs to other detainees;
>
> e.  The failure to properly train employees on how to detect and/or monitor detainees for drug possession, drug distribution, and drug overdoses;
>
> f.  The failure to implement policies and train employees on how to respond to detainees experiencing a drug overdose and/or how to render medical treatment and/or how to render

> > life-saving aid to detainees suffering from a drug overdose; and
>
> g.    The failure to implement policies requiring the appropriate administration of Narcan.

(*Id.* ¶ 86.)    These "collective failures—actions and inactions" by Monmouth County and the Policymaker Defendants constituted a custom, practice, and/or policy of deliberate indifference to the health and safety of detainees that violated Jennifer's federal and state constitutional rights and her statutory and common law rights and proximately caused Jennifer's overdose, pain and suffering, loss of enjoyment of life, and wrongful death together with the losses suffered by Jennifer's sons.    (*Id.* ¶¶ 85, 87.)

### iii.    Plaintiff's Thirteen Counts

In her Complaint, Plaintiff pleads thirteen counts.    The first four counts consist of federal claims brought pursuant to 42 U.S.C. § 1983 for violating Jennifer's constitutional rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution: (1) failure to protect against the County Defendants (Count One) (ECF No. 1 ¶¶ 98-112); (2) failure to train, supervise, or discipline against Monmouth County and the Policymaker Defendants (Count Two) (*id.* ¶¶ 113-20); (3) state-created danger against Monmouth County and the Policymaker Defendants (Count Three) (*id.* ¶¶ 121-33); and (4) failure to render adequate medical care against the Corrections Officer Defendants, McKittrick, and John and Jane Doe CFG Agents 1-5 (Count Four) (*id.* ¶¶ 134-45).    In the fifth claim (Count Five), Plaintiff alleges that: (5) Defendants violated the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2, by depriving Jennifer of her rights protected by Article I, Paragraph 1 and 12 of the New Jersey Constitution.    (ECF No. 1 ¶¶ 146-50.)    The remaining counts consist of state law claims for: (6) negligence in the performance of ministerial duties under the New Jersey Tort Claims Act ("NJTCA"), N.J. Stat.

Ann. §§ 59:1-1 to 59:12-3, against the County Defendants (Count Six) (ECF No. 1 ¶¶ 151-59); (7) negligent failure to train and/or supervise under the NJTCA against Monmouth County and the Policymaker Defendants (Count Seven) (*id.* ¶¶ 160-67); (8) negligence in the performance of discretionary activities under the NJTCA against Monmouth County and the Policymaker Defendants (Count Eight) (*id.* ¶¶ 168-75); (9) common law negligence against the CFG Defendants (Count Nine) (*id.* ¶¶ 176-83); (10) lost chance of survival under the NJTCA against the County Defendants (*id.* ¶¶ 184-93); (11) lost chance of survival under the common law against McKittrick (Count Eleven) (*id.* ¶¶ 193-201); (12) wrongful death under the New Jersey Wrongful Death Act, N.J. Stat. Ann. §§ 2A:31-1 to -6, against Defendants (Count Twelve) (ECF No. 1 ¶¶ 202-07); and (13) a survival action under the New Jersey Survivor's Act, N.J. Stat. Ann. § 2A:15-3, against Defendants (ECF No. 1 ¶¶ 208-11).

In the December 6, 2024 Stipulation and Order, Plaintiff and the County Defendants agreed that "Plaintiff withdraws and will not assert any claims against the Monmouth County Defendants in connection with Officers Dylan Connell's and Randi Patterson's alleged failure to administer additional doses of Narcan to Jennifer Ross once Nurse Bonnie McKittrick arrived on the scene to respond to Ms. Ross's overdose." (ECF No. 44 at 2.)

**B.    Procedural History**

On January 9, 2024, Plaintiff filed her Complaint. (ECF No. 1.) The County Defendants moved to dismiss on March 25, 2024 (ECF No. 14), Plaintiff opposed the Motion to Dismiss on May 31, 2024 (ECF No. 25), and the County Defendants replied on June 14, 2024 (ECF No. 26). On February 5, 2024, CFG and McKittrick answered the Complaint. (ECF No. 4.)

On November 20, 2024, the Court heard oral argument on the County Defendants' Motion to Dismiss. (ECF No. 39; *see also* ECF No. 45.) The two stipulations were entered on December

6, 2024 and March 6, 2025, respectively. (ECF Nos. 44, 61.) On February 13, 2025, the Court ordered the County Defendants and Plaintiff to submit supplemental briefing addressing the January 31, 2025 decision in *Young*. (ECF No. 55.) Their respective letter briefs were filed on February 20, 2025. (ECF Nos. 59-60.)

## II. **LEGAL STANDARD**

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)).

A defendant moving to dismiss under Rule 12(b)(6) bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231-32 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

## III.    **DISCUSSION**

In her Complaint, Plaintiff asserts several federal and state law claims against the County Defendants. According to Plaintiff, "[t]his case is about the unconscionable conditions at the MCCI and the deliberate indifference of the County Defendants that led to the death of [Jennifer]." (ECF No. 25 at 1.) Plaintiff alleges that the MCCI was a "'correctional' institution with a notorious history of drug use, drug overdoses, and drug overdose deaths," which the County Defendants allowed to "persist for years." (*Id.* at 2.) It was then allegedly foreseeable that, because of this policy and custom, Jennifer, who was known to be at a heightened risk of overdose and death, obtained and ingested a fatal fentanyl cocktail. (*Id.*)

As to Plaintiff's claims under § 1983 and the NJCRA, the Court concludes that Plaintiff's Complaint "contain[s] enough facts to state a claim to relief that is plausible on its face" against Monmouth County under *Monell v. Department of Social Services of City of New York*, 436 U.S. 378 (1978), for failure to protect Jennifer from a serious risk of harm as well as for failure to train, supervise, and discipline MCCI personnel. *Wilson*, 57 F.4th at 140 (alteration in original) (citation omitted). The Court likewise concludes that Plaintiff adequately alleges a plausible claim for failure to train, supervise, or discipline against the Policymaker Defendants and that the County Defendants do not meet their burden to show that the Policymaker Defendants are entitled to qualified immunity on this "failure-to" claim. However, the Court agrees with the County Defendants that Plaintiff's state-created danger claim must be dismissed and that she fails to allege sufficient facts to state plausible claims for failure to protect and inadequate medical care against the Corrections Officer Defendants.

Regarding Plaintiff's negligence (and derivative) claims under state law, the Court agrees with the County Defendants that the NJTCA bars such claims to the extent that they arise out of

alleged injuries caused by the County Defendants' failure to enforce state laws, NJDOC regulations and MCCI policies. Because Monmouth County's and the Policymaker Defendants' direct actions are discretionary in nature, the Court dismisses the negligence and derivative claims against them to the extent that they are alleged to arise out of their alleged negligence in the performance of ministerial duties. However, the Court rejects the County Defendants' other NJTCA arguments.

**A.     Count One: "Failure to Protect" Claim Against Monmouth County and the Corrections Officer Defendants**

In Count One of her Complaint, Plaintiff asserts a *Monell* claim under § 1983 and the Due Process Clause of the Fourteenth Amendment against Monmouth County for failing to protect Jennifer from known dangers threatening her health and safety. (ECF No. 1 ¶¶ 98-112.) Plaintiff alleges that there was "a pattern of unconscionable inaction and deliberate indifference to numerous specific failures by Monmouth County [to stem the flow of drugs into and distribution of drugs within the MCCI] that directly contributed to Jennifer's death." (ECF No. 25 at 22 (citing ECF No. 1 ¶¶ 38-42, 52-53, 62-67, 69-71, 74-75, 77-78, 80, 82-87).) Plaintiff also asserts in Count One an individual capacity claim under § 1983 and the Fourteenth Amendment's Due Process Clause against the Corrections Officer Defendants for failing to protect Jennifer.[4] (*Id.* at 22 n.5.) The County Defendants argue that the Complaint fails to plead a plausible claim for municipal liability against Monmouth County because it does not allege facts indicating that the Policymaker Defendants were deliberately indifferent. (ECF No. 14-1 at 14-19.) They also assert that Count

---

[4]     Plaintiff clarifies that "Count One is not intended to assert official and individual capacity claims against Warden Iannello, Sheriff Golden, and Undersheriff Freeman because they would be duplicative of claims against the Monmouth County." (ECF No. 25 at 22 n.5 (citing ECF No. 14-1 at 19).)  "Count One is intended to assert claims only against Monmouth County, CO Connell, and CO Patterson." (*Id.*)  The Court considers the individual capacity claims in Counts Two and Three against the Policymaker Defendants in Sections III.B. and III.C., *infra*.

One should be dismissed as to the Corrections Officer Defendants because it fails to allege facts raising the plausible inference that Jennifer was incarcerated under conditions posing a substantial risk of serious harm, that the Corrections Officer Defendants were deliberately indifferent to that objective risk, and their deliberate indifference caused her harm. (*Id.* at 19-23.)

The Court concludes that Plaintiff pleads a facially plausible failure-to-protect *Monell* claim against Monmouth County. However, she fails to allege sufficient facts in support of a claim against the Corrections Officer Defendants for failing to protect Jennifer.

      i.    **Failure-to-Protect Claims and *Monell* Liability**

Because Jennifer was a pretrial detainee, Plaintiff's federal claims must be analyzed under the Fourteenth Amendment as opposed to the Eighth Amendment. *See Hubbard v. Taylor*, 538 F.3d 229, 231 (3d Cir. 2008). "Nonetheless, the Fourteenth Amendment's Due Process Clause affords pre-trial detainees protections that are 'at least as great as the Eighth Amendment protections available to convicted prisoners.'" *Corbin v. Bucks Cnty.*, No. 23-2784, 2024 WL 2980218, at *2 n.2 (D.N.J. June 23, 2024) (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003)). Under the Eighth Amendment, the United States Constitution imposes a duty on prison officials to "provide humane conditions of confinement" and to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). In concluding that a prisoner does not have a reasonable expectation of privacy entitling him or her to the protection of the Fourth Amendment against unreasonable searches, the Supreme Court over forty years ago noted that prison authorities "must be ever alert to attempts to introduce drugs and other contraband into the premises, which, we can judicially notice, is one of the most perplexing problems of prisons today." *Hudson*, 468 U.S. at 527.

It is undisputed that Plaintiff's "failure-to-protect" claim consists of two elements or prongs: an objective prong and a subjective prong. *Corbin v. Cnty. of Bucks*, 703 F. Supp. 3d 527, 534 (E.D. Pa. 2023). Under the objective prong, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). The plaintiff meets the subjective prong by alleging facts plausibly indicating that "the prison officials had 'a sufficiently culpable state of mind'—*i.e.,* 'deliberate indifference' to inmate health or safety" *id.* (cleaned up) (quoting *Farmer*, 511 U.S. at 834), which caused the inmate harm, *see Young*, 2025 WL 354447, at *4.[5]

In *Monell*, the Supreme Court recognized that, while local government units can be liable under § 1983, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," *Monell*, 436 U.S. at 691. Thus, a local government cannot be held liable for "an injury inflicted solely by its employees or agents." *Id.* at 694. However, a plaintiff may hold a municipality liable if she shows that the municipality's "choices were the 'moving force' behind the constitutional violation." *Hightower*, 2024 WL 5453086, at *2 (quoting *Monell*, 436 U.S. at 694). A plaintiff may allege that an unconstitutional policy or custom of the municipality caused his or her injuries. *See Est. of Roman v. City of Newark*, 914 F.3d 789, 798-99 (3d Cir. 2019) (citing *Monell*, 436 U.S. at 694).

A plaintiff may demonstrate an unconstitutional municipal policy or custom in several ways. One way is to show that "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker

---

[5]     The Third Circuit has not decided whether deliberate indifference "under the Fourteenth Amendment standard is subjective or objective." *Hightower v. City of Philadelphia*, No. 24-1116, --- F.4th ---, 2024 WL 5453086, at *2 (3d Cir. Mar. 7, 2025) (noting circuit split). Plaintiff concedes that a subjective standard applies. (ECF No. 25 at 24.)

17

can reasonably be said to have been deliberately indifferent to the need.'" *Natale*, 318 F.3d at 584 (alteration in original) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla v. Brown*, 520 U.S. 397, 417-18 (1997)). To plead such a claim the plaintiff must allege facts showing "there was an obvious and clear need for the affirmative promulgation of a new policy to address deficiencies which, if left uncorrected, were so likely to cause a violation such as the one the plaintiff suffered that the defendant in question can be said to have been deliberately indifferent to the deficiency." *Young*, 2025 WL 354447, at *3 (citing *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222-23 (3d Cir. 2015); *Natale*, 318 F.3d at 584).

### ii.    The Objective Prong

In *Zakora v. Chrisman*, 44 F.4th 452 (6th Cir. 2022), "one of the few cases to have directly considered the viability of a failure-to-protect claim following a prisoner drug overdose," *Corbin*, 703 F. Supp. 3d at 535, the Sixth Circuit concluded that the complaint plausibly alleged that the prisoner, who suffered a fatal fentanyl overdose, "was at a substantial risk of that injury before it occurred due to the widespread presence of drugs at [the prison], and in the C-Unit [Zakora's housing unit] specifically," *Zakora*, 44 F.4th at 470.

"[T]he risk of injury from unfettered access to deadly drugs inside a prison is 'not one that today's society chooses to tolerate.'" *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). However, the *Zakora* court "emphasiz[ed] that simple exposure to drugs, without more, does not violate contemporary standards of decency and thus does not satisfy the objective prong." *Id.* at 472. Prison officials are not obligated to show that they have prevented all drugs from entering the facility. *Id.* "Instead, we hold that unfettered access to drugs in a prison, as evidenced here by the officials' failure to promptly investigate the two prior overdoses in Zakora's C-Unit, is sufficiently serious to satisfy the objective prong of an Eighth Amendment claim." *Id.*

In 2024, the Sixth Circuit further emphasized this distinction between mere exposure to drugs, which is not sufficient to satisfy the objective element, and "unfettered" access to drugs, which does meet this threshold requirement. *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679, 684-86 (6th Cir. 2024). The *Caraway* court explained that three alleged facts supported *Zakora*'s conclusion that the estate plausibly alleged that Zakora had unfettered access to deadly drugs inside the prison: (1) the complaint contained detailed allegations regarding the widespread presence of drugs at the facility; (2) in the two days before the fatal overdose, two other inmates in his twelve-to-sixteen-inmate unit had overdosed; and (3) prison officials failed to investigate the overdoses. *Id.*

In *Young*, the court considered a failure-to-protect claim arising out of Egner's drug overdose while housed in the MCCI and his subsequent death. *Young*, 2025 WL 354447, at *1. Relying on *Caraway*, the *Young* court recognized that "the threat of unfettered access to drugs in a controlled environment of incarceration may give rise to a failure to protect claim under certain circumstances." *Id.* (citing *Caraway*, 98 F.4th at 684). However, "simple exposure to drugs while incarcerated, or a 'run-of-the-mill drug-overdose case' will not be sufficient to support a failure to protect claim in the absence of detailed facts showing that the defendants knew of serious and widespread access to illegal drugs and knew that those drugs were actively being abused, such as in a case where numerous inmates suffer overdoses in a relatively short time frame." *Id.*

Applying this framework, the Court concludes that Plaintiff's Complaint alleges "the kind of 'unfettered access to drugs in a prison'" that is sufficient to satisfy the objective prong of an Eighth Amendment claim, *id.* Specifically, Plaintiff alleges facts showing: (1) "the widespread presence of drugs," *Caraway*, 98 F.4th at 684 (citing *Zakora*, 44 F.4th at 470), (2) that "numerous inmates suffer[ed] overdoses in a relatively short time frame," *Young*, 2025 WL 354447, at *4

(citing *Caraway*, 98 F.4th at 684), and (3) there was a "failure to investigate" or otherwise adequately respond to the drug problem, *Caraway*, 98 F.4th at 685 (emphasis omitted). However, the Court initially considers the dangers of the illicit drug that caused Jennifer's death.

### 1.    The Dangers of Fentanyl

In *Zakora*, the Sixth Circuit "stated that '[f]entanyl unquestionably poses a severe danger to anyone who comes in contact with it,'" and "this inherent danger 'is magnified when introduced to a controlled environment like a prison.'" *Corbin*, 703 F. Supp. 3d at 535 (quoting *Zakora*, 44 F.4th at 470). Fentanyl can be deadly in even miniscule doses, and, according to the National Institutes of Health, the drug is the primary driver of the country's ongoing epidemic of overdose deaths. *Id.; see also Zakora*, 44 F.4th at 470 (observing that prisoners are twelve times more likely to exhibit drug dependence or use than the general population, isolation and boredom in prison complicate efforts to resist drugs, and overdose fatalities in state prisons increased by more than 600% from 2001 to 2018).

The County Defendants acknowledge that there is a "drug epidemic in this country—an epidemic with tentacles that reach into all segments of our national life," and that "drug-dependent people are dying at alarming rates from drug overdoses." (ECF No. 14-1 at 1.) In her Complaint, Plaintiff specifically alleges that, according to a news article and research studies, approximately seventy-six percent of inmates in county jails have problems with addiction and inmates charged with drug offenses are particularly vulnerable to overdoses because individuals in withdrawal have lower tolerance for opioids. (Complaint ¶ 60.) Furthermore, fentanyl and related compounds have saturated the illicit drug supply, resulting in unprecedented rates of fatal overdoses; incarcerated persons are particularly vulnerable because the burden of opioid use disorder is disproportionately higher in the prison population and tolerance generally decreases during incarceration; and

incarceration contributes to increased risk of an overdose, particularly for users of opioids, through tolerance loss during periods of abstinence, limited access to medical treatment and Narcan, disruptions in health care, and lack of social supports. (*Id.* ¶ 60 n.3.) Jennifer was arrested for failing to appear on scheduled dates in Drug Court, had a history of using drugs and a substance use disorder, had needle marks on her right arm, was placed on a withdrawal protocol and prescribed detox medication. (*Id.* ¶ 37.) Like Jennifer, Egner fatally overdosed on fentanyl-laced heroin. (*Id.* ¶ 49.)

## 2.    The Prevalence of Drugs in the MCCI

Plaintiff describes how drugs have been smuggled into and distributed in the facility. According to her Complaint, drugs were brought into the MCCI in several ways—by MCCI corrections officers and other facility staff, detainees who were not adequately searched upon admission, and in the mail. (ECF No. 1 ¶¶ 41-42.) Specifically, "envelopes soaked in drugs addressed to detainees were permitted to enter the Facility and were then smoked by detainees," and "[d]etainees also arranged to have co-conspirators send contraband to them using what appeared to be a letter from an attorney," which allowed detainees to open the envelopes outside the presence of corrections officers. (*Id.* ¶ 41.) Detoxing detainees sold prescribed medications to other inmates, and detainees openly consumed drugs by such means as inhaling drug-coated papers. (*Id.* ¶¶ 41-42.) MCCI personnel and detainees ran two drug conspiracies in the facility. (*Id.* ¶¶ 44-48.) In the first conspiracy, Steinmetz (an MCCI employee) smuggled strips of Suboxone (an opioid) into the facility, which detainees hid in food items and distributed on meal trays. (*Id.* ¶¶ 45-46.) In the other conspiracy, an MCCI corrections officer named Mack smuggled a cannabinoid drug into the facility using potato chip bags. (*Id.* ¶ 48.) Hall was involved in both conspiracies, and a search of his cell uncovered more than 100 pills (including Suboxone). (*Id.* ¶¶

45-48.)  Plaintiff also alleges that Hinton (a detainee) smuggled and distributed fentanyl-laced heroin, which resulted in Egner's fatal overdose.  (*Id.* ¶ 49.)

The County Defendants argue that the *Caraway* complaint likewise included several specific allegations regarding the prevalence of drugs in the facility, but that the case was nonetheless dismissed.  (ECF No. 45 at 15:20-16:3.)  However, the *Caraway* court did not characterize the complaint as containing "specific" allegations regarding the prevalence of drugs.  In fact, it stated that the decedent's estate merely alleged that "the prison was 'plagued by rampant drugs' entering the facility," without explaining "how the drugs got inside."  *Caraway*, 98 F.4th at 684 (citations omitted).  In this case, Plaintiff explains at length "how the drugs got inside" the MCCI.  The Sixth Circuit also noted that it need not decide whether that allegation was sufficient to plausibly allege "the widespread presence of drugs" in the facility because the estate failed to allege the two other critical facts.  *Id.*

According to the County Defendants, "the *Young* plaintiffs also relied on the same newspaper articles and similar conclusory allegations in attempting to show the County Defendants had knowledge of a serious and widespread issue," and "[t]he *Young* Court found that '[the p]laintiffs' allegations and the articles in question do not show widespread overdoses, nor do they support [the] [p]laintiffs' conclusory allegations that drug abuse and distribution was rampant in the county jail.'"  (ECF No. 59 at 2 (quoting *Young*, 2025 WL 354447, at *4).)  The plaintiffs in *Young* "recapitulate[d] in their complaint the allegations of [Plaintiff's] lawsuit" and referred to Mack's arrest and prosecution for smuggling Suboxone and other illicit drugs.  *Young*, 2025 WL 354447, at *2 (citation omitted).  The *Young* plaintiffs also cited to the 2018 Asbury Park Press article, which discussed a voluntary addiction recovery program instituted at the MCCI and stated that jail officials report that seventy-six percent of inmates in county jail face addiction, and a 2024

New Jersey Monitor article, which mentioned the potato chip bag conspiracy and summarized the allegations in the present lawsuit and the contents of the 2017 article by Undersheriff Freeman regarding the installation of new X-ray screening devices aimed at increasing the discovery rate of contraband hidden in inmates' body cavities. *Id.* "The only actual incidents of drug abuse mentioned in either article occurred in either 2013, nearly a decade before Egner's incident, or 2022, in the case of Ross's death which took place several months after Egner's passing." *Id.*

According to the court in *Young,* "[the p]laintiffs' allegations and the articles in question do not show widespread overdoses, nor do they support [the p]laintiffs' conclusory allegations that drug abuse and distribution was rampant in the county jail." *Id.* at *4. Furthermore, the *Young* court noted that the staff members were prosecuted for smuggling illicit substances "completely different from those involved in Egner's case well over a year before Egner's overdose." *Id.*

However, in *Young* there is no indication of any additional specific allegations regarding how the drugs were smuggled into the MCCI. In contrast, Plaintiff's Complaint "include[s] specific allegations about how the drugs got there," such as through the mail,[6] *Caraway,* 98 F.4th at 684 (citing *Zakora,* 44 F.4th at 461). (*See* ECF No. 1 ¶¶ 41-42.)

---

[6]      Furthermore, Plaintiff alleges more facts regarding the prevalence of drugs in MCCI than her counterpart in *Corbin,* who still prevailed on the defendants' motion to dismiss. In *Corbin,* the plaintiff alleged that "inmates were actively using and distributing narcotics on the block where the decedent was housed," "describes 'a persistent smuggling problem,'" and indicated that at least one other BCCF ("Bucks County Correctional Facility") inmate overdosed on fentanyl purchased while incarcerated. 703 F. Supp. 3d at 536. The complaint did not allege detailed facts regarding how the drugs were smuggled into and distributed in the BCCF. Yet the court concluded that the allegations "plausibly describe the kind of 'unfettered access to drugs in a prison' that the *Zakora* court determined was 'sufficiently serious to satisfy the objective prong of an Eighth Amendment claim'" *Id.* (quoting *Zakora,* 44 F.4th at 472).

### 3.    MCCI Drug Overdoses

According to the Complaint, Exhibit A to the December 6, 2024 Stipulation and Order, and the March 6, 2025 Stipulation and Order, in 2022, three MCCI inmates fatally overdosed on opioids (*i.e.*, Egner and Jennifer, who died on April 17, 2022 and September 20, 2022, respectively, and a third unidentified detainee, who died of an overdose in the MCCI infirmary on December 13, 2022, less than three months after Jennifer).    (ECF No. 1 ¶¶ 49, 55; ECF No. 43 at MCSO000625; ECF No. 61 at 2.)   Exhibit A indicates that there were nine opioid overdoses in 2022, and six opioid overdoses in 2023.   (ECF No. 43 at MCSCO000625-MCSC000626.)   The County Defendants further stipulated that, on January 23, 2022, a detainee collapsed in the MCCI, was given Narcan, and tested positive for fentanyl, opiates, and cocaine.   (ECF No. 61 at 2.)   This January 23, 2022 overdose is not included on Exhibit A.   The exhibit also does not list the overdose death in December 2022, and it evidently does not include this additional December incident in its listing of overdoses for that year.

In sum, Plaintiff alleges that there were a total of seventeen MCCI detainee opioid overdoses in 2022-2023 (eleven in 2022 and six in 2023), with three of these seventeen overdoses resulting in detainees' deaths.

While true that twelve of the seventeen 2022-2023 overdoses (one of them fatal) occurred after Jennifer's death, *see Young*, 2025 WL 354447, at *4 (noting that the plaintiffs alleged "another overdose which occurred months *after* Egner's overdose" and characterizing Jennifer's overdose as the "one truly similar incident") the *Corbin* court rejected the argument that, because an overdose took place after the decedent's death, "it has no bearing on his deliberate indifference claim." *Corbin*, 703 F. Supp. 3d at 536 n.3.   The "'existence of additional inmate deaths under 'eerily similar circumstances' . . . permits an inference [under the objective prong] that these

dangerous conditions existed at the time of [the detainee's] death and remain unabated months after." *Id.* (citation omitted). Given the obligation to accept all factual allegations in the complaint as true and to draw all reasonable inferences in favor of the plaintiff, *see Wilson*, 57 F.4th at 140, the Court agrees with *Corbin*'s assessment and considers the "eerily similar" overdoses following Jennifer's death for purposes of determining whether Plaintiff sufficiently alleged unfettered access to drugs.

In any event, Plaintiff alleges there were four overdoses (January 23, 2022, April 17, 2022, August 24, 2022, and September 1, 2022) that occurred *before* Jennifer's death on September 20, 2022. In *Young*, there were only two prior overdoses, which occurred "nearly ten years, before Egner's death." *Young*, 2025 WL 354447, at *4. In fact, in this case, there were two overdoses in the thirty-day period immediately preceding Jennifer's overdose and two more inmates overdosed in the two-week period immediately following her overdose (including an overdose only three days later). (ECF No. 43 at MCSO000625.)

Responding to Exhibit A, which they dismiss as a "sheet of paper," the County Defendants assert that *Zakora* was based on two overdoses that occurred in a twelve-to-sixteen-person cellblock in the 48-hour period prior to the prisoner's death and the officials' failure to investigate these incidents until after his death. (ECF No. 45 at 14:18-24, 15:20-16:3.) They contend that it is unknown how the inmates listed on the document, including Jennifer, obtained the drugs. (*Id.* at 15:4-8.) In their supplemental brief, the County Defendants contend that any attempt to distinguish *Young* based on "the Stipulation and Supplemental Stipulation" would be without merit because the documents merely list occasions on which Narcan was used at the facility and two alleged overdoses (one which occurred after Jennifer's death), "with no supporting context." (ECF No. 59 at 3.) Purportedly, "[a]t most, the Stipulations suggest that prior to Jennifer's death, three,

perhaps four, inmates received Narcan at the facility – one of who received Narcan on the same day of his/her intake into the Facility, with no details regarding the circumstances in which those inmates obtained drugs." (*Id.*(footnote omitted).) According to the County Defendants, "[t]here are no facts . . . that would permit a finding that 'numerous' inmates suffered overdoses under circumstances similar to Jennifer's, so as to support an inference that the County Defendants were deliberately indifferent to Jennifer's well-being." (*Id.*)

Although Plaintiff does not allege "back-to-back overdoses in a twelve-to-sixteen person unit" in the two days before the inmate's death, *Caraway*, 98 F.4th at 684 (citing *Zakora*, 44 F.4th at 461), neither *Caraway* nor *Young* involved *seventeen* alleged drug overdoses in a two-year period, or *two* drug overdoses in the weeks immediately preceding the decedent's fatal overdose.[7] (*Id.*) Furthermore, according to Exhibit A, Jennifer's overdose occurred in "F-1 (Intake)"/"F1-103." (ECF No. 43 at MCSO000625). The document also indicates that four additional overdoses happened in "F1," including the September 1, 2022 overdose (in "F-106") and the September 23, 2022 incident, in "F1-106". (*Id.* at MCSO000625-MCSO000626.) In any event, the fact that multiple overdoses occurred in different parts of the MCCI (e.g., "F-1 Intake," and "A1," (*id.*)) indicates that inmates had access to drugs in different locations in the facility.[8]

---

[7]    The County Defendants further argue that, in *Curran v. Venango County*, No. 23-19, 2023 WL 8439274 (W.D. Pa. Nov. 2, 2023), *R&R adopted by* 2023 WL 8061513 (W.D. Pa. Nov. 21, 2023), the deficient complaint cited to prior instances of inmate overdoses at the facility. (ECF No. 45 at 16:16-21.) However, the plaintiff in *Curran* did not allege any prior drug overdose. *See Curran*, 2023 WL 8439274, at *8.

[8]    The *Corbin* court found that the plaintiff pled sufficient facts to establish the objective component even though the plaintiff only alleged that "at least one other BCCF inmate overdosed on fentanyl that was also purchased while incarcerated." *Corbin*, 703 F. Supp. 3d at 536 (footnote omitted). Apart from the plaintiff's "eerily similar circumstances" characterization, *id.* at 536 n.3, no details were provided with respect to the second overdose. In contrast, Plaintiff alleges there were seventeen overdoses in two years, provides the dates and locations for each incident and that at least three overdoses involved fentanyl.

### 4.    Failure to Investigate or Respond

In addition to alleging facts regarding a widespread presence of drugs and several drug overdoses, Plaintiff adequately alleges a failure on the part of MCCI officials to investigate or respond to the drug problem. "In *Zakora*, prison officials' failure to investigate the two overdoses in the two days before Zakora's death contributed to the risk he faced." *Caraway*, 98 F.4th at 685 (citing *Zakora*, 44 F. 4th at 461, 472). The Sixth Circuit in *Caraway* explained that "[b]ecause the estate here alleged no immediately prior overdoses at Whiteville, prison officials couldn't have failed to investigate them." *Id.* "The estate, again, includes some generalized allegations about the defendants' failure to respond to the alleged drug problem. But those allegations are a far cry from *Zakora*'s specific, close-in-time failure." *Id.* (citations omitted). The *Young* court noted that "the articles on which Plaintiffs rely and their own complaint indicate that the jail had adopted numerous policies and taken actions specifically aimed at combatting the threat of drugs." *Young*, 2025 WL 354447, at *4. According to the County Defendants, the court's words in *Young* "apply with equal force to this case." (ECF No. 59 at 3.)

As the Court has noted, *see supra* Section III.A.ii.2., both Plaintiff and her counterparts in *Young* rely on the same 2018 Asbury Park Press article and the arrest and prosecution of Mack, and the *Young* plaintiffs recapitulate the allegations in the present case and cite to the 2024 New Jersey Monitor article (which summarized, inter alia, the 2017 article by Freeman). *Young*, 2025 WL 354447, at *1-2; (ECF No. 1 ¶¶ 44-48, 56, 60.) According to *Young*, "[t]he articles Plaintiffs cite indicate that the county jail adopted treatment programs and put in place high tech detection equipment to inhibit the smuggling of illicit substances." *Young*, 2025 WL 354447, at *4. Furthermore:

> Plaintiffs' own complaint indicates that standard jail policies in place at the time of Egner's overdose required monitoring of inmates

> suspected of undergoing detoxification from drugs, frequent cell checks on such inmates, controlled movement of detoxifying inmates, the reporting and recording of incidents of drug exposure, the searching of incoming inmates and others entering the jail to deter the smuggling of illicit drugs, and immediate contact with medical staff in the event of an incident.

*Id.* (citation omitted). The *Young* plaintiffs also indirectly alleged that the MCCI had policies in place for discovering, firing, and prosecuting staff members, such as Mack, who were found to be smuggling and facilitating drug use in the facility. *Id.* at *2. In the present case, Plaintiff similarly alleges that Steinmetz and Mack were prosecuted for their involvement in the drug conspiracies and that the facility had policies and procedures in place requiring corrections officers to monitor detoxing detainees by using video equipment and conducting physical checks every fifteen minutes. (ECF No. 1 ¶¶ 44-48, 70.)

However, unlike the plaintiffs in *Caraway* and *Young*, Plaintiff pleads specific facts showing that several inmates suffered overdoses in a relatively short period of time, *see Young*, 2025 WL 354447, at *4 (citing *Caraway*, 98 F.4th at 684). The allegations in this case regarding the pattern of drug overdoses and deaths in 2022-2023 plausibly indicates that officials failed to respond to the ongoing drug problem. In fact, despite the November 2016 introduction of a full-body X-ray scanner, which, according to Freeman, resulted in the beginning of a "new era in contraband searches" (ECF No. 26 at 3 (quoting ECF No. 26 at 31)), drugs were still being smuggled into the facility by MCCI staff, inmates, and others through various methods (such as through the mail and hidden in potato chip bags) (*see* ECF No. ¶¶ 41, 47). After the two smuggling rings were prosecuted, seventeen drug overdoses occurred in a two-year timeframe. (*Id.* ¶¶ 41-50; ECF No. 43 at MCSO00625-MSCO000626; ECF No. 61 at 2.) Furthermore, MCCI officials allegedly failed to report Egner's death as a death in custody to the NJDOC as required by state regulations on the pretext that he died in the hospital. (ECF No. 1 ¶¶ 51-54); N.J. Admin. Code §

10A:31-13. Additionally, the Complaint states that, "when [a pretrial detainee who suffered an overdose in the MCCI in 2022 returned to the facility from the hospital], no MCCI official questioned the detainee about the source of the drugs that nearly killed him."[9] (ECF No. 1 ¶ 43.)

Accordingly, given the alleged facts indicating a persistent pattern of drug overdoses in the MCCI and other deficiencies in the MCCI's response to the drug problem, Plaintiff adequately alleges the third "fact" under the Sixth Circuit approach.  In sum, because Plaintiff alleges sufficient facts to establish the existence of the three "facts" together with the dangers of fentanyl in a correctional setting, the Court concludes that, "at this stage of litigation, [Plaintiff] plausibly describe[s] the kind of 'unfettered access to drugs in a prison that the *Zakora* court determined was sufficiently serious to satisfy the objective prong of an Eighth Amendment claim.'" *Corbin*, 703 F. Supp. 3d at 536 (quoting *Zakora*, 44 F.4th at 472).

### iii.    Deliberate Indifference under the Subjective Prong of a Claim for Failure to Protect and *Monell*

Under the subjective prong of a failure-to-protect claim, Plaintiff must plead facts showing that the official was deliberately indifferent to the substantial risk of serious harm and that his or her deliberate indifference caused the inmate harm. *See Young*, 2025 WL 354447, at *4.

"Deliberate indifference" is a subjective standard whereby "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir.

---

[9]    The County Defendants also argue that, in *Corbin*, there were detailed allegations regarding the specific failures by the defendant corrections officials that allowed the decedent to obtain the drugs. (ECF No. 45 at 21:5-22:8).  While the *Corbin* court considered the allegations regarding the officers' "specific shortcomings" (e.g., that the officers performed only a cursory pat down of the smuggler during his intake) in its discussion of the subjective prong, it did not refer to these alleged facts in its discussion of the objective prong. *See Corbin*, 703 F. Supp. 3d at 534-38.

2001)), *abrogated on other grounds as recognized by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020).

As noted by the Third Circuit:

> [i]t is not sufficient that the official should have known of the risk.
> [*Beers-Capitol,* 256 F.3d at 133]. A plaintiff can, however, prove
> an official's actual knowledge of a substantial risk to his safety "in
> the usual ways, including inference from circumstantial evidence."
> *Farmer,* [511 U.S. at 842]. In other words, "a factfinder may
> conclude that a prison official knew of a substantial risk from the
> very fact that the risk was obvious." *Id.*

*Id.* at 367; *see also Paulino v. Burlington Cnty. Jail,* 438 F. App'x 106, 109 (3d Cir. 2011) (noting

that state of mind requirement for prisoner claims of deliberate indifference applies to pretrial

detainee claims); *Miller v. Ricci,* No. 11-859, 2011 WL 1655764, at *10 (D.N.J. Apr. 28, 2011)

("To plead an Eighth Amendment failure to protect claim a plaintiff must plead facts raising a

plausible inference of: (1) a substantial risk of harm; (2) the defendants' deliberate indifference to

that particular risk of harm" and (3) causation." (citing *Hamilton v. Leavy,* 117 F.3d 742, 747 (3d

Cir. 1997)). "A plaintiff 'may demonstrate deliberate indifference by showing that the risk of harm

was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past

such that the defendants must have known about the risk.'" *Parkell v. Danberg,* 833 F.3d 313,

335 (3d Cir. 2016) (quoting *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 259 (3d Cir. 2010)).

Plaintiff asserts that Monmouth County is liable under *Monell* on the grounds that the

Policymaker Defendants "failed to act affirmatively at all, [though] the need to take some action

to control the agents of the government 'is so obvious, and the inadequacy of existing practice so

likely to result in the violation of constitutional rights, that the policymaker can reasonably be said

to have been deliberately indifferent to the need.'" *Natale,* 318 F.3d at 584 (alteration in original)

(quoting *Bryan Cnty.,* 520 U.S. at 417-18); *see also Hightower,* 2024 WL 5453086, at *2 (stating

that a plaintiff challenging "failures and inadequacies by municipalities" must show deliberate

indifference (quoting *Forrest v. Parry*, 930 F.3d 193, 105 (3d Cir. 2019))). "Under *Monell*, deliberate indifference requires 'proof that a municipal actor disregarded a known or obvious consequence of his action." *Hightower*, 2024 WL 5453086, at *3 (*Bryan Cnty.*, 520 U.S. at 410). As Plaintiff acknowledges, "[i]n the context of a [*Monell*] claim, the pivotal question is whether previous incidents alerted policymakers to known or obvious dangers, and whether their subsequent inaction constitutes deliberate indifference." (ECF No. 25 at 18); *see also Hightower*, 2024 WL 5453086, at *3 (stating that plaintiff must ordinarily show a pattern of similar constitutional violations putting the municipality on notice that, by failing to act, it was being deliberately indifferent to inmates' rights); *Schlaybach v. Berks Heim Nursing & Rehabilitation*, 839 F. App'x.759, 760 (3d Cir. 2021) (stating that the plaintiff must identify a specific policy or custom of the municipality that amounts to deliberate indifference to constitutional rights and, in most cases, deliberate indifference requires the plaintiff to allege a pattern of similar past conduct).

"The Supreme Court has 'hypothesized' that 'in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference,'" providing as a hypothetical example a city arming its police with guns without any legal training on when to use them. *Hightower*, 2024 WL 5453086, at *3 (citing *City of Canton*, 489 U.S. at 390 n.10) (concluding that "[f]ailing to temporarily segregate inmates falls far short of giving police guns without training them on the law of deadly force").

The Complaint pleads sufficient facts to state a plausible *Monell* failure-to-protect claim against Monmouth County. However, it fails to allege sufficient facts to raise a reasonable inference that the non-policymaking Corrections Officer Defendants were deliberately indifferent to a serious risk of injury.

### 1.    Monmouth County

As the Court has explained, *see supra* Section III.A.ii., Plaintiff's factual allegations plausibly describe a facility in which inmates had unfettered access to illicit drugs. This unfettered access to drugs resulted in a pattern of seventeen detainee overdoses, and three deaths, in 2022-2023. (ECF No. 43 at MCSCO000625-MCSC000626; ECF No. 61 at 2.)  Significantly, *four* of these seventeen overdoses (on January 23, 2022, April 17, 2022 (Egner's fatal overdose), August 24, 2022, and September 1, 2022) occurred in the months immediately preceding Jennifer's fatal overdose on September 20, 2022.  And, *two* of the four overdoses occurred only twenty-seven and nineteen days, respectively, before Jennifer's death, and, in turn, the immediately preceding overdose (September 1, 2022) and the incident with Jennifer took place in the same housing unit (F1).  (ECF No. 43 at MCSO000625.)  Plaintiff thereby alleges sufficient facts permitting this Court to draw the reasonable inference that it was obvious to the Monmouth County policymakers that further official action had to be taken to combat the persistent drug problem at the MCCI and that this failure to act led to Jennifer's fatal overdose.  *See Natale*, 318 F.3d at 584; *Young*, 2025 WL 354447, at *3-4.

According to the County Defendants, Plaintiff "assert[s] no facts in support of a theory that Jennifer was particularly vulnerable to an overdose, given Plaintiff's acknowledgement that she was among the 76% of inmates in county jails that struggle with addiction." (ECF No. 26 at 5 (quoting ECF No. 1 ¶ 60).)  They also indicate that there are no allegations to support an inference that the Individual County Defendants (including the Policymaker Defendants) had actual knowledge of Jennifer's drug addiction.  (ECF No. 14-1 at 20-21.)

However, Plaintiff alleges specific factual details distinguishing Jennifer (and similarly situated detainees) from the broader categories of inmates or inmates struggling with addiction,

which plausibly rendered her more susceptible or vulnerable to drug use and suffering a fatal drug overdose. Like Egner (who was sentenced to incarceration on drug distribution charges, deferred into an intensive supervision program, and then taken into custody and placed into the MCCI following instances of violating the program through drug use, *Young*, 2025 WL 354447, at \*1), Jennifer was arrested for failing to appear on scheduled dates in Drug Court, and during the intake process, it was learned that she had a history of drug use and a substance use disorder. (ECF No. 1 ¶¶ 34, 37.) Furthermore, needle marks were observed on Jennifer's right arm, she was placed on "the Clinical Opiate Withdrawal Scale and Clinical Withdrawal Assessment" (i.e., COWS/CIWA) protocol, and "prescribed detox medication to ease her withdrawal symptoms." (*Id.* ¶ 37.) The *Young* court did not indicate that Egner was prescribed detox medication and placed on the withdrawal protocol. A newly admitted detainee actively going through, and being medically treated for, drug withdrawal, would appear to be especially vulnerable to giving into the temptation of using drugs and suffering a fatal overdose. (*See* ECF No. ¶ 60 (noting that the July 2018 article in the Asbury Park Press stated that with "withdrawal comes a lower tolerance for opioids").) Accordingly, NJDOC regulations require detoxification to occur under medical supervision. (ECF No. 1 ¶ 61); N.J. Admin. Code § 10A:31-13.26. Plaintiff alleges that, instead of placing Jennifer under medical supervision, she was assigned to a cell with other detainees who had been charged with possession of controlled dangerous substances and/or possession of drug paraphernalia. (ECF No. 1 ¶ 64.)

In any event, as the Sixth Circuit explained in *Zakora*, "the Supreme Court has made 'clear that the correct inquiry is whether [the defendant] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be.'" *Zakora*, 44 F.4th at 472 (alteration in original (citing *Taylor v. Mich. Dep't of Corr.*,

69 F.3d 76, 81 (6th Cir. 1993)). Accordingly, "it does not matter whether" a prisoner faces an excessive risk of injury for "reasons personal to him or because all prisoners in his situation face such a risk."[10] *Id.* (quoting *Farmer*, 511 U.S. at 843); *see also id.* at 475 ("The supervisor need not have known of the substantial risk to the injured party but rather must have possessed knowledge of potential danger to a particular class of persons." (quoting *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 488 (6th Cir. 2020)). Plaintiff adequately alleges facts regarding the Policymaker Defendants' knowledge of the risks of a fatal overdose for inmates struggling with drug addiction and withdrawal. (ECF No. 1 ¶ 60 & n.3 (citing article quoting Golden and noting that some seventy-six percent of county jail inmates struggle with addiction and that inmates going through withdrawal are particularly vulnerable to overdosing because of a lower opioid tolerance).)

According to the County Defendants, although Plaintiff asserts that she pleads a valid *Monell* claim by identifying a governmental policy that caused Jennifer's death, she does not "specifically articulate what the policy or custom is," "identify a pattern of similar incidents [or] specific policies that may have prevented Jennifer's death but were considered and rejected," or explain "how she got the drugs and whether that was at all similar to any of the [prior overdoses]." (ECF No. 26 at 4-5; ECF No. 45 at 23:13-17.) They further argue that Plaintiff's claims of deliberate indifference are "conclusively defeated" by the actions taken to combat the drug problem at the MCCI, including the implementation of full-body X-ray screening for contraband

---

[10]    The County Defendants assert that the Complaint "repeatedly relies on impermissible group pleading." (ECF No. 14-1 at 20-21.)    However, like the operative pleading in *Corbin*, Plaintiff's Complaint "makes clear which of the defendants it seeks to hold responsible for the [respective failures]," *e.g.,* Monmouth County, through its "leadership" (the Policymaker Defendants), were allegedly responsible for failing to implement adequate policies and procedures to combat the drug problem and the Corrections Officer Defendants allegedly failed to adequately monitor Jennifer in her cell, *Corbin,* 703 F. Supp. 3d at 533. (*See* ECF No.1 ¶¶ 68-70.)

following prior inmate deaths, the uncovering and prosecution of multiple drug smuggling rings, conducting targeted searches of detainees in response to detainee overdoses, the adoption of programs to assist inmates struggling with addiction, and the adoption of policies and procedures to monitor detoxing detainees. (ECF No. 26 at 6.) Plaintiff's arguments purportedly rest on the (unstated) notion that, because Monmouth County has been unable to eradicate drugs from the MCCI, it should be held liable for the consequences of any overdose at the facility despite the impossibility of achieving this objective given the scope of the drug epidemic and the prevalence of addiction in the inmate population. (ECF No. 14-1 at 18.) The County Defendants claim that Plaintiff's Complaint essentially "attempts to replace the high burden required to hold a state actor liable under Section 1983 with a strict liability standard that would impose civil liability on the Monmouth County Defendants for any drug overdose at MCCI." (*Id.* at 2.)

The Court is mindful of the County Defendants concerns. "[P]rison officials are not required to show that they have prevented all drugs from entering their facility in order to be protected from liability." *Zakora*, 44 F.4th at 472. The Court "acknowledge[s] that the [Plaintiff] would have no claim if this were simply a run-of-the-mill drug-overdose case." *Id.* at 473; *see also Young*, 2025 WL 354447, at *4 (stating that simple exposure to drugs while incarcerated or a run-of-the-mil drug-overdose case will not be sufficient to support a failure-to-protect claim). However, Plaintiff does not allege a run-of-the-mill drug-overdose case and does not attempt to hold Monmouth County strictly liable for failing to eliminate the drug problem from its facility. On the contrary, the alleged facts in the Complaint plausibly establish that, despite the Policymaker Defendants' knowledge of, and efforts to combat the drug problem, MCCI inmates continued to have unfettered access to dangerous drugs because of specific and ongoing deficiencies in the facility's policies and practices regarding the screening of detainees, MCCI personnel, and

incoming mail entering the facility as well as the monitoring and supervision within the facility of at-risk detainees and others for drug distribution, use, and overdoses. (*See* ECF No. 1 ¶¶ 34-88; ECF No. 43 at MCSCO000625; ECF No. 61 at 2.) These facts "indicate[] . . . that there was an obvious and clear need for the affirmative promulgation of a new policy to address deficiencies which, if left uncorrected, were so likely to cause a violation such as the one" Jennifer suffered that the municipality "can be said to have been deliberately indifferent to the deficiency," *Young*, 2025 WL 354447, at *3 (citations omitted).

Specifically, the County Defendants emphasize Freeman's 2017 article in which the Monmouth County Undersheriff claimed that "a new era in contraband searches" began on November 7, 2016, "when MCCI implemented use of a Smiths Detection B-Scan 16HR-LD250 full body scanner." (ECF No. 26 at 3 (quoting ECF No. 26 at 31).) But, after this "new era" began, Plaintiff alleges that MCCI employees and detainees operated two drug smuggling rings (in which MCCI personnel, and not detainees, smuggled the drugs into the facility) in 2020 and 2021, Hinton (a detainee) smuggled and distributed fentanyl-laced heroin in 2022, and *seventeen* drug overdoses (and *three* deaths) occurred in a two-year period (2022-2023). (ECF No. 1 ¶¶ 41-50; ECF No. 43 at MCSCO000625; ECF No. 61 at 2.) According to the 2017 article only "incarcerated individuals" were scanned with the full-body X-ray, and there is no indication that MCCI personnel, or the mail, were similarly scanned or searched for drugs. (ECF No. 26 at 32 (quoting Golden).)

Additionally, Plaintiff identifies specific deficiencies with respect to the "after-the-fact" actions taken in response to the overdoses. "In the case of a death of an inmate, the Administrator, or designee, of the adult county correctional facility shall be responsible to ensure that the New Jersey Department of Corrections is notified," N.J. Admin. Code § 10A31-13.31, but allegedly

"there was a failure to report Egner's [April 2022] death as a death in custody to the NJDOC," thereby "conceal[ing]" the "true extent of the drug problem" and "undermin[ing] the NJDOC's supervisory role." (ECF No. 1 ¶¶ 51-53.) "Also in 2022, a pretrial detainee suffered a drug overdose in the MCCI," but, "[w]hen he returned to the Facility [from the hospital], no MCCI official questioned the detainee about the source of the drugs that nearly killed him." (*Id.* ¶ 43.)

According to the Complaint, Jennifer, a drug addict who was prescribed a medication for her withdrawal symptoms and who should have been under medical supervision, was then placed with cellmates also struggling with drug issues—in the same housing unit (F1) in which another inmate had overdosed less than a month earlier. (ECF No. 1 ¶¶ 61, 64; ECF No. 43 at MCSO0000625); N.J. Admin. Code § 10A:31-13.26. "Jennifer had no drugs in her possession when she entered the Facility." (ECF No. 1 ¶ 36.) Plaintiff then obtained a fentanyl-laced drug from someone within the facility and ingested this "fatal drug cocktail." (*Id.* ¶¶ 66-67.) Given the factual allegations regarding Jennifer's vulnerability to suffering a fatal overdose, a prior pattern of drug overdoses, the alleged drug smuggling conspiracies and the various ways in which drugs were smuggled and distributed, and the alleged deficiencies in responding to the drug problem at the MCCI (*see* ECF No. 1 ¶¶ 34-88; ECF No. 43 at MCSCO000625; ECF No. 61 at 2), the Complaint permits the Court to draw the reasonable inference that the Policymaker Defendants' policy failures were the "moving force" behind Jennifer's fatal overdose, *Hightower*, 2024 WL 5453086, at *2.

Furthermore, several district courts have denied motions to dismiss *Monell* claims with similar alleged facts.

In *Turner v. Cook County Sheriff's Office*, No. 19-5441, 2020 WL 1166186 (N.D. Ill. Mar. 11, 2020), the district court permitted a *Monell* claim to proceed against the county sheriff because

the plaintiff supported his allegations that the decedent died as a result of inadequate or nonexistent policies resulting in easy and frequent access to drugs by "cit[ing] several inmate overdoses, many occurring within the past five years," *id.* at *3. "Plaintiff also alleges that 'top policymakers' in Cook County acknowledged the problem, cited failures in policy, and were aware of the substantial risk these failures posed to inmates. According to Plaintiff, Sheriff Dart knew about the problem and the inmate risk, yet he did nothing." *Id.* (citations omitted). The sheriff disputed the sufficiency of this overdose history, arguing that the complaint "details one example of drug smuggling, mentions instances where Jail staff administered overdose antidotes, and discusses unrelated cases of overdose from alcohol and legally obtained medication." *Id.* Nonetheless, the court rejected these arguments:

> These arguments quibble with red herring factual details and fail to address Plaintiff's overarching allegations—that inmate overdoses regularly occur, Sheriff Dart and Jail staff know that, the Jail's policies (if they exist) do not adequately address the problem, Jail staff are not appropriately trained or supervised as to drug screening or overdose treatment, and because of all that, Ms. Scott overdosed and died. Sheriff Dart's arguments might be more well-received on a motion for summary judgment, but the Court finds them lacking here.

*Id.*

The County Defendants likewise "quibble" with the "factual details" of the prior overdoses by arguing that the Complaint, Exhibit A, and the March 6, 2025 Supplemental Stipulation and Order do not provide any "supporting context" for an alleged pattern of MCCI overdoses and thereby would not "permit a finding that 'numerous' inmates suffered overdoses under circumstances similar to Jennifer's, so as to support an inference that the County Defendants were deliberately indifferent to Jennifer's well-being." (ECF No. 59 at 3.) They further note that, while Plaintiff overdosed in F1, three days after her intake, the immediately preceding overdose

happened on the intake date. (*Id.*) As *Turner* indicates, a plaintiff need not allege such granular details or similarities to state a plausible claim for relief, and the County Defendants' arguments appear better suited to a motion for summary judgment after the parties have an opportunity to conduct discovery. *Compare Corbin*, 703 F. Supp. 3d at 537 ("At this stage of litigation, Corbin's burden is to *plausibly allege* that prison officials knowingly ignored a substantial risk of serious harm—not to provide definitive evidence that they in fact did so. For the reasons previously discussed, she has satisfied this burden. Whether or not she can substantiate these allegations is a question that will be resolved in discovery." (citation omitted)), *with Corbin*, 2024 WL 2980218, at *5-6 (granting summary judgment to the defendants on the grounds that a jury could not conclude from the record evidence that they were deliberately indifferent to the decedent's health and safety).

The Court notes, however, that the alleged overdose record at the MCCI is more severe than the record at the Cook County Jail. Specifically, the decedent in *Turner* overdosed on fentanyl and acetyl fentanyl in March 2019, but the court relied on overdoses dating back to 2012 and 2014. *Turner*, 2020 WL 1166186, at *1. Even the most recent incidents occurred in 2017, approximately two years before the decedent's death. *Id.* Some of the *Turner* overdoses resulted from alcohol and cocaine. *Id.* In contrast, Plaintiff alleges there were four prior overdoses from January 2022 through September 2022, and that two of these four incidents occurred less than thirty days before Jennifer's death. (ECF No. 43 at MCSO000625; ECF No. 61 at 2.)

The *Turner* decision noted that "[a] representative from Cook County Sheriff's Office made a public statement indicating that Ms. Scott's death was likely the result of drugs smuggled into the Jail because of Sheriff Dart's 'decision to stop performing strip searches on inmates due to fear of litigation and lawsuits.'" *Turner*, 2022 WL 1166186, at *1 (citation omitted) (further

39

stating that, in one prior incident, an inmate smuggled heroin into the jail by hiding it in his genitals). The County Defendants contrast the Cook County Sheriff's decision to cease conducting strip searches with "Monmouth County's decision to institute full[] body X-Ray searches following two inmate deaths at MCCI." (ECF No. 26 at 7.) As the Court has already observed, the drug smuggling, distribution, and (and sometimes fatal) overdoses persisted from 2016 (when the full body screening of inmates for contraband purportedly commenced) through 2022 (when Jennifer obtained a fentanyl-laced cocktail in the MCCI and suffered a fatal overdose) and 2023. (*See* ECF No. 1 ¶¶ 41-50; ECF No. 43 at MCSCO000625-MCSCO000626; ECF No. 61 at 2.) In any event, the *Cook* court also permitted the plaintiff's allegations with respect to other alleged deficiencies to proceed. Specifically, it noted that "the Amended Complaint alleges that Sheriff Dart failed to adequately train Jail staff on drug screening methods, inmate supervision, drug treatment, and drug overdose response." *Turner*, 2020 WL 1166186, at *4. "These allegations are sufficient to establish notice of the problem, its consequences, and a failure to act." *Id.*; *see also id.* at *5 ("Plaintiff also alleges several specific failures by Sheriff Dart to institute adequate policies for inmate supervision, screening, monitoring, and treatment related to drug smuggling, addiction, and overdose." (citation omitted)). The Court reaches the same conclusion with respect to the *Monell* allegations in this case.

In *Estate of Johnson v. County of Sacramento*, 2024 WL 279137 (E.D. Cal. Jan. 25, 2024), the plaintiffs supported their allegations of inadequate supervision, monitoring, and observation of inmates and untimely cell checks by identifying prior incidents of inmate deaths and injuries, *id.* at *5. "Plaintiffs have identified fifteen incidents within the past ten years where they say a lack of monitoring and observation of inmates has resulted in delays in care and, ultimately death from overdose, withdrawal and assault by other inmates." *Id.* (citation omitted). Furthermore, "[t]welve

of the alleged incidents occurred between April 2019 and February 2022; they all occurred within four to five years prior to the decedent's death." *Id.* (citation omitted). While there were more prior incidents in *Johnson* than in this case (fifteen versus four overdoses), *Johnson* (like *Turner*) adopted an expansive view of the relevant time period. *Id.* In addition, the court observed that, "[a]lthough the specific facts are distinguishable, they all support the allegation that the same conduct contributed to the incident: inadequate supervision, monitoring and observation within the jail." *Id.* (citing *Sanchez v. Cnty. of Sacramento*, No. 19-1545, 2021 WL 4066262, at *5 (E.D. Cal. Sept. 7, 2021)). The similar allegations in the present case also "plausibly allege the existence of a qualifying policy or custom [under *Monell*] and give [Monmouth County] fair notice to enable [it] to defend effectively." *Id.*

The County Defendants cite to case law in support of their position that the *Monell* failure-to-protect claim should be dismissed, including the recent ruling in *Young*. (ECF No. 14-1 at 15-18; ECF No. 26 at 19; ECF No. 59 at 2-3.) However, the case law is readily distinguishable.

In *Young*, the court concluded that the prior incidents (two overdoses occurring nearly ten years before Egner's death and staff member prosecutions for smuggling different illicit substances over a year before the fatal overdose) were insufficient to show either an obvious need for further policies, or that the defendants were deliberately indifferent to a risk to Egner's health or safety. *Young*, 2025 WL 354447, at *4. The *Young* court also stated that, taking into account the various policies adopted and the actions taken to combat the drug problem, "it was not sufficiently obvious from the course of past incidents that further training or policy adoption was so necessary that the supervisory and municipal County Defendants can be said to have been deliberately indifferent to Egner's needs." *Id.*

However, as this Court has indicated, *see supra* Section III.A.ii.3., the plaintiffs in *Young* did not allege detailed facts showing that, despite the various steps taken to combat the drug problem, there were four opioid overdoses in the nine months prior to the decedent's death, or that two of these four overdoses occurred less than thirty days before Jennifer's fatal overdose (and the immediately preceding overdose happened in the same housing unit).[11]  (*See* ECF No. 43 at MCSCO000625; ECF No. 61 at 2.)

In conclusion, especially given the alleged facts regarding the prior (and persistent) pattern of overdoses in the MCCI and the rulings in *Turner* and *Johnson*, the Court concludes that the Complaint pleads sufficient facts to state a plausible *Monell* failure-to-protect claim against Monmouth County.

---

[11]    The County Defendants also rely on the district court rulings in *Brooks*, *Caraway*, *Corbin*, and *Curran*. (ECF No. 14-1 at 15-18; ECF No. 26 at 19.)  None of these cases involved specific factual allegations of persistent policy deficiencies with respect to the proper screening of incoming detainees, employees, and the mail for illicit drugs and monitoring and supervising admitted detainees (including detainees going through withdrawal) for drug possession, transfer, use, and overdoses.  They also did not involve several drug overdoses in the months prior to the decedent's fatal overdose.  *See Corbin*, 703 F. Supp. 3d at 537-38 (noting that the amended complaint "provides no specifics regarding why these policies and procedures were insufficient, and indeed elsewhere faults the non-supervisor defendants for not complying with them"); *Curran*, 2023 WL 8439274, at *8 (dismissing the *Monell* claim because "[t]he only fact alleged concerning this claim [that the county maintained a policy or custom facilitating the decedent's exposure to illicit drugs] is that fentanyl and cocaine were found in Cara's bloodstream following her death" (citation omitted)); *Brooks v. Harper*, No. 21-1228, 2023 WL 2653471, at *7 (W.D. Pa. Mar. 2, 2023) ("The presence of and risk of exposure to illegal drugs in prison does not in itself give rise to a Constitutional violation, and an isolated instance of Plaintiff's consumption of it in a bag in his oatmeal cannot alone sustain a claim that Defendants knew of and recklessly disregarded an unreasonable risk of such occurrence." (footnote omitted) (citations omitted)), *R&R adopted by* 2023 WL 2649089 (W.D. Pa. Mar. 27, 2023); (ECF No. 14-1 at 18 (acknowledging that the district court in *Caraway* concluded that the complaint "failed to state a claim where 'Plaintiff merely alleges that defendant had a policy and/or custom of chronically understaffing its facilities to save money and this understaffing led to an influx of illegal drugs which ultimately resulted in the decedent's death, but alleged no facts to connect that understaffing to the drugs that killed decedent'" (quoting *Caraway*, 2023 WL 2799732, at *11).)

2.    **The Corrections Officer Defendants**

The Court next must consider whether the Complaint plausibly alleges that the Corrections Officer Defendants also exhibited deliberate indifference to a serious risk of harm. The Court concludes that the Complaint does not state a plausible claim against the individual Corrections Officer Defendants.

The Corrections Officer Defendants are not policymakers with the ability to set Monmouth County's policies, practices, and customs. Instead, Plaintiff indicates that they can be held liable as non-policymakers for their personal involvement in the conduct causing Jennifer's death. (ECF No. 25 at 27.)

Plaintiff asserts that the Complaint adequately alleges that "COs Connell and Patterson (Corrections Officer Defendants)" knew of the risks posed to drug dependent detainees in a facility "overrun" by drugs and that some detainees would overdose and die; that they had actual knowledge of Jennifer's drug dependency; they were tasked with maintaining safety and attending to the health needs of detainees; and, despite their knowledge of such facts and "the high likelihood that [Jennifer] could not resist temptation," they did not take protective measures mandated by MCCI policies to prevent Jennifer from obtaining drugs. (*Id.* at 23, 26 (citing ECF No. 1 ¶¶ 28-29, 37, 63, 66-68, 103-105, 110, 128, 155).)

However, the Court concludes that Plaintiff fails to allege sufficient facts to support the inference that the Corrections Officer Defendants knew that MCCI was "overrun" by drugs. In *Caraway*, the Sixth Circuit concluded that the estate did not satisfy the subjective component of the failure-to-protect claim because it "doesn't sufficiently allege that the defendants knew of a drug problem at [the decedent's facility]." *Caraway*, 98 F.4th at 687. "Its complaint, to be sure contains numerous allegations that the defendants 'had knowledge' of a drug-smuggling problem

43

at Whiteville and other CoreCivic facilities. But the complaint doesn't offer any factual details to support that conclusion—such as how the defendants obtained that knowledge, when they obtained it, or what that knowledge entailed." *Id.* (first citation omitted) (citing *Zakora*, 44 F.4th at 468). Likewise, Plaintiff alleges that "the Corrections Defendants knew the ease with which illicit drugs were smuggled into the MCCI and of the pervasive distribution and use of drugs at the Facility." (ECF No. ¶ 103.) However, Plaintiff does not plead "factual details to support that conclusion, such as how [the Corrections Officer Defendants] obtained that knowledge, [and] when they obtained it," *Caraway*, 98 F.4th at 687. Specifically, there are no alleged facts indicating how, when, and why rank-and-file corrections officers would know the numbers of overdoses and overdose deaths in the facility over a two-year period.

Plaintiff asserts that, "[b]ased on the allegations in the Complaint, including the criminal convictions of their co-workers, it may be reasonably inferred that these corrections officers knew of the drug-infested conditions where they worked daily." (ECF No. 60 at 5; *see also* ECF No. 45 at 25:5-37:9.) According to Plaintiff, "throughout this Complaint, we speak about an epidemic within the institution and the pervasive [smuggling, distribution, and] use of drugs" and the overdoses occurring "everywhere" in the facility. (ECF No. 45 at 29:1-5; 37:4-6.) "And from that, surely, we believe that a reasonable inference could be drawn that they knew as much as what all the detainees [their co-workers, the Monmouth County bar, and the general public] knew, and that was, drugs were available." (*Id.* at 37:6-9.)

On a motion to dismiss for failure to state a claim, the Court must draw all reasonable inferences in the plaintiff's favor. *See Wilson*, 57 F.4th at 140. However, the inferences must be reasonable, and, in any event, the complaint must still "contain enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Watters*, 975 F.3d at 412). Instead of alleging

specific facts regarding their knowledge of the MCCI drug problem, Plaintiff presents unsupported speculation that, for instance, "the Monmouth County Bar knew that [drugs were coming in] through mail that was made to look as though attorneys were sending in communications," (ECF No. 45 at 25:16-18), that Connell and Patterson could not know "any less than what the entire public knows in terms of those criminal complaints that were filed [against their co-workers in connection with the drug smuggling conspiracies]" (*id.* at 25:22-24), and that the officers "presumably . . . read the newspapers" (*id.* at 26:25-27:1). Such assertions are insufficient to defeat a motion to dismiss under Rule 12(b)(6).

Citing to *Zakora* and *Corbin*, Plaintiff asserts that the Complaint "does not simply paint 'a run-of-the-mill drug-overdose case,'" but instead "describes, an environment in which relevant defendants allegedly knew that [Jennifer] was at risk and ignored the risk, making this case directly comparable to the suicide 'deliberate-indifference' cases where failure to protect claims have been permitted to proceed beyond the motion to dismiss stage." (ECF No. 25 at 26-27 (cleaned up) (alteration in original) (quoting *Zakora*, 44 F.4th at 473; *Corbin*, 2023 WL 8042560, at *5).) But the Sixth Circuit observed that a prisoner allegedly provided the officers "step by step details of how and when drugs were entering the facility and . . . about the individuals supplying large amounts of drugs to Mr. Zakora." *Zakora*, 44 F.4th at 473. The defendants who were privy to this information then failed to act. *Id.* Plaintiff does not allege that the Corrections Officer Defendants ignored a specific tip regarding drug smuggling.

In *Corbin*, the court concluded that the allegations against the individual corrections officers satisfied the subjective prong of the failure-to-protect claim. *Corbin*, 703 F. Supp. 3d at 536-37. With respect to the officers' alleged subjective knowledge of the drug problem in the BCCF, it exclusively relied on the allegation that they "knew there was a pervasive drug smuggling

problem at the Bucks County Prison." *Id.* This bald assertion, which was unsupported by "any factual details to support that conclusion—such as how defendants obtained that knowledge, when they obtained it, or what that knowledge entailed," was insufficient to satisfy the knowledge requirement. *Caraway*, 98 F.4th at 687 (citing *Zakora*, 44 F.4th at 468).

Accordingly, Plaintiff fails to allege facts plausibly indicating that the Corrections Officer Defendants were deliberately indifferent to a substantial risk to inmate health and safety.

In sum, for the foregoing reasons, the Court concludes that Plaintiff alleges a plausible *Monell* failure-to-protect claim against Monmouth County. However, Plaintiff fails to plead a plausible claim for failure to protect against the individual Corrections Officer Defendants. Accordingly, the Court denies the County Defendants' Motion to Dismiss as to Count One of the Complaint to the extent that it alleges a *Monell* claim against Monmouth County. It dismisses without prejudice Count One to the extent it alleges a claim against the Corrections Officer Defendants.

**B.    Count Two: Failure to Train, Supervise, or Discipline**

In Count Two, Plaintiff claims that constitutionally infirm polices, practices, and/or customs of Monmouth County and the Policymaker Defendants relating to the training, supervision, and discipline of the staff at the MCCI resulted in "lax drug screening and detection measures, inadequate monitoring of at-risk detainees with known histories of substance use disorders, and inadequate responses to detainees suffering from a suspected overdose." (ECF No. 1 ¶ 117.) "Those Defendants are liable for failing to supervise and/or train the MCCI's corrections officers to fulfill their constitutional duties to protect detainees from the substantial risk of harm posed by the omnipresence of drugs in the Facility and to discipline those officers who did not fulfill those duties, resulting in the violation of Jennifer's constitutional rights and her death." (*Id.*

¶ 118.)  The County Defendants argue that the Complaint does not plausibly allege a claim for failure to train, supervise, or discipline.  (ECF No. 14-1 at 23-24.)  The Court disagrees with the County.

The failure-or-inadequacy theory of municipal liability under § 1983 requires a plaintiff to establish that a municipality's failure to train, supervise, or discipline "'amounts to deliberate indifference to the rights of persons with whom the [subordinates] come into contact." *Kelley v. Reyes*, No. 19-17911, 2025 WL 618207, at *21 (D.N.J. Feb. 26, 2025) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see also Young*, 2024 WL 354447, at *3.  "This consists of establishing whether '[1] municipal policymakers know that employees will confront a particular situation, [2] the situation involves a difficult choice or a history of employees mishandling, and [3] the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" *Kelley*, 2025 WL 618207, at *21 (quoting *Forrest*, 930 F.3d at 105).

The plaintiff must allege facts showing that the failure to act reflects a deliberate or conscious choice. *See Beers v. Cnty. of Northumberland*, No. 23-2555, 2024 WL 2874283, at *3 (3d Cir. June 7, 2024) (per curiam); *Est. of Roman*, 914 F.3d at 798.  "Additionally, 'the identified deficiency in a city's training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (alteration in original) (quoting *Canton*, 489 U.S. at 391); *see also Beers*, 2024 WL 2874283, at *3 (same).  "Establishing a failure to train claim under Section 1983 is difficult and applies in narrow situations." *Cooper v. City of Paterson*, No. 23-3566, 2024 WL 1298917, at *5 (D.N.J. Mar. 27, 2024) (citing *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997); *City of Canton*, 489 U.S. at 387)); *see also Young*, 2025 WL 354447, at *3 (stating that a municipality's culpability is at its most tenuous where a claim

rests on a failure to train and will only be tenable where the failure to train amounts to deliberate indifference to the rights of persons in contact with untrained personnel).

A municipal policymaker or supervisor may be held individually liable for failing to train, supervise, or discipline his or her subordinates. *See Rentas v. Kuhn*, No. 24-10107, 2025 WL 685975, at *5 (D.N.J. Feb. 28, 2025); *Young*, 2025 WL 354447, at *3. "[A] plaintiff must show that policymakers were on actual or constructive notice that particular flaws in their training, discipline or supervision caused subordinate officials to violate citizens' constitutional rights, which generally requires knowledge of a prior pattern of similar incidents and circumstances." *Rentas*, 2025 WL 685975, at *5 (alteration in original) (quoting *Best v. Hicks*, No. 22-6911, 2024 WL 4891774, at *6 (D.N.J. Nov. 26, 2024)). Likewise, a pattern of similar constitutional violations by untrained employees is ordinarily required to demonstrate deliberate indifference for purposes of a claim for failure to train against a municipality. *See Thomas*, 749 F.3d at 223; *Young*, 2025 WL 354447, at *3.

"A mere pattern of a handful of vaguely similar constitutional violations is generally insufficient to meet this requirement." *Young*, 2022 WL 354447, at *3 (quoting *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011)). As the court in *Young* noted, the Supreme Court in *Connick* held that "having four convictions overturned for *Brady* violations over ten years was insufficient to support a failure to train claim where those violations were dissimilar to the specific *Brady* violation." *Id.* In *Young*, the court concluded that the alleged incidents, *i.e.*, two overdoses nearly ten years before Egner's death, another overdose months after his death, and the prosecutions of at least two MCCI staff members for smuggling different illicit substances over a year before Egner's fatal overdose, were insufficient to show "an obvious need for further training" and thus could not support an inference of deliberate indifference. *Id.* at *4. It also concluded

plausible municipal and supervisory claims in Count Two for failure to train, supervise, or discipline. Specifically, unlike Egner's estate in *Young*, Plaintiff alleges that, before Jennifer's fatal overdose on September 20, 2022, four MCCI inmates overdosed in 2022 (and one of these overdoses was fatal). (ECF No. 43 at MCSO000625; ECF No. 61 at 2.) Two of the incidents occurred within the thirty-day period preceding Jennifer's overdose, and both Jennifer's and the September 1, 2022 overdoses took place in the same housing unit (F1). (ECF No. 43 at MCSO000625.) Even if these prior incidents are insufficient to constitute a pattern of constitutional violations, they raise a reasonable inference that Jennifer's fatal overdose "was a 'highly predictable' consequence of the failure to train . . . for single-incident liability." *Thomas*, 749 F.3d at 224. Furthermore, the drug overdoses occurred despite the various countermeasures purportedly adopted by Monmouth County, including the beginning of a supposed "new era" of contraband searches in 2016 with the adoption of full-body X-ray scanning of inmates (ECF No. 26 at 3 (quoting ECF No. 26 at 31)). "The high degree of predictability [in a single-incident case]' may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Thomas*, 749 F.3d at 226 (alterations in original) (quoting *Bryan Cnty.*, 520 U.S. at 409-10).

Additionally, Plaintiff "cannot be expected to know, without discovery, exactly what training policies were in place or how they were adopted.'" *Huysers v. N.J. Dep't of Corr.*, No. 19-16786, 2021 WL 2680098, at *2 (D.N.J. June 30, 2021) (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 358 (3d Cir. 1999)). Accordingly, Plaintiff need not, at this preliminary stage of the case, identify the specific deficiencies in the programs to train, discipline, and supervise MCCI personnel with respect to drug screening and monitoring in the MCCI. *See Martinez v. City of Asbury Park*, No. 20-8710, 2021 WL 1343837, at *7 (D.N.J. Mar. 5, 2021) ("Plaintiff need not

provide details about the Municipality Defendants' specific training programs or protocols at this stage of the case." (citing *Carter*, 181 F.3d at 358)); *Huysers*, 2020 WL 2764818, at \*5.

The *Turner* and *Johnson* decisions are again instructive. In *Turner*, the complaint "cites several inmate overdoses, many occurring within the past five years" and "alleges that Sheriff Dart failed to adequately train Jail staff on drug screening methods, inmate supervision, drug treatment, and drug overdose response." *Turner*, 2020 WL 1166186, at \*3-4 (citations omitted). Like the County Defendants, the sheriff claimed that the prior instances were insufficient to support plausible claims for relief, but the *Turner* court specifically rejected the sheriff's "quibbl[ing] with red herring factual details" as arguments that "might be more well-received on the motion for summary judgment" and that "fail to address Plaintiff's overarching allegations—that . . . Jail staff are not appropriately trained or supervised as to drug screening or overdose treatment," resulting in the decedent's fatal overdose. *Id.* at \*4. Similarly, the *Johnson* court concluded that the plaintiffs sufficiently alleged inadequate training regarding inmate supervision, monitoring, and observation because, inter alia, "Plaintiffs have supported their allegation with details of prior incidents of inmate deaths in the jail." *Johnson*, 2024 WL 279137, at \*5 (citation omitted). "Although the specific facts of the prior incidents . . . are dissimilar, the conduct is the same: inadequate supervision, monitoring and observation. Plaintiffs also have alleged defendants routinely fail to hold jail staff accountable and were on notice regarding the need to train staff in these areas related to their work." *Id.* (citation omitted).

The Court concludes that, based on this case law and the alleged pattern of drug smuggling, distribution, use, and overdoses in the facility, Plaintiff's "allegations [regarding the failure to train, supervise, or discipline] are sufficient to establish notice of the problem, its consequences,

and a failure to act."[12] *Turner*, 2020 WL 1166186, at *4. Accordingly, the Motion to Dismiss is denied as to Count Two of the Complaint.

**C.    Count Three: State-Created Danger**

In Count Three of her Complaint, Plaintiff asserts a state-created danger claim under § 1983 against Monmouth County and the Policymaker Defendants. (Complaint ¶¶ 121-33.) "As a general rule, there is no affirmative right to governmental protection under the Due Process Clause of the Fourteenth Amendment." *Bilbili v. Klein*, 249 F. App'x 284, 287 (3d Cir. 2007) (citing *DeShaney v. Winnebago Cnty Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). "There are two exceptions to this general rule: (1) where a special relationship exists between the State and the individual and (2) where a state-created danger exists." *Ivers v. Brentwood Borough Sch. Dist.*, No. 23-1799, 2024 WL 1088447, at *2 (3d Cir. Mar. 13, 2024) (non-precedential) (citing *Sanford v. Stiles*, 456 F.3d 298, 303-04 (3d Cir. 2006)). Under the second exception, a "plaintiff can allege a substantive due process violation under § 1983 by showing that the harm suffered at the hands of third parties was a direct result of state action." *Bilbili*, 249 F. App'x at 287 (citing *Kneipp v. Klein*, 95 F.3d 1199, 1208–09 (3d Cir. 1996)).

To state a claim for state-created danger, a plaintiff must plausibly allege the following elements:

---

[12]      At oral argument, the County Defendants cited to the Third Circuit's non-precedential ruling in *Joines v. Township of Ridley*, 229 F. App'x 161 (3d Cir. 2007), which stated that "the plaintiff failed to show that the risk reduction associated with the proposed training is so great and obvious that failure to implement it was deliberate indifference." (ECF No. 45 at 43:1-6.) Similarly, in their reply brief, they cite to the Third Circuit's non-precedential opinion in *Beers*, which held that the plaintiff failed to allege facts linking the prior suicides to deficient training, showing that the county had notice of any deficiency, or indicating that the decedent died in the same manner as the other inmates. (ECF No. 26 at 9-10 (citing *Beers*, 2024 WL 2874283).) However, as they acknowledge, *Joines* was decided "at the summary judgment stage," and not on a motion to dismiss. (ECF No. 45 at 43:2-3.) Furthermore, unlike in *Beers*, Plaintiff has presented evidence of similar prior incidents.

(1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* (citing *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)).

Initially, it appears that the state-created danger exception is inapplicable because a special relationship existed between the County Defendants and Jennifer, a person taken into custody and held against her will.[13] *Rodriguez v. Mercer Cnty.*, No. 09-4505, 2010 WL 920153, at *7 (D.N.J. Mar. 9, 2010) ("Instead, any liability arises out of the 'special relationship' between the state and [the inmate] as a result of taking [her] into custody.") As a pretrial detainee, Jenniffer had a substantive due process right to protection from serious risks to her health and safety, which Plaintiff specifically invokes in Count One of her Complaint, *see supra* Section III.A. *See Rodriguez*, 2010 WL 920153, at *7 (concluding that state-created danger theory did not apply to claims of dangerous conditions alleged by inmate who was either a convicted and sentenced prisoner protected under the Eighth Amendment or a pretrial detainee protected by the Due Process Clause of the Fourteenth Amendment); *see also L.R.*, 836 F.3d at 247 n.57 (noting that a separate

---

[13]    Although the "state-created danger" theory or exception requires the plaintiff to show there was a "relationship" such that the plaintiff was a foreseeable victim of the state actor's conduct, "[a] 'special relationship' is not required." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 247 n.57 (3d Cir. 2016). "Indeed, this [special relationship] is an entirely separate theory on which to base a substantive due process claim, applicable when "the State takes a person into its custody and holds him there against his will." *Id.* (citing *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013) (en banc)).

theory of liability applies where the state takes the plaintiff into custody and holds him against his will).

However, the County Defendants do not raise this issue of the inapplicability of the "state-created danger" doctrine. Instead, the County Defendants argue that Plaintiff's claim does not satisfy the first, second, and fourth elements of a "state-created danger" claim. (ECF No. 14-1 at 25-28.) Plaintiff responds that she sufficiently pleads that Jennifer's death was foreseeable, the County Defendants' conduct shocks the conscience, and they took actions that rendered Jennifer vulnerable to danger. (ECF No. 25 at 32-39.) Because the Court concludes that Plaintiff fails to plead sufficient facts satisfying the fourth element, it need not—and does not—address the other disputed elements.

The fourth element "asks whether the state's conduct created or increased the risk to the plaintiff." *L.R.*, 836 F.3d at 242. As Plaintiff notes (ECF No. 25 at 37-38), the Third Circuit has indicated that "the dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 915 (3d Cir. 1997). However, this statement must be viewed in its specific context:

> It is important to put this observation in context, however. This sentence appears in *Morse's* discussion of the district court's application of the fourth element of the test. The district court identified a single alleged affirmative act—the defendants having unlocked the back door to a school through which the plaintiff's attacker entered—and expressed uncertainty as to whether this affirmative act was sufficient to establish liability. We concluded the question of whether an affirmative act was required had been answered by *Mark v. Borough of Hatboro*. *Mark* articulated the fourth element of the test as requiring that "state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur." *Mark v. Borough of*

> *Hatboro,* 51 F.3d 1137, 1152 (3d Cir. 1995). A use of authority that creates an opportunity for harm necessarily entails an affirmative act. But an affirmative act, while necessary, is not sufficient. The test also requires a direct causal relationship between the affirmative act and foreseeable harm to the plaintiff. In *Morse,* this meant asking whether unlocking the door created a foreseeable opportunity for the plaintiff to be attacked by a mentally ill intruder. Only then would the state actor have "used its authority to create an opportunity which otherwise would not have existed for the specific harm to occur." *Morse,* 132 F.3d at 914. In this context, we do not read *Morse*'s language to suggest liability can be based on an omission alone or a failure to act. We read it to clarify that the relevant test involves asking whether a state actor's behavior constituted an affirmative act, and, if so, whether the affirmative act created a foreseeable opportunity for harm.

*Bright,* 443 F.3d at 283 n.7.

"This element is often contested because of the inherent difficulty in drawing a line between an affirmative act and a failure to act. Often times there is no clear line to draw; virtually any action may be characterized as a failure to take some alternative action." *L.R.,* 836 F.3d at 242 (footnotes omitted) (finding "it useful to first evaluate the setting or the 'status quo' of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo"); *see also id.* at 249 ("As the Seventh Circuit later articulated in *Bowers v. DeVito,* '[i]f the state puts a [person] in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.'" (alterations in original) (quoting 686 F.2d 616, 618 (7th Cir. 1982)). However, it remains well established that "[i]t is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Id.* (alteration in original) (quoting *Bright,* 443 F.3d at 282). Accordingly, "[m]erely restating the Defendants' inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct." *Morrow,* 719 F.3d at 179.

Plaintiff contends that the County Defendants placed Jennifer in a dangerous position that was foreseeable by (1) maintaining practices allowing her placement in a cell with known drug addicts where she would have access to illicit drugs, (2) permitting lax drug searches of detainees and the mail (and apparently no searches of staff), (3) not enforcing the policy requiring corrections officers to monitor detoxing detainees, and (4) manipulating statistics in reporting overdose fatalities to the NJDOC. (ECF No. 25 at 38 (citing ECF No. 1 at ¶¶ 39-40, 61, 69-70, 125-26, 130).) However, the Court agrees with the County Defendants that the allegations fall short of meeting the "misuse of state authority" requirement. (ECF No. 14-1 at 28.)

In *Young*, the court rejected a materially identical state-created danger claim, stating that "Plaintiffs' claims largely depend on *inaction*—the failure of Defendants to adopt further policies or pursue greater training, or the failure to increase drug interdiction efforts—rather than actual state misuse of power." *Young*, 2025 WL 354447, at *6. "Such inaction is insufficient to support a state created danger claim under the Due Process clause." *Id.* at *6 (citing *Bright*, 443 F.3d at 282). Plaintiff's claim likewise "largely depend[s] on inaction," *e.g.*, "*permit[ing]* lax drug searches of detainees and the mail (and apparently no searches of corrections officers and employees) that *allowed* the smuggling of drugs into the MCCI" (ECF No. 25 at 38 (emphasis added) (citing ECF No. 1 ¶¶ 69, 126)); and "*fail[ing]* to report Egner's death as a death in custody to the NJDOC [as required by state regulations], even though the fatal overdose that led to his death occurred in the Facility" (ECF No. 1 ¶ 52 (emphasis added)).

Plaintiff cites to the New Jersey Supreme Court's ruling in *Gormley v. Wood-El*, 218 N.J. 72 (2014), finding that an attorney who was attacked by her client at a state-run psychiatric hospital for the involuntarily committed alleged a viable claim because the defendants "brought the dangerous patient together with the attorney in an unsecured setting," and *Hargrove v. City of*

56

*Philadelphia*, 671 F. Supp. 3d 595 (E.D. Pa. 2023), a district court decision in which the court permitted a state-created danger claim to proceed based on the defendants loading a released inmate into a prison van and ordering him to get out of the vehicle and stand in the dark at a desolate and dangerous bus stop. (ECF No. 25 at 38 (quoting *Gormley*, 218 N.J. at 109; *Hargrove*, 671 F. Supp. 3d at 604).) However, in these cases, the defendants' affirmative conduct placed the injured party in a situation that enabled a third party to physically attack an attorney or fatally shoot a released inmate, respectively. *See Gormley*, 218 N.J. at 108-10; *Hargrove*, 671 F. Supp. 3d at 600, 604. Furthermore, Plaintiff does not allege that Jennifer was placed in a cell with known drug smugglers or distributors.[14]

In any event, the County Defendants' "failure to remediate an allegedly known risk does not constitute an affirmative act that satisfies the fourth element of a state-created danger claim."[15]

---

[14] At oral argument, Plaintiff states that "we don't even know whether or not [Jennifer] voluntarily ingested" the drug cocktail and that "[h]ow [it] actually entered into her body is yet to be determined." (ECF No. 45 at 49:24-50:4.) However, in the Complaint, Plaintiff does not allege any facts plausibly suggesting that Jennifer ingested the drug involuntarily. In fact, she states that the County Defendants placed Jennifer in a section of the MCCI where drugs were "available" and presented an "irresistible temptation" to her, indicating that Jennifer gave into this temptation (and was not forcibly or surreptitiously drugged by another person). (ECF No. 1 ¶ 63.)

[15] Plaintiff also refers to "*Morrow v. Balaski*, where two girls were repeatedly bullied and assaulted by a fellow student who was allowed to continue attending school despite these incidents," which, according to Plaintiff, "was considered a state created danger." (ECF No. 45 at 45:5-9.) Plaintiff also notes that, in *L.R.*, the Third Circuit found there was a state-created danger where "a kindergarten child left school with an unidentified adult." (*Id.* at 45:11-13.) However, as Plaintiff indicates, *L.R.* involved a young child, and not an adult inmate, and the Third Circuit emphasized that the status quo was a typical kindergarten classroom in which the child was safe under close supervision "unless and until her teacher" permitted her to leave. *L.R.*, 836 F.3d at 243 ("When [the teacher] allowed Jane to leave the classroom with an adult who failed to produce proper identification or verification, he exposed Jane to a danger she would not have otherwise encountered."). In *Morrow*, the Third Circuit, sitting en banc, explicitly declined to conclude that "a school's alleged failure to enforce a disciplinary policy [by expelling a student adjudicated guilty of a crime as mandated by school policy] is equivalent to an affirmative act under the circumstances here." *Morrow*, 719 F.3d at 178.

*K.W. ex rel. White v. Southeastern Pa. Transp. Auth.*, 760 F. App'x 104, 108 (3d Cir. 2019) (citations omitted); *see also Doe K.B. v. Southeastern Pa. Transp. Auth.*, No. 23-3900, 2024 WL 2832447, at *4 (E.D. Pa. June 4, 2024) ("The Complaint mostly contains allegations of the SEPTA Defendants' failure to act [including allegations that no one on the train intervened or made efforts to report the crime at any time prior to or during the plaintiff passenger's sexual assault and rape]. But alleging the SEPTA Defendants failed to act is insufficient to satisfy the fourth element." (citation omitted)).

Accordingly, because Plaintiff does not sufficiently allege an affirmative misuse of state authority, the Court dismisses Count Three without prejudice.

### D.    Count Four: Inadequate Medical Care

The Eighth Amendment's prohibition on cruel and unusual punishment requires prison officials to provide basic medical treatment to inmates.[16]  *See Perotti v. United States*, 664 F. App'x 141, 144 (3d Cir. 2016) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)); *see also Duran v. Merline*, 923 F. Supp. 2d 702, 719 (D.N.J. 2013) (explaining that the Constitution mandates that prison officials satisfy inmates' "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety" (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). To plead deliberate indifference to serious medical needs, an inmate must allege that "(1) he had a serious medical need, (2) the defendants were deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff." *Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023) (citing *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003)). The Third Circuit has found "'deliberate indifference' in a variety of circumstances, including where the prison official (1)

---

[16]      As a pretrial detainee, Jennifer's right to adequate medical care arose under the Due Process Clause of the Fourteenth Amendment. *See Natale*, 318 F.3d at 581. But courts analyze such claims using the same deliberate indifference standard that applies under the Eighth Amendment. *See id.* at 581-82.

knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Parkell*, 833 F.3d at 337 (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

The County Defendants move for the dismissal of Count Four of the Complaint against the Corrections Officer Defendants on the grounds that Plaintiff does not plead a plausible § 1983 cause of action for failure to render adequate medical care. (ECF No. 14-1 at 28-30.) In the December 6, 2024 Stipulation and Order, the County Defendants and Plaintiff agreed that "Plaintiff withdraws and will not assert any claims against the Monmouth County Defendants in connection with Officers Dylan Connell's and Randi Patterson's alleged failure to administer additional doses of Narcan to Jennifer Ross once Nurse Bonnie McKittrick arrived on the scene to respond to Ms. Ross's overdose." (ECF No. 44 at 1-2.) According to Plaintiff, the Complaint alleges that, before the nurse's arrival: (1) Connell and Patterson were first to respond after being alerted that Jennifer was in medical distress; (2) both correctional officers observed that she was having a drug overdose; (3) despite knowing she was suffering from an overdose, they "let critical minutes pass before finally opening her cell door;" and (4) when they did open the cell door, they knowingly failed to administer Narcan to Jennifer "during those critical moments by ignoring generally accepted standards of care." (ECF No. 25 at 40 (citing ECF No. 1 ¶¶ 137-39, 187-88).)

When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC*, 999 F.3d at 903). With respect to the correctional officers' alleged "opportunity" to provide medical care, Plaintiff merely pleads that, "[d]espite Defendants CO Connell's and CO Patterson's training, they did not timely respond

to Jennifer's medical emergency, letting critical minutes pass before finally opening her cell door" and that "[n]either administered Narcan to Jennifer and, therefore, they did not follow generally accepted standards of care for corrections officers in their treatment of Jennifer." (ECF No. 1 ¶ 188.) Plaintiff does not allege specific facts in support of her conclusory assertions that the two officers did not "timely" respond to the emergency, and then let "critical" minutes pass before opening the cell door.[17] (*See id.* ¶¶ 67-78, 134-45.) As to Connell's and Patterson's alleged failure to follow generally accepted standards of care, such an allegation may support a negligence claim. *See Young*, 2025 WL 354447, at *5 (stating that "failure to timely discover the unconscious Egner may support an assertion of negligence"). But a plaintiff "who pleads facts amounting to only negligence or medical malpractice will fail to make out a claim for relief under § 1983," *id.* (citing *Rouse*, 182 F.3d at 197), and Plaintiff's factual allegations do not plausibly suggest that CO Connell and CO Patterson were deliberately indifferent to Jennifer's serious medical needs.

---

[17]    At oral argument, Plaintiff additionally contends that, "had they [Connell and Patterson] been monitoring [Jennifer] on the video [and conducting checks every fifteen minutes] as they were required to, according to [MCCI] protocols, they would have seen her at some point in distress and, therefore, made a reasonable response [by immediately administering Narcan]." (ECF No. 45 at 59:9-13.) However, the Complaint does not allege that the officers observed Jennifer in medical distress before they were alerted and arrived at her cell; on the contrary, the Complaint alleges that, "[a]s a result of Defendants CO Connell, CO Patterson, and John/Jane Doe COs' failure to closely monitor Jennifer, Jennifer's overdose went undetected for an unreasonable period, which delayed an adequate response and urgent life-saving measures." (ECF No. 1 ¶ 68; *see also id.* ¶ 70 (alleging that Corrections Officer Defendants failed to follow policies and procedures requiring constant video monitoring and fifteen-minute physical checks of detoxing detainees).) As the court explained in *Young*, the plaintiffs' medical claim, because it was "based on the time *before* [the officers] discovered Egner," was "not based on their knowledge of and indifference to Egner's medical state, but rather their failure to follow watch rules and thereby delayed discovery of Egner's condition." *Young*, 2025 WL 354447, at *5. The Court reaches the same conclusion as to Plaintiff's medical claim for the time period before the officers witnessed signs of Jennifer's overdose.

Accordingly, the Court dismisses without prejudice Plaintiff's Count Four to the extent it alleges that the Corrections Officer Defendants failed to render adequate medical care.[18]

### E.     Count Five: NJCRA

Plaintiff asserts in Count Five of the Complaint that all Defendants violated the NJCRA, N.J. Stat. Ann. § 10:6-2. (ECF No. 1 ¶¶ 146-50.) It is undisputed that NJCRA is analogous to § 1983 and that the analysis of Plaintiff's claims against the County Defendants is the same under both statutes. (ECF No. 25 at 12 n.2 (citing *Gormley v. Wood-El*, 218 N.J. 72, 97 (2014)). Accordingly, because the Court dismisses Counts One and Four against the Corrections Officer Defendants and Count Three against Monmouth County and the Policymaker Defendants, it must also dismiss without prejudice Plaintiff's parallel NJCRA claims against these respective Defendants.[19] Likewise, to the extent that the Court denies the Motion to Dismiss as to Count One and Count Two, the Court denies this motion as to the equivalent civil rights claims under state law.

### F.     Qualified Immunity

The Individual County Defendants argue that they are entitled to qualified immunity under § 1983 and the NJCRA. (ECF No. 14-1 at 31-35.) As to Count Two, the Court disagrees.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231

---

[18]     Count Four also names McKittrick and John and Jane Doe CFG Agents 1-5 as Defendants. McKittrick has not moved to dismiss the claim against her. The Court expresses no opinion as to whether Plaintiff alleges a plausible cause of action against the medical personnel for failing to render adequate medical care.

[19]     The CFG Defendants are named as defendants in Count Five, but the Court expresses no opinion on the viability of the claims against them.

(2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* It aims to resolve "insubstantial claims" against government officials prior to discovery, *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987) (quoting *Harlow*, 457 U.S. at 818-19), and protects "all but the plainly incompetent or those who knowingly violate the law," *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).

Qualified immunity protects officials from money damages unless a plaintiff pleads facts showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 735 (quoting *Harlow*, 457 U.S. at 818). "At the motion-to-dismiss stage, courts evaluate qualified immunity for a constitutional claim by examining (i) whether the complaint contains plausible allegations of a constitutional violation and (ii) whether the asserted constitutional right is clearly established." *Karkalas v. Marks*, 845 F. App'x 114, 118 (3d Cir. 2021) (citing *Wood v. Moss*, 572 U.S. 744, 757 (2014)). "The defendant official has the burden to establish they are entitled to qualified immunity." *Bethlehem Manor Vill., LLC v. City of Bethlehem*, No. 22-5215, 2024 WL 4367922, at *10 (E.D. Pa. Sept. 30, 2024) (citing *E. D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019)), *appeal filed*, No. 24-2925 (3d Cir. Oct. 17, 2024); *see also Plavix Mktg., Sales Pracs. & Prod, Liab. Litig.*, 974 F.3d at 231-32 (stating that the moving defendant has the burden of showing that a complaint fails to state a claim under Rule 12(b)(6)); *Scotti v. Univ. Corr. Health Care*, No. 19-13981, 2022 WL 4217766, at *11 (D.N.J. Sept. 13, 2022) (stating that qualified immunity is an affirmative defense and the burden of pleading rests with the defendant (citing *Gomez v. Toledo*, 446 U.S. 635, 639

(1980))). "[I]t is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." *Seidle v. Neptune Twp.*, No. 17-4428, 2021 WL 1720867, at *7 (D.N.J. May 1, 2021) (alteration in original) (quoting *Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009)).

The Court has already concluded that Plaintiff's Complaint does not plausibly allege that the Corrections Officer Defendants violated Jennifer's constitutional rights by failing to protect Jennifer or to provide her with adequate medical care. *See supra* Sections III.A.iii.2., III.D. Likewise, Plaintiff does not plead facts showing that the Policymaker Defendants are liable under the state-created danger doctrine. *See supra* Section III.C. Accordingly, the Court need not—and does not—consider whether, assuming the Plaintiff adequately alleges failure-to-protect and medical care claims against the Corrections Officer Defendants and a state-created danger claim against the Policymaker Defendants, the respective Defendants thereby violated a clearly established right. However, the Court does conclude that Plaintiff plausibly alleges in Count Two a claim against the Policymaker Defendants for failing to train, supervise, or discipline their subordinates. *See supra* Section III.B.

Accordingly, the Court considers, under the second prong of the qualified immunity doctrine, "whether the asserted constitutional right is clearly established." *Karkalas*, 845 F. App'x at 118 (citation omitted). Plaintiff specifically invokes the "obviousness" component of this "clearly established right" prong. (*Id.* at 46-47.) As the Third Circuit has explained:

> Although the Officers are correct that the right must be defined beyond a high level of generality [*Mullenix v. Luna*, 577 U.S. 7, 12 (2015)], there need not be "a case directly on point for a right to be clearly established.' [*Rivas-Vellegas v. Cortesluna*, 595 U.S. 1, 7-8 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).] "'A public official,' after all, 'does not get the benefit of "one liability-free violation" simply because the circumstance of his case is not identical to that of a prior case.'" [*Mack v. Yost*, 63 F.4th 211, 233

(3d Cir. 2023) (quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 166 (3d Cir. 2021)).] Instead, the law requires only that the right "is sufficiently clear that a reasonable official would understand that what he is doing violates that right." [*Id.* at 231 (quoting *Peroza-Benitez*, 994 F.3d at 165); *Pauly*, 580 U.S. at 79-80 (noting that "general statements of the law are not inherently incapable of giving fair and clear warning").] That standard is met when a violation is "so obvious" it becomes likewise evident that a clearly established right is in play, "even in the absence of closely analogous precedent." [*Mack*, 63 F.4th at 232 (quoting *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011)).] As a result, qualified immunity is not appropriate when the case in question presents "extreme circumstances" to which "a general constitutional rule already identified in the decisional law may apply with obvious clarity." [*Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).] That is the case before us.

We may rely on general principles to find that the facts here present a violation that is "so obvious" "that every objectively reasonable government official facing the circumstances would know that the [Officers'] conduct . . . violate[d] federal law when [they] acted." [*Mack*, 63 F.4th at 232 (quoting *Schneyder*, 63 F.4th at 330).] In such a case, "general standards can 'clearly establish' the answer, even without a body of relevant case law." [*Brosseau*, 543 U.S. at 199.] In other words, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." [*Hope*, 536 U.S. at 741.]

*Thomas v. City of Harrisburg*, 88 F.4th 275, 284 (3d Cir. 2023), *cert. denied*, 145 S. Ct. 141 (2024).

The County Defendants note that "[t]he obviousness exception has been limited to extraordinary instances of callous misconduct, such as confining an inmate to a cell covered in feces; handcuffing an inmate to a hitching post for several hours without water or bathroom breaks; intentionally suppressing religious worship; and framing criminal defendants with fabricated evidence." (ECF No. 26 at 18 (citing *Rivera v. Redfern*, 98 F.4th 419, 424-25 (3d Cir. 2024)). In *Thomas*, the Third Circuit concluded that it was obvious under this exception that, "when an officer is aware of the oral ingestion of narcotics by an arrestee under circumstances suggesting the amount consumed was sufficiently large that it posed a substantial risk to health or a risk of death,

that officer must take reasonable steps to render medical care." *Thomas*, 88 F.4th at 285 (citations omitted). Because the alleged circumstances are sufficiently analogous to the situation in *Thomas* and the other "extraordinary instances of callous misconduct," the County Defendants fail to show that the Policymaker Defendants are entitled to qualified immunity at this preliminary stage of the proceeding, *see Bethlehem Manor Vill.*, 2024 WL 4367922, at *10 (stating that defendant has the burden to establish his or her entitlement to qualified immunity).

In fact, the Court rejects the County Defendants' overly broad formulation of "the asserted constitutional right." They characterize the right at issue as "a blanket constitutional duty on the part of correctional officials to protect detainees with substance abuse problems against drugs entering the facility." (ECF No. 14-1 at 33-34.) Instead, as the court recognized in *Young*, the Sixth Circuit observed in *Zakora* and *Caraway* that, while "simple exposure to drugs or a 'run-of-the-mill drug overdose case' is insufficient," the "threat of unfettered access to drugs in a controlled environment of incarceration may give rise to a failure to protect claim under certain circumstances," specifically, where there "are detailed facts showing that the defendants knew of serious and widespread access to illegal drugs and knew that those drugs were actively being abused, such as in a case where numerous inmates suffer overdoses in a relatively short time frame." *Young*, 2025 WL 354447, at *4 (citing *Caraway*, 98 F.4th at 684).

As explained above, *see supra* Sections III.A.ii.-iii.1., III.B., Plaintiff pleads facts plausibly showing that there was unfettered access to drugs in the MCCI and that the Policymaker Defendants were deliberately indifferent to this serious problem. Of particular significance, Exhibit A and the March 6, 2025 Stipulation and Order show a pattern of seventeen inmate drug overdoses in the MCCI (three of them fatal) in 2022-2023. (ECF No. 43 at MCSO000625-MSCO000626; ECF No. 61 at 2.) Four of the seventeen overdoses (including Egner's fatal

overdose in April 2022) occurred before Jennifer's fatal overdose on September 20, 2022, with two of the four overdoses occurring less than thirty days before her death. (ECF No. 43 at MCSO000625.) Additionally, five incidents, including the immediately preceding incident, occurred in the same housing unit (F1) in which Jennifer overdosed. (*Id.*) "The [alleged] facts here present a violation that is 'so obvious' 'that every objectively reasonable government official facing the circumstances would know that the [Policymaker Defendants'] conduct . . . violate[d] federal law when [they] acted.'" *Thomas*, 88 F.4th at 284 (first alteration added) (quoting *Mack*, 63 F.4th at 232).

In *Zakora*, which was decided approximately one month before Jennifer's death, the Sixth Circuit indicated that the plaintiff had a strong "obviousness" argument:

> Our dissenting colleague describes our refusal to address the "clearly established" prong as a "deus ex machina" (whatever that means), arguing that we are improperly saving the Estate's claim from defeat. Dissent at 486–87. But our decision is not based on some obscure technicality. The Estate makes serious allegations of misconduct within Lakeland. Consider, for example, the Estate's allegations that top prison officials instructed their subordinates not to investigate known drug smuggling at Lakeland and that other officials were themselves involved in supplying the lethal drugs to Zakora. Accepting these allegations as true, as we must at this stage in the proceedings, the Estate has at least a colorable argument that "the unlawfulness of the [officials'] conduct is sufficiently clear even though existing precedent does not address similar circumstances." *See* [*Dist. of Columbia v. Wesby*, 583 U.S. 48, 63-65 (2018)] (citation omitted).

*Zakora*, 44 F.4th at 467. Admittedly, there are factual differences between the present case and *Zakora*. For instance, "[t]he complaint in *Zakora* alleged that two other inmates in Zakora's small cell block overdosed in the two days before his death." *Caraway*, 98 F.4th at 684 (citing *Zakora*, 44 F.4th at 461). However, Plaintiff similarly alleges that there were several overdoses "in a relatively short time frame," *Young*, 2025 WL 354447, at *4 (citing *Caraway*, 98 F.4th at 684).

(ECF No. 43 at MCSO000625-MSCO000626; ECF No. 61 at 2).  In addition, she pleads facts indicating that "top [MCCI] officials" did not take appropriate action to respond to "known [and persistent drug smuggling at MCCI] and that other officials were involved in supplying [drugs to inmates at the facility]," *Zakora*, 44 F.4th at 467; (ECF No. 1 ¶¶ 45-48 (alleging that MCCI personnel and detainees ran two drug smuggling conspiracies in 2020-2021); ECF No. 43 at MCSO000625-MSCO000626 (listing overdoses in 2022-2023); ECF No. 26 at 3 (quoting Freeman's 2017 article stating 'a new era in contraband searches' began on November 7, 2016, years before the occurrence of two drug smuggling conspiracies and seventeen drug overdoses (and three deaths)).)  Given these circumstances, the Court concludes that "the unlawfulness of the [officials'] conduct is sufficiently clear even though existing precedent does not address similar circumstances," *Zakora*, 44 F.th at 467 (citation omitted).

Accordingly, the Court finds that the Policymaker Defendants fail to show their entitlement to qualified immunity at this preliminary stage.

### G.    The State Law Negligence and Derivative Claims

In Count Six (negligence in the performance of ministerial duties), Count Seven (negligent failure to train and/or supervise), Count Eight (negligence in the performance of discretionary activities), and Count Ten (lost chance of survival), Plaintiff advances negligence claims against all or some of the County Defendants under the NJTCA.  (Complaint ¶¶ 151-75, 184-93.)  The County Defendants argue that Counts Six, Seven, Eight, and Ten should be dismissed because they involve discretionary as opposed to ministerial conduct under N.J. Stat. Ann. §§ 59:2-3(a) and (b) and 59:3-2(a) and (b); the County Defendants are entitled to immunity for medical, hospital, and public health activities, *see id.* §§ 59:6-5(a), 59:6-6(a); and they are also immune for actions adopting or failing to adopt any law and for failing to enforce any law, *see id.* §§ 59:2-4, 59:3-5.

(ECF No. 14-1 at 36-50.)  They further contend that Plaintiff's derivative claims under state law in Count Twelve (wrongful death) and Count Thirteen (survival action) against them should be dismissed given the dismissal of the underlying NJTCA claims.  (*Id.* at 50-51.)  In their reply brief, the County Defendants assert that Count Eight should be dismissed because Plaintiff does not offer any proof that Monmouth County's and the Policymaker Defendants' conduct was "palpably unreasonable."  (ECF No. 26 at 23-24 (citing N.J. Stat. Ann. § 59:3-2(d)).)

In *Young*, the court considered whether the defendants were entitled to immunity from the plaintiffs' state law claims.  *Young*, 2025 WL 354447, at *7.  As the *Young* court explained, the NJTCA "serves as a limited waiver of sovereign immunity by the State of New Jersey and controls the liability of New Jersey's public entities and their employees under state law."  *Young*, 2025 WL 354447, at *7 (citing *Gaston v. New Jersey*, 298 F. App'x 165, 167-68 (3d Cir. 2008); N.J. Stat. Ann. § 59:8-1, *et seq.*).  Because the purpose of the statute was to re-establish sovereign immunity and provide broad immunity for public entities and employees, "immunity is the rule, and liability the exception."  *Id.* (quoting *Gonzalez ex rel. Gonzalez v. City of Jersey City*, 247 N.J. 551, 570 (2021)).

Under the NJTCA, "[w]hen a public entity's or employee's actions are discretionary, liability is imposed only for 'palpably unreasonable conduct.'"  *Gonzalez*, 247 N.J. at 571 (quoting *Henebema*, v. *S. Jersey Transp. Auth.*, 219 N.J. 481, 490 (2014)).  In contrast, "ministerial acts" are subject to the ordinary negligence standard.  *See Young*, 2025 WL 354447, at *7; *Gonzalez*, 247 N.J. at 571.  "Discretionary" acts consist of both "actual, high-level policymaking decisions involving the balancing of competing considerations," *Gonzalez*, 247 N.J. at 571 (quoting *Coyne v. Dep't of Transp.*, 182 N.J. 481, 489 (2005)), and actions taken by lower-level employees requiring "a significant thoughtful analysis and exercise of personal deliberations regarding a

variety of factors," *id.* at 572 (quoting *S.P. v. Newark Police Dep't*, 428 N.J. Super. 210, 231 (App. Div. 2012)). "Ministerial acts, in contrast, are those 'which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done.'" *Id.* at 571-72 (quoting *S.P.*, 428 N.J. Super. at 231). The fact that the employee must make "'[o]perational judgments,' such as 'when, where and how' to carry out a required duty," does not render the action non-ministerial. *Id.* at 572 (alteration in original) (quoting *Ojinnaka v. City of Newark*, 420 N.J. 22, 37 (Law Div. 2010); *Morey v. Palmer*, 232 N.J. Super. 144, 149 (App. Div. 1989)).

"The distinction between ministerial and discretionary action is thus fact specific and turns on whether 'the circumstances [are] thought to be such that reasonable [officers] in the position of the defendants could have differed about whether or how to act.'" *Young*, 2025 WL 354447, at *8 (alteration in original) (quoting *Gonzalez*, 247 N.J. at 573).

According to *Young*, "the direct actions of the supervisory and municipal County Defendants are discretionary in nature." *Id.* "Plaintiffs' claims against them based on their own direct actions arise entirely out of these Defendants' decisions as to what policies to adopt, what further training was required for their subordinate officers, and how best to combat the threat posed by the potential smuggling of illicit drugs into a county jail." *Id.* The Court reaches the same conclusion with respect to the substantially indistinguishable direct negligence claims against Monmouth County and the Policymaker Defendants. In fact, at oral argument Plaintiff "recognize[s] that there are certain big policy oriented decisions about how often you scan, what kind of – for drugs, what kind of scanners you invest in, how many corrections officers you have on a particular shift, how you train those corrections officers" that "may be big policy oriented questions that are subject to the palpably unreasonable standard." (ECF No. 45 at 74:17-22; *see*

*also id.* at 79:5-9 ("We recognize that there are certain facts we allege here about the steps MCCI took to respond to the flow of drugs into the facility that may fall within that standard of high level policymaking decisions.").) Thus, the Court dismisses without prejudice the direct negligence and derivative claims against Monmouth County and the Policymaker Defendants to the extent that they purportedly arise out of their alleged direct negligence in the performance of ministerial duties. (ECF No. 1, Count Six).

On the other hand, the Court concludes that "the state law claims against the County Defendants—either alleged directly against the [Corrections Officer Defendants] or against their supervisors on a *respondeat superior* basis—arise instead out of the alleged negligence of the officers in failing to properly watch, oversee, and secure [Jennifer] prior to [her] death in accordance with the rules in place inside the jail." *Young*, 2025 WL 454447, at *8 (noting that the defendants did not argue that the supervisors were entitled to immunity for claims based on a *respondeat superior* theory of liability). "These actions largely lack discretionary decision making and instead appear based on the current state of the complaint to be ministerial in nature." *Id.* In their letter brief addressing *Young*, the County Defendants do not dispute the applicability of *Young* as to its determination that the state law claims against the Corrections Officer Defendants implicate ministerial duties. Instead, they claim that Plaintiff does not allege in her Complaint that the supervisors should be liable based on *respondeat superior*. (ECF No. 59 at 4.) However, there is no indication in the *Young* decision that the plaintiffs in that case specifically invoked the *respondeat superior* theory of liability in their complaint.

The court in *Young* dismissed the plaintiffs' direct state law claims against the supervisory and municipal defendants "because . . . Plaintiffs have not pled facts sufficient to show that their [discretionary] actions were palpably unreasonable sufficient to surmount immunity." *Young*,

2025 WL 35447, at *8 (footnote omitted). "As the [New Jersey] Supreme Court has explained, under the Act, when a 'public entity's or employee's actions are discretionary, liability is imposed only for palpably unreasonable conduct.'" *Id.* (quoting *Gonzalez*, 247 N.J. at 571). The "palpably unreasonable" determination is typically a jury question. *See May v. Atl. City Hilton*, 128 F. Supp. 2d 195, 202 (D.N.J. 2000); *Henebema*, 430 N.J. Super. at 491. The concept "implies a more obvious and manifest breach of duty" than simple negligence. *Williams v. Town of Phillipsburg*, 171 N.J. Super. 278, 286 (App. Div. 1979); *see also Kolitch v. Lindedahl*, 100 N.J. 485, 493 (1985) (indicating that palpably unreasonable conduct is conduct that is patently unacceptable under any given circumstance).

For substantially the same reasons that the Court concludes that Plaintiff pleads facts sufficient to show that Monmouth County and the Policymaker Defendants were deliberately indifferent for purposes of Plaintiff's § 1983 and NJCRA claims, *see supra* Sections III.A.iii.1., III.B., the Court concludes that Plaintiff alleges sufficient facts to raise a reasonable inference that their conduct was palpably unreasonable. According to the County Defendants, the article regarding the implementation of full body X-ray screening for inmate processing and the Asbury Park Press article regarding the County's efforts to assist inmates with drug dependency issues demonstrates that their conduct was not palpably unreasonable. (ECF No. 26 at 24.) But the allegations regarding the ongoing drug problem in the MCCI after these actions were taken, *e.g.*, seventeen drug overdoses in 2022-2023 and two drug smuggling conspiracies in 2020-2021 involving MCCI personnel (*see* ECF No. 1 ¶¶ 45-48; ECF No. 43 at MCSO000625-MSCO000626; ECF No. 61 at 2), plausibly indicate that these steps were "palpably" insufficient.

The County Defendants also rely on N.J. Stat. Ann. § 59:2-4 ("A public entity is not liable for any injury caused by adopting or failing to enforce a law.") and N.J. Stat. Ann. § 59:3-5 ("A

public employee is not liable for any injury caused by his adoption of or failure to adopt any law or by his failure to enforce any law"), which provide immunity for an injury caused by the adoption or failure to adopt a law or the failure to enforce a law. (ECF No. 59 at 4.) The NJTCA defines "Law" to include "enactments and also the decisional law applicable within this State as determined and declared from time to time by the courts of this State and of the United States," N.J. Stat. Ann. § 59:1-3, while "Enactment" includes "a constitutional provision, statute, executive order, ordinance, resolution or regulation," *id.* "The failure-to-enforce-any law immunity may be invoked whenever the 'critical causative conduct by government employees consists of non-action or the failure to act with respect to the enforcement of the law.'" *Maison v. N.J. Transit Corp.*, 245 N.J. 270, 301-02 (2021) (quoting *Lee v. Brown*, 232 N.J. 114, 127 (2018)). Immunity for failing to enforce a law applies to both ministerial and discretionary acts. *See Garry v. Payne*, 224 N.J. Super. 729, 735 (App. Div. 1988).

Plaintiff's state law claims rely, at least in part, on the County Defendants' "non-action or the failure to act with respect to the enforcement of the law," *Maison*, 245 N.J. at 301-02 (citation omitted). Plaintiff alleges, for example, that the Corrections Officer Defendants breached their duty of reasonable care by "failing to adhere to earlier referenced NJDOC regulations, including N.J.A.C. 10A:31-13:26, which dictates that detoxification from alcohol, barbiturates, and similar drugs must occur under medical supervision at the MCCI" and "failing to adhere to earlier referenced MCCI policies and procedures, including the requirement that corrections officers constantly monitor detoxing detainees by using video equipment and/or conducting physical checks of those detainees every fifteen minutes." (ECF No. 1 ¶ 155.)

The NJTCA's definition of "law" explicitly encompasses "enactments," including "regulations." N.J. Stat. Ann. § 59:1-3. In *Estate of Yearby v. Middlesex County*, No. A-1974-20,

2022 WL 1714534 (N.J. App. Div. May 27, 2022) (per curiam), the New Jersey Appellate Division concluded that a municipality was immune from liability for a police officer's alleged failure to comply with a state statutory provision requiring "a law enforcement officer to take a person in custody to a screening service if there is reasonable cause to believe that the person requires involuntary commitment" and "related [police department] policies" regarding detainees "exhibiting signs of mental illness," *id.* at *11 (citing N.J. Stat. Ann. § 30:4-27.6). The County Defendants likewise are entitled to immunity from liability for their alleged failure to comply with state laws, NJDOC regulations and MCCI policies regarding detoxing detainees and combating drug smuggling, distribution, use, and overdoses.[20]

Plaintiff contends that her negligence claims are based on "systemic failures" in the operation of the MCCI that are unrelated to and go "far beyond the failure to adopt or enforce any 'law.'" (ECF No. 25 at 60.) According to her, there is "no singular 'law'" that the County Defendants failed to enact or enforce that proximately caused Jennifer's fatal overdose, and, even if the County Defendants had identified a specific law, they fail to satisfy the "critical causative conduct" requirement because "[i]t is not Defendants' violation of an express statute or regulation that led to Jennifer's untimely death but rather their breach of the common-law and constitutional duties to protect detainees in their custody." (*Id.* at 62-63 (citing *L.E. v. Plainfield Pub. Sch. Dist.*, 456 N.J. Super. 336, 339, 344-39 (App. Div. 2018); *see also id.* at 60-61 ("Rather, the Complaint

---

[20]    Plaintiff notes that the statutory definitions of "law" and "enactment" do not specifically or explicitly list "policies," *Yearby* is an unpublished opinion, and it considered police department policies that were related to a state statute. (ECF No. 25 at 61-62.) However, the alleged MCCI policies are related to NJDOC regulations. Furthermore, *Yearby* is the only case cited by the parties to have considered how alleged failures to enforce municipal policies should be treated under Sections 59:2-4 and 59:3-5. *See Oliver v. Main*, No. 12-3757, 2016 WL 1305292, at *6 (D.N.J. Apr. 4, 2016) ("Although *Harbeson* is an unpublished [Appellate Division] opinion, the New Jersey Supreme Court has not ruled on whether section 41(b) applies to nurses, and *Harbeson* is therefore the best indication of how the New Jersey Supreme Court would rule on this issue." (citing *Lomando v. United States*, 667 F.3d 667 F.3d 363, 385-86 (3d Cir. 2011)).

alleges that the Individual County Defendants negligently breached multiple common-law and constitutional duties they owed to Jennifer that were not imposed by any statute or other law and thus do not immunize Defendants from liability under N.J.S.A. 59:2-4 or 59:3-5." (citing ECF No. 1 ¶¶ 152-53, 162; *Maison*, 245 N.J. at 276, 304)).

However, Plaintiff does not cite to any case law adopting her "systemic failures," "no singular 'law,'" or "express statute or regulation" theories. Plaintiff relies on *Maison* and *L.E.* (*Id.* at 60-63.) In *Maison*, the New Jersey Supreme Court merely concluded that the "[t]he critical causative conduct' giving rise to Maison's injuries and her legal claims was defendants' breach of their common-carrier duties – their failure to protect her from the reasonably foreseeable dangerous conduct of other passengers, not from [the bus driver] Coats's purported failure to enforce NJ Transit's regulations." *Maison*, 245 N.J. at 304 (citation omitted). "Moreover, NJ Transit regulations – even if bus drivers were charged with enforcing them [which they arguably were not] – could not extinguish centuries-old common carrier duties." *Id.* The *L.E.* court noted that "[t]he parties have not cited to us, nor have we found, any State regulations or Department of Education guidelines or standards addressing the level of supervision that a high school should maintain over its students." *L.E.*, 456 N.J. Super. at 349 n.3.

Accordingly, the Court dismisses without prejudice the state law negligence and derivative claims in Counts Six, Seven, Eight, Ten, Twelve, and Thirteen against the County Defendants to the extent that they arise out of alleged injuries caused by the County Defendants' failure to enforce state laws, NJDOC regulations and MCCI policies. However, sections 59:2-4 and 59:3-5 do not

bar such claims to the extent they arise out of alleged injuries caused by the County Defendants' breaches of their constitutional or common law duties of care.[21]

## IV.    CONCLUSION

For the reasons set forth above, and other good cause shown, the County Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**. The following claims are **DISMISSED** without prejudice: (1) Counts One and Four against the Corrections Officer Defendants; (2) Count Three; (3) Count Five to the extent that it alleges claims equivalent to the aforementioned dismissed claims in Counts One, Three, and Four; and (4) Counts Six, Seven,

---

[21]    It is undisputed that sections 59:2-4 and 59:3-5 do not apply to Plaintiff's § 1983 and NJCRA claims in Counts One through Five. "New Jersey courts have determined that claims under the NJCRA are not subject to the NJTCA's procedural requirements, including its 'notice-of-claim' provision.  The Third Circuit and this Court have also held that the NJTCA is inapplicable to constitutional claims and claims brought under the NJCRA." *Teel v. Eliasen*, No. 17-2253, 2018 WL 5307806, at *3 (D.N.J. Oct. 26, 2018) (citing *Cnty. Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 174 (3d Cir. 2006); *Ingram v. Twp. of Deptford*, 911 F. Supp. 2d 289, 299 (D.N.J. 2012); *Baklayan v. Ortiz*, No. 11-3943, 2012 WL 1150842, at *3 n.3 (D.N.J. Apr. 5, 2012); *Owens v. Feigin*, 194 N.J. 607, 612-14 (2008)).  As the New Jersey Supreme Court has noted, the NJCRA's purpose is to rectify constitutional violations, "the protection of which has never depended on the satisfaction of the [NJTCA's] requirements." *Owens*, 194 N.J. at 613 (citing *Velez v. City of Jersey City*, 180 N.J. 284, 296 (2004)).  Likewise, a public entity (or public employee) may be liable under § 1983 "even when [such liability is] inconsistent with [the NJTCA's] immunities to suit." *Id.* (citing *Tice v. Cramer*, 133 N.J. 347, 375 (1993)).

Additionally, the County Defendants argue that they are entitled to immunity for medical, hospital, and public health activities, *see* N.J. Stat Ann. §§ 59:6-5(a), 59:6-6(a).  (ECF No. 14-1 at 45-48.)  However, the *Young* court persuasively rejected this argument, explaining that "[i]t misses Plaintiffs' contention that it was not the decision of the John Doe Officers to determine whether or how to confine Egner, but that the standard jail rules in place required them to watch, confine, and secure him during his entry period into the jail, and the negligent failure to do so resulted in his overdose death." *Young*, 2025 WL 354447, at *8; *see also Conforti v. Cnty. of Ocean*, 255 N.J. 142, 166-67 (2023) (concluding that "59:6-5" and "65:6-6" did not provide immunity for, inter alia, alleged negligence in failing to adequately train jail staff on preventing inmate suicide, adopting and implementing an adequate suicide prevention policy, conducting mortality reviews after suicides and revising policies based on their results, and recognizing or appreciating the red flags preceding the decedent's death).  The County Defendants do not mention these two provisions in their supplemental briefing, and the Court agrees with the *Young* court that they are not entitled to immunity under sections 59:6-5 or 59:6-6.

Eight, Ten, Twelve, and Thirteen against the Monmouth County and the Policymaker Defendants to the extent they purportedly arise out of their alleged direct negligence in the performance of ministerial duties and against all County Defendants to the extent that the conduct giving rise to the alleged injuries was caused by the County Defendants' alleged failure to enforce state laws, NJDOC regulations, and MCCI policies.  The Motion to Dismiss is **DENIED** in all other respects. An appropriate Order follows.

DATED: March 26, 2025

**GEORGETTE CASTNER**
**United States District Judge**