**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MICHELLE TRUSSELL, *as Administrator ad Prosequendum of the Estate of Jennifer A. Ross, and as Guardian of minors L.R.K. and B.A.K.*,<br><br>Plaintiff,<br><br>v.<br><br>MONMOUTH COUNTY, *et al.*,<br><br>Defendants. | Civil Action No. 24-0151 (GC) (JTQ)<br><br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** is before the Court on the Motion to Dismiss the First Amended Complaint (FAC) (ECF No. 93) for failure to state a claim pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6) filed by Defendants CFG Health Systems, LLC (CFG), Bonnie McKittrick, James Neal, and Denise Rahaman (collectively CFG Defendants). (ECF No. 110.) The FAC was filed by Plaintiff Michelle Trussell, as the Administrator *ad Prosequendum* of the Estate of Jennifer A. Ross (Jennifer), and as Guardian of minors L.R.K. and B.A.K. (ECF No. 93 ¶ 23.) Plaintiff responded to the CFG Defendants' Motion to Dismiss, (ECF No. 117), and CFG Defendants filed a reply brief, (ECF No. 118). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, the CFG Defendants' Motion to Dismiss is **DENIED**.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. The FAC[1]

In her FAC, Plaintiff names as Defendants: Monmouth County, which owns, operates, manages, and controls the Monmouth County Correctional Institute (MCCI); Shaun Golden, who has served as the Sheriff of Monmouth County since 2010; Theoadore Freeman, the Executive Undersheriff of the Monmouth County Sheriff's Office; Victor Iannello, who became the Warden of the MCCI on November 30, 2021 (after having previously served as the Acting Deputy Warden); Dylan J. Connell, a corrections officer at the MCCI (CO Connell); Kristin Freeman, a resident nurse, "Code Leader," and an employee or agent of CFG and Monmouth County, who worked at the MCCI at the time of Jennifer's detention (RN Freeman); Bonnie McKittrick, a licensed practical nurse, and employee or agent of CFG and Monmouth County, who worked at the MCCI at the time of Jennifer's detention (LPN McKittrick); James Neal, the Corporate Medical Director at CFG, and an employee or agent of CFG and Monmouth County at the time of Jennifer's detention; Denise Rahaman, RN, CFG's Executive Director of Correctional Services and an employee/agent of CFG and Monmouth County at the time of Jennifer's detention; CFG, a for-profit company providing medical and behavioral health services to correctional facilities, including the MCCI; John and Jane Doe Corrections Officers 1-10; and John and Jane Doe CFG Agents 1-5. (ECF No. 93 ¶¶ 12, 27-38.) All Defendants are named in their individual capacities.[2] (*Id.*)

---

1 On a motion to dismiss, the Court accepts as true all well-pled facts in the Complaint. *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) (quoting *Umland v. PLANCO Fin. Servs. Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)). The following summary focuses on the CFG Defendants' alleged misconduct.

2 The Court refers to Golden, Freeman, and Iannello as "Monmouth County Policymakers," and Neal and Rahaman as "CFG Policymakers." (ECF No. 93 ¶¶ 5-6.)

### 1. Alleged Drug Smuggling, Drug Distribution, and Drug Use at the MCCI

According to Plaintiff, before and during Jennifer's detention illicit drugs were available to detainees at the MCCI in several ways:

> a. Detainees were not adequately searched for drugs when admitted into the [MCCI].
>
> b. Drugs were sold or traded inside the [MCCI] for money, food, or favors.
>
> c. Drugs were smuggled into the [MCCI] through the mail in different ways. For instance, envelopes soaked in drugs addressed to detainees were permitted to enter the [MCCI] and were then smoked by detainees. Detainees also arranged to have co-conspirators send contraband to them using what appeared to be a letter from an attorney. This allowed detainees to open the envelopes outside the presence of corrections officers.
>
> d. Drugs were smuggled into the [MCCI] by MCCI staff, who then conspired with detainees to distribute them.

(ECF No. 93 ¶ 47.) Additionally, detainees who were prescribed detoxification medications would sell them to other detainees, and detainees also lit and inhaled drug-coated papers. (*Id.* ¶ 49.)

Criminal complaints provide "a glimpse" into the pervasiveness of drugs at the MCCI. (*Id.* ¶ 49.)

From January to May 2020, MCCI detainee Taques Hall, other detainees, and MCCI employee Ryan Steinmetz ran a drug smuggling conspiracy at the facility, distributing over 100 doses of Suboxone (an opioid and controlled dangerous substance). (*Id.* ¶ 51.) Steinmetz smuggled the drugs and other contraband to detainees, who hid strips of Suboxone and marijuana in food items to distribute and sell the contraband to other detainees. (*Id.* ¶ 52.)

Between August 1, and September 3, 2021, an MCCI correctional officer (Bryant Mack) conspired with Hall and other detainees to distribute controlled dangerous substances. (*Id.* ¶ 53.)

Mack smuggled ADB-BUTINACA (a cannabinoid drug) into the MCCI using potato chip bags and then gave the items to Ladonn Brown, a detainee food server. (*Id.*) Brown gave one bag to Hall. (*Id.*) A September 4, 2021 search of Brown's cell uncovered thirteen suspected Suboxone pills, marijuana, a bottle of K2 spray with the label "Blunt life," and contraband packaging. (*Id.* ¶ 54.) A search of Hall's cell on the same day found fifty-one light green whole pills, ninety light green half pills and twenty orange pills suspected to be Suboxone, more than half a pound of synthetic marijuana, two bottles of K2 synthetic marijuana, and packaging materials and scales. (*Id.*)

In another publicized incident, MCCI detainee Alvino Hinton admitted that, on April 17, 2022, he smuggled fentanyl-laced heroin into the facility. (*Id.* ¶ 55.) He gave the drugs to another detainee, David Egner. (*Id.*) Subsequently, Egner suffered acute heroin/fentanyl poisoning, and he was taken to CentraState Medical Center, where he died three days later. (*Id.*) A search uncovered thirty-six wax folds of suspected fentanyl in Hinton's underwear. (*Id.* ¶ 56.) New Jersey Department of Corrections (NJDOC) regulations require every adult correctional facility in the state to report deaths in custody to the department. (*Id.* ¶ 57 (citing N.J. Admin. Code § 10A:31-13.31).) Egner's death was not reported to the NJDOC, thereby concealing the true extent of the drug problem at the MCCI. (*Id.* ¶¶ 57-59.) On August 17, 2022, Hinton was criminally charged with causing Egner's death. (*Id.* ¶ 59.) Jennifer overdosed only a month after Hinton was charged. (*Id.* ¶ 61.)

In 2017, Freeman co-authored an article citing incidents in which detainees smuggled drugs into the MCCI. (*Id.* ¶ 62.) The smuggling resulted in the deaths of two detainees from drug overdoses and lawsuits against Monmouth County. (*Id.*)

In fact, drug-related incidents were commonplace at the facility in the years before (and

after) Jennifer's fatal overdose in September 2022. (*Id.* ¶ 64.)

Between January 1, 2017 and December 31, 2021, there were "dozens" of confirmed or suspected incidents of drug use, drug overdoses, and incidents leading to the discovery of detainees possessing or distributing drugs. (*Id.*) Between January 2018 and August 2022, Narcan was administered to detainees experiencing (or suspected of experiencing) overdoses on at least fourteen separate occasions. (*Id.* ¶ 65.) In 2022, there were "dozens" of drug-related incidents, *e.g.*, eleven instances of pretrial detainees suffering overdoses—three of which predated Jennifer's September 20, 2022 overdose—and one fatal overdose occurred on or around September 23, 2022. (*Id.* ¶¶ 66, 69.) In 2023, there were at least six overdoses requiring the administration of Narcan. (*Id.* ¶¶ 68, 70 (noting that a female detainee overdosed on or around July 24, 2023 after being given drugs smuggled into the MCCI by other detainees).) Accordingly, there were at least seventeen MCCI detainee drug overdoses in 2022 and 2023 (eleven in 2022 and six in 2023), with three of the seventeen overdoses resulting in detainee deaths. (*Id.* ¶ 71.) However, Monmouth County, Monmouth County Policymakers, and CFG Policymakers did not ensure that MCCI policies were consistent with the governing medical standard at the time, nor did they require corrections officers to start carrying and administering Narcan. (*Id.* ¶ 72.)

### 2. Jennifer's Heightened Risk of Overdose, September 20, 2022 Overdose, and Medical Treatment

Plaintiff alleges that Jennifer was arrested on September 17, 2022 by Monmouth County Sheriff's officers on warrants for failure to appear on scheduled dates in the Monmouth County Drug Court and the Highlands Municipal Court. (ECF No. 93 ¶ 39.) That evening, Jennifer was transported to the MCCI, where she was processed and detained. (*Id.* ¶ 40.) She had no drugs in her possession when she entered the facility; however, she had needle marks on her right arm, which were seen by Corrections Officer Randi Patterson and recorded on Jennifer's Inmate

Screening Sheet. (*Id.* ¶¶ 41-42.) As a result of the intake process, Jennifer was placed on the Clinical Opiate Withdrawal Scale and Clinical Institute Withdrawal Assessment (COWS/CIWA) protocol and prescribed detoxification medication to ease her withdrawal symptoms. (*Id.* ¶ 42.)

MCCI officials and CFG personnel knew of Jennifer's documented history of drug dependency and substance use disorder. (*Id.* ¶¶ 42-43.) Jennifer was placed in a tan jumper—used only for detoxing detainees—and assigned to medical isolation with a low bunk and low tier designation. (*Id.* ¶ 43.) However, MCCI officials and CFG personnel placed Jennifer in a non-isolation tier with other inmates and a cell with a roommate. (*Id.* ¶¶ 44, 81.) Furthermore, Jennifer was observed on the top bunk by corrections officers and other detainees and was found on the top bunk at the time of the overdose. (*Id.* ¶¶ 45, 81.)

On September 20, 2022, the MCCI placed in Jennifer's cell a detainee who, at the time of her arrest, was found with heroin packaging marked "Amber AL(wireless)RT" in red ink. (*Id.* ¶ 16.) The same packaging was found underneath Jennifer's body after Jennifer had fatally overdosed. (*Id.*)

According to the FAC, Monmouth County, Monmouth County Policymakers, CFG, and CFG Policymakers knew that detainees like Jennifer with a history of substance use disorder are at a heightened risk of an overdose and death if they ingest drugs. (*Id.* ¶ 73.) A July 31, 2018 article appearing in the Asbury Park Press quoted Golden and stated that, "[a]ccording to jail officials, some 76% of inmates in county jails face addiction." (*Id.* ¶ 74 (citing Ken Serrano, *Recovery Coaches Head to Jail to Help Monmouth County Detainees with Addictions*, Asbury Park Press (Jul. 31, 2018), https:www/app.com/story/news/2018/07/31/recovery-coaches-head-jail-help-detainees-addictions/868087002/)).) The article also noted that inmates charged with drug offenses are particularly vulnerable to overdoses because withdrawal comes with a lower

drug tolerance. (*Id.*) Citing to several other articles, the FAC alleges that the heightened risk of inmates, especially inmates with substance use disorders, suffering an overdose and death was well known to both the general public and persons working in correctional facilities. (*Id.* (citing Eliana Kaplowitz et al., *Fentanyl-related Overdose During Incarceration: A Comprehensive Review*, 9 Health & Just. J. 13 (2021), https://healthandjusticejournal.biomedcentral.com/articles/10.1186/s40352-021-00138-6); *Overdose Deaths and Jail Incarceration: National Trends and Racial Disparities*, Vera Inst. of Just., https://www.vera.org/publications/overdose-deaths-and-jail-incarceration/national-trends-and-racial-disparties (last visited Jan. 9, 2024); *Criminal Justice DrugFacts*, Nat'l Inst. On Drug Abuse (June 2020), https://nida.nih.gov/publications/drugfacts/criminal-justice; Beth Schwartzapfel & Jimmy Jenkins, *Overdose Deaths in State Prisons Have Jumped Dramatically Since 2001*, NPR (Jul. 15, 2021, 6:00 AM), https://www.npr.org/2021/07/15/1015447281/overdose-deaths-state-prisons-increase).) NJDOC regulations also dictate that detoxification occur under medical supervision. (*Id.* ¶ 75 (citing N.J. Admin. Code § 10A:31-13-26).)

Despite the fact that the MCCI records showed that Jennifer was suffering from substance use disorder, drug withdrawal, anxiety, and depression, Jennifer was assigned to a section of the MCCI where drugs were available and presented her with "an irresistible temptation." (*Id.* ¶¶ 78-79.) Specifically, Jennifer was housed with other detainees with known drug histories, and her cellmates were charged with possession of controlled dangerous substances and/or possession of drug paraphernalia in or before September 2022. (*Id.* ¶ 79.) Neither corrections officers nor medical staff took steps to safeguard Jennifer, ignoring her assignment to medical isolation and a low bunk and failing to adequately monitor her, thereby depriving her of the protections designed

to prevent a fatal overdose. (*Id.* ¶ 82.)

Narcan, also known by its generic name naloxone, is a medication that acts as an antidote to an opioid overdose. (*Id.* ¶ 84.) It is generally accepted in the medical community that this antidote should be administered to an individual experiencing an overdose as quickly as possible. (*Id.*) Administering Narcan to an individual having a medical emergency that is not an opioid overdose will not cause harm, but the immediate administration of the drug in suspected opioid overdose situations can be lifesaving. (*Id.* (citing Centers for Disease Control and Prevention, *About Naloxone*, CDC (May 2, 2024), https://www.cdc.gov/overdose-prevention/reversing-overdose/about-naloxone.html. ("*About Naloxone*")).) There is no limit to the number of doses that can be administered to an overdose victim, and Narcan typically begins to work within two to three minutes (even when an overdose victim is unresponsive and not breathing). (*Id.* ¶ 85 (citing *About Naloxone*).) Since 2015, the National Commission on Correctional Health Care has recommended that correctional staff, including corrections officers, undergo training regarding the correct technique for administering Narcan. (*Id.* ¶ 86 (citing National Commission on Correctional Health, *Position Statement: Nalaxone in Correctional Facilities for the Prevention of Opioid Overdose Deaths* (Apr. 12, 2015), archived at https://web.archive.gov/web/20151209184706/http:www.ncchc.org/naloxone-for-the=prevention-of-opiod-overdose-deaths).) In 2014, the American Society of Addiction Medicine recommended that "individuals commonly in a position to initiate early response to evidence of opioid overdose," such as corrections staff, be given "broadened accessibility to naloxone." (*Id.* ¶ 87 (citing American Society of Addiction Medicine, *Public Policy Statement on the Use of Naloxone for the Prevention of Drug Overdose Deaths* (Aug. 2014), archived at https://web.archive/org/web/20150424112547/https://www/asam.org/docs/default-

source/public-policy-statements/1naloxone-rev-8-14.pdf?sfvrsn=0).)

CFG Policymakers were responsible for instituting and approving healthcare training programs for corrections officers at CFG facilities. (*Id.* ¶ 88.) The 2012 CFG Health Systems LLC Emergency Treatment & Nursing Sick Call Protocol ("2021 Narcan Policy"), was in effect when Jennifer overdosed, and was approved by CFG Policymakers as part of their responsibilities at CFG. (*Id.* ¶¶ 34-35, 120.) The 2021 Narcan Policy directed CFG personnel and agents responding to opioid overdoses to "ONLY administer Narcan if OPIATE use is the DEFINITIVE cause of the patient's condition" and to re-administer Narcan every three to five minutes if necessary. (*Id.* ¶ 89.)

In December 2022, CFG and CFG Policymakers revised the Narcan policy by deleting the phrase "ONLY administer Narcan if OPIATE use is the DEFINITIVE cause of the patient's condition" and changing the re-administration protocol from one use every three to five minutes to every two to three minutes. (*Id.* ¶¶ 122-23.)

On September 20, 2022, Jennifer ingested "a fatal drug cocktail" provided to her by someone inside the MCCI. (*Id.* ¶ 90.) RN Freeman and LPN McKittrick responded to Jennifer's cell when Jennifer was overdosing but did not follow established medical protocols. (*Id.* ¶ 94.) Specifically, at approximately 7:41 p.m., corrections officers were notified that Jennifer was experiencing a medical emergency. (*Id.* ¶ 95.) Shortly before 7:42 p.m., CO Connell was the first responder to enter the cell, and he began CPR (but did not administer Narcan). (*Id.* ¶ 96.) RN Freeman was the first healthcare team member to respond to the overdose, arriving at the cell shortly before 7:43 p.m. (*Id.* ¶ 97.) RN Freeman had Narcan in her "charge nurse bag." (*Id.*) LPN McKittrick arrived seconds later, and she also had Narcan on her person. (*Id.* ¶ 98.) RN Freeman never administered Narcan, nor immediately directed LPN McKittrick to administer

Narcan, in violation of the accepted standard of care. (*Id.* ¶¶ 99-100.) LPN McKittrick also did not administer Narcan on her own, although she knew that Narcan was the only effective means of reversing the deadly effects of an overdose; instead she took direction from RN Freeman, the "Code Leader." (*Id.* ¶¶ 100-01.)

At approximately 7:48 p.m., and 7:50 p.m., respectively, two other LPNs (Orfa Bizer and Tracy Mottley-Ellis) arrived at Jennifer's cell, and RN Freeman likewise did not direct them to administer Narcan. (*Id.* ¶ 102.)

At approximately 7:50 p.m.—"nine minutes after Jennifer was in the throes of an overdose"—RN Freeman directed LPN McKittrick to administer Narcan to Jennifer. (*Id.* ¶ 103.) LPN McKittrick administered only one dose of Narcan in violation of CFG protocols requiring that Narcan be repeatedly administered if there is minimal or no response to initial doses. (*Id.* ¶ 104.) RN Freeman did not direct LPN McKittrick or any other CFG agent to administer another Narcan dose, nor did the LPNs decide to administer additional doses on their own. (*Id.* ¶ 105.)

Jennifer's death resulted from mixed drug toxicity, including fentanyl. (*Id.* ¶ 106.) No one was arrested or charged with distributing the drugs that caused the death. (*Id.* ¶ 113.) Jennifer is survived by her sons (L.R.K. and B.A.K.), her parents, her twin brother, her grandparents, and many other family members (and friends). (*Id.* ¶ 132.) Jennifer's death has adversely affected her two sons' behavior and emotional health. (*Id.* ¶¶ 132-40.)

RN Freeman's and LPN McKittrick's failure to administer additional doses of Narcan and provide Jennifer with a reasonable standard of medical care denied Jennifer her last chance of survival. (*Id.* ¶ 107.)

Plaintiff also alleges that CFG and CFG Policymakers deprived Jennifer of her last chance at survival by failing to train medical staff and corrections officers on how to properly administer

Narcan, by promulgating inadequate policies regarding how healthcare staff should respond to actual or suspected overdoses, and by inadequately training and supervising such staff on how to respond to overdoses. (*Id.* ¶ 110.)

According to Plaintiff, CFG's 2021 Narcan Policy, directing CFG personnel and agents to administer Narcan only if opiate use constitutes the definitive cause of the patient's condition and to administer the dose every three to five minutes if necessary, was inconsistent with the standard of care at the time. (*Id.* ¶¶ 89, 118-19.) CFG and CFG Policymakers were responsible for the implementation and oversight of on-site medical care at the MCCI, had authority to issue policies governing healthcare treatment and training for corrections officers and medical staff on how to respond to actual or suspected overdoses, and based on the years-long history of drug use, overdoses, and other drug-related medical incidents, knew of the nature and extent of the MCCI drug problem and of the serious health dangers facing detainees (especially detainees requiring heightened care and surveillance because of substance use disorders). (*Id.* ¶ 116.) However, not only did CFG Policymakers fail to enact policies requiring corrections officers to be trained on administering Narcan and how to monitor detoxing detainees, CFG's existing policies were deficient and inconsistent with the standard of care. (*Id.* ¶¶ 88-89, 117.) CFG and CFG Policymakers did not revise the 2021 Narcan Policy by eliminating the "DEFINITIVE Cause" directive and changing the re-administration directive to two to three minutes until December 2022. (*Id.* ¶¶ 118-23.)

Furthermore, Plaintiff claims in the FAC that Monmouth County, Monmouth County Policymakers, CFG, and CFG Policymakers knew, or should have known, of previous drug overdoses in the MCCI, including three overdoses predating Jennifer's death (with Jennifer's intake records showing that she was a heightened risk of an overdose because she was a Drug

Court participant with a history of drug dependency); their custom, policy, and/or practice of deliberate indifference to the serious medical needs of drug dependent detainees proximately caused Jennifer's overdose, pain and suffering, loss of enjoyment of life, and wrongful death; their collective failures (actions and inactions) constituted a custom, practice, and/or policy of deliberate indifference to the health and safety of detainees violating Jennifer's federal and state constitutional rights and statutory and common law rights and proximately caused Jennifer pain and suffering, loss of enjoyment of life, wrongful death, and losses to Jennifer's sons; and (together with CO Connell, John/Jane Doe COs, and John/Jane Doe CFG Agents) they acted in wanton and willful disregard of the foreseeable harm Jennifer faced while detained at the MCCI. (*Id.* ¶¶ 125-26, 130-31.) CFG and CFG Policymakers also breached various state and federal laws, as well as their duties, by permitting or acquiescing in the failure to properly train employees on how to detect and/or monitor detainees' drug overdoses, failing to implement policies and train both corrections officers and medical staff on how to respond to detainees experiencing a drug overdose and/or to render medical treatment and/or life-saving aid to overdosing detainees, and failing to implement policies concerning the proper administration of Narcan. (*Id.* ¶ 129.)

### 3. Plaintiff's Twelve Counts

In her FAC, Plaintiff pleads twelve counts. The first three counts consist of federal claims brought pursuant to 42 U.S.C. § 1983 for violations of Jennifer's constitutional rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution: (1) failure to protect against Monmouth County (Count One), (ECF No. 93 ¶¶ 141-55); (2) failure to train, supervise, or discipline against Monmouth County, Monmouth County Policymakers, CFG, and CFG Policymakers (Count Two), (*id.* ¶¶ 156-64); and (3) failure to render adequate medical care against Monmouth County, Monmouth County Policymakers, CFG, CFG Policymakers, RN

Freeman, LPN McKittrick, and John/Jane Doe CFG Agents (Count Three), (*id.* ¶¶ 165-79). In the fourth claim (Count Four), Plaintiff alleges that: (4) Monmouth County, Monmouth County Policymakers, CFG, CFG Policymakers, RN Freeman, and LPN McKittrick violated the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2, by depriving Jennifer of her rights protected by Article I, Paragraphs 1 and 12 of the New Jersey Constitution. (ECF No. 93 ¶¶ 180-85.) The remaining counts consist of state law claims for: (5) negligence in the performance of ministerial duties under the New Jersey Tort Claims Act (NJTCA), N.J. Stat. Ann. §§ 59:1-1 to 59:12-3, against Monmouth County, CO Connell, and John/Jane Doe COs (Count Five), (ECF No. 93 ¶¶ 186-193); (6) negligent failure to train and/or supervise under the NJTCA against Monmouth County and Monmouth County Policymakers (Count Six), (*id.* ¶¶ 194-201); (7) negligence in the performance of discretionary activities under the NJTCA against Monmouth County and Monmouth Policymaker Defendants (Count Seven), (*id.* ¶¶ 202-09); (8) common law negligence against CFG, CFG Policymakers, RN Freeman, LPN McKittrick, and John/Jane Doe CFG Agents (Count Eight), (*id.* ¶¶ 210-18); (9) lost chance of survival under the NJTCA against Monmouth County, Monmouth County Policymakers, CO Connell, and John/Jane Doe COs (Count Nine), (*id.* ¶¶ 219-35); (10) lost chance of survival under the common law against RN Freeman and LPN McKittrick (Count Ten), (*id.* ¶¶ 236-44); (11) wrongful death under the New Jersey Wrongful Death Act, N.J. Stat. Ann. §§ 2A:31-1 to -6, against all Defendants (Count Eleven), (*id.* ¶¶ 245-49); and (12) a survival action under the New Jersey Survivor's Act, N.J. Stat. Ann. § 2A:15-3, against all Defendants (Count Twelve), (*id.* ¶¶ 250-54).

For relief, Plaintiff requests: (1) entry of judgment in favor of Plaintiff on behalf of the Estate of Jennifer for "compensatory, pain and suffering, punitive, and loss of enjoyment of life damages, as allowed by law, against each Defendant, jointly and severally in an amount to be

determined;" (2) entry of judgment in Plaintiff's favor on behalf of L.R.K. and B.A.K. for compensatory damages, the loss of love, advice, counsel, companionship, guidance, and financial support Jennifer provided them as their mother, and punitive damages against each Defendant, jointly and severally; and (3) counsel fees and costs pursuant to 42 U.S.C. § 1988 and the NJCRA. (*Id.* at 50-51.)

**B. Procedural History**

On January 9, 2024, Plaintiff filed her initial Complaint.[3] (ECF No. 1.) Monmouth County Defendants moved to dismiss on March 25, 2024, (ECF No. 14), Plaintiff opposed the Monmouth County Defendants' motion on May 31, 2024, (ECF No. 25), and Monmouth County Defendants replied on June 14, 2024, (ECF No. 26). On February 5, 2024, CFG and LPN McKittrick answered the Complaint. (ECF No. 4.)

On November 20, 2024, the Court heard oral argument on the Monmouth County Defendants' Motion to Dismiss. (ECF No. 39; *see also* ECF No. 45.) On December 6, 2024 and March 6, 2025, respectively, the Court entered stipulations executed by Plaintiff and Monmouth County Defendants.[4] (ECF Nos. 44, 61.) On February 13, 2025, the Court ordered Monmouth

---

[3] In the original Complaint, Plaintiff named as Defendants Monmouth County, Monmouth County Policymakers, CO Connell, Corrections Officer Randi Patterson (CO Patterson), LPN McKittrick, CFG, John and Jane Joe Doe Officers 1-10, and John and Jane CFG Agents 1-5. (ECF No. 1 ¶¶ 24-33.) The Court generally refers to Monmouth County, Monmouth County Policymakers, CO Connell, CO Patterson, and John and Jane Joe Doe Officers 1-10 as "Monmouth County Defendants."

[4] In the December 6, 2024 Stipulation and Order, Plaintiff and Monmouth County Defendants agreed to incorporate a redacted spreadsheet listing inmate deaths that occurred (and Narcan dosages administered) in the MCCI in 2022 and 2023 into the Complaint. (ECF No. 44 at 1.) Furthermore, in the March 6, 2025 Stipulation and Order, Plaintiff and Monmouth County Defendants agreed to incorporate a January 23, 2022 drug overdose/Narcan administration and a December 13, 2022 fatal overdose. (ECF No. 61 at 2.) In addition, Plaintiff withdrew any claim against Monmouth County Defendants in connection with CO Connell's and CO Patterson's alleged failure to administer additional doses of Narcan to Plaintiff once LPN McKittrick arrived on the scene. (ECF No. 44 at 1-2.)

County Defendants and Plaintiff to submit supplemental briefing addressing the January 31, 2025 decision in *Young v. Monmouth County*, No. 25-4975, 2025 WL 354447 (D.N.J. Jan. 31, 2025). (ECF No. 55.) The respective letter briefs were filed on February 20, 2025. (ECF Nos. 59-60.)

On March 26, 2025, the Court entered an Opinion and Order granting the Monmouth County Defendants' Motion to Dismiss in part and denying it in part. *See Trussell v. Monmouth Cnty.*, No. 24-00151, 2025 WL 9194923 (D.N.J. Mar. 26, 2025); (ECF No. 65). In short, the Court concluded:

> As to Plaintiff's claims under § 1983 and the NJCRA, the Court concludes that Plaintiff's Complaint "contain[s] enough facts to state a claim to relief that is plausible on its face" against Monmouth County under *Monell v. Department of Social Services of City of New York*, 436 U.S. 378 (1978), for failure to protect Jennifer from a serious risk of harm as well as for failure to train, supervise, and discipline MCCI personnel, [*Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023)] (alteration in original) (citation omitted). The Court likewise concludes that Plaintiff adequately alleges a plausible claim for failure to train, supervise, or discipline against the [Monmouth County] Policymaker Defendants and that the [Monmouth] County Defendants do not meet their burden to show that the [Monmouth] Policymaker Defendants are entitled to qualified immunity on this "failure-to" claim. However, the Court agrees with the [Monmouth] County Defendants that Plaintiff's state-created danger claim must be dismissed and that she fails to allege sufficient facts to state plausible claims for failure to protect and inadequate medical care against the Corrections Officer Defendants [CO Connell, CO Patterson, and John and Jane Doe Corrections Officers 1-10].
>
> Regarding Plaintiff's negligence (and derivative) claims under state law, the Court agrees with the [Monmouth] County Defendants that the NJTCA bars such claims to the extent that they arise out of alleged injuries caused by the [Monmouth] County Defendants' failure to enforce state laws, NJDOC regulations and MCCI policies. Because Monmouth County's and the [Monmouth County] Policymaker Defendants' direct actions are discretionary in nature, the Court dismisses the negligence and derivative claims against them to the extent that they are alleged to arise out of their alleged negligence in the performance of ministerial duties. However, the Court rejects the [Monmouth] County Defendants'

other NJTCA arguments.

*Trussell*, 2025 WL 914923, at *7.

On April 24, 2025, Monmouth County, Monmouth County Policymaker Defendants, CO Connell, and CO Patterson answered the Complaint. (ECF No. 71.) On December 26, 2025, Plaintiff filed the FAC. (ECF No. 93.) Monmouth County, Monmouth County Policymaker Defendants, CO Connell, and CO Patterson answered the FAC on January 23, 2026, (ECF No. 96), and RN Freeman filed an Answer to the FAC on February 5, 2026, (ECF No. 103). On March 13, 2026, CFG Defendants moved to dismiss the FAC. (ECF No. 110.) On April 20, 2026, Plaintiff opposed the CFG Defendants' Motion to Dismiss. (ECF No. 117.) CFG Defendants replied on April 27, 2026. (ECF No. 119.)

## II. LEGAL STANDARD

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)).

A defendant moving to dismiss under Rule 12(b)(6) bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231-32 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

## III. DISCUSSION

### A. The § 1983 Claims Against CFG Defendants

Count Two of the FAC "is brought pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, which entitles pretrial detainees to safe and humane confinement," against Monmouth County, Monmouth County Policymakers, CFG, and CFG Policymakers.[5] (ECF No. 93 ¶ 157.) Specifically, Plaintiff alleges that these Defendants: had the authority and duty to hire, screen, train, supervise, and discipline employees, corrections officers, medical staff, and personnel in the MCCI; their unconstitutional policies, practices, and/or customs relating to the training, supervision, and discipline of employees, corrections officers, medical staff, and personnel resulted in a lack of drug screening and detection measures, inadequate monitoring of at-risk detainees with known histories of substance use disorders, and inadequate responses to detainees suffering from a suspected overdose; they are liable for failure to supervise and/or train corrections officers and medical staff to fulfill their duties to protect detainees from the substantial risk posed by the omnipresence of

---

5 Section 1983 "imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005) (citation omitted). It is undisputed that private entities and their employees contracted to provide constitutionally mandated medical services to inmates on behalf of a governmental entity are deemed to act under color of state law for § 1983 purposes. *See West v. Atkins*, 487 U.S. 42, 49-54 (1988); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003). Plaintiff alleges that CFG undertook that obligation by contract with Monmouth County, and CFG Policymakers and LPN McKittrick (as well as RN Freeman and John/Jane Doe CFG Agents) carried it out as CFG's agents at the MCCI. (ECF No. 93 ¶¶ 32-36, 38.)

drugs in the facility and to properly respond to drug overdoses and discipline those officers and medical staff who failed to fulfill their duties; such failures were the direct and proximate cause of the violation of Jennifer's constitutional rights and her death, and as a result of the alleged conduct, Jennifer sustained economic damages, conscious pain and suffering, and loss of enjoyment of life, her children sustained the loss of care, guidance, companionship, and financial support; and, on behalf of Jennifer's Estate, Plaintiff seeks recovery for all of those losses, attorneys' fees, and punitive damages. (*Id.* ¶¶ 159-64.)

Similarly, in Count Three, Plaintiff alleges that Monmouth County, Monmouth County Policymakers, CFG, CFG Policymakers, RN Freeman, LPN McKittrick, and John/Jane Doe CFG Agents failed to render adequate medical care in violation of the Due Process Clause. Specifically, according to the FAC, RN Freeman, LPN McKittrick, and John/Jane Doe CFG Agents, had a duty to comply with generally accepted standards of care expected of medical professionals in their treatment of Jane. (*Id.* ¶ 167.) It is widely accepted in the corrections field that detainees with substance use disorders are at a substantial risk of overdose if they ingest drugs without medical supervision, detainees suffering from an opioid overdose should be administered Narcan immediately, and Narcan should be re-administered if the initial dose is ineffective. (*Id.* ¶ 168.) It is also a widely accepted protocol in the medical profession that Narcan must be administered immediately and in timely repeated doses to an overdose victim until she begins to breathe again. (*Id.* ¶ 169.) RN Freeman and LPN McKittrick knew or should have known that Jennifer had a history of substance use disorder, required medical supervision and frequent monitoring, was supposed to be placed in medical isolation; however, despite knowing there was a substantial likelihood Jennifer (who was wearing the tan detoxing detainee jumper) had overdosed on drugs, the two medical professionals failed to timely administer Narcan, failed to administer required

repeated doses, and failed to direct other members of the healthcare team to do so immediately upon their arrival. (*Id.* ¶ 170.) RN Freeman's and LPN McKittrick's failure to follow basic protocols to save a distressed detainee's life constituted deliberate indifference to the detainee's immediate medical needs, and, as a direct proximate result of this failure to immediately administer Narcan and to administer additional doses in the critical moments that could have saved Jennifer's life, Jennifer died due to a lack of reasonable medical care. (*Id.* ¶¶ 172-73.)

Furthermore, with respect to Monmouth County, Monmouth County Policymakers, CFG, and CFG Policymakers, Plaintiff seeks to hold these Defendants liable under Count Three under a "failure/inadequacy" theory of liability. Plaintiff alleges that Monmouth County, Monmouth County Policymakers, CFG, and CFG Policymakers had the authority and duty to hire, screen, train, supervise and discipline employees, corrections officers, medical staff, and personnel in the MCCI, and to promulgate and enforce policies concerning the administration of Narcan, including the 2021 Narcan Policy; their constitutionally infirm policies, practices, and/or customs relating to the training, supervision, and discipline resulted in inadequate responses to detainees, such as Jennifer, suffering from a suspected overdose; they failed to equip, or provide access to Narcan to corrections officers and to supervise and train corrections officers regarding how to administer Narcan; they failed to fulfill their constitutional duties to protect detainees from the substantial risk of harm posed by the omnipresence of drugs in the MCCI; and the alleged collective failures were the direct and proximate cause of the violation of Jennifer's constitutional rights and her death. (*Id.* ¶¶ 173-76; *see also id.* ¶¶ 177-79 (further alleging that as a direct and proximate result of "these Defendants" deliberate indifference to serious medical needs, Jennifer needlessly died," she sustained economic and compensatory damages, conscious pain, and suffering, and loss of enjoyment of life, her children have sustained loss of Jennifer's care, guidance, companionship,

and financial support, and Plaintiff seeks punitive damages against Monmouth County Policymakers, CFG, CFG Policymakers, RN Freeman, and LPN McKittrick, and attorney's fees)).

The Court will analyze Plaintiff's inadequate medical care claim against each CFG Defendant, in turn.

### 1. LPN McKittrick

Plaintiff's § 1983 civil rights claims against CFG Defendants implicate the constitutional right of pretrial detainees to a basic medical treatment. The Eighth Amendment's prohibition on cruel and unusual punishment requires prison officials to provide basic medical treatment to inmates.[6] *See Perotti v. United States*, 664 F. App'x 141, 144 (3d Cir. 2016) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)); *see also Duran v. Merline*, 923 F. Supp. 2d 702, 719 (D.N.J. 2013) (explaining that the Constitution mandates that prison officials satisfy inmates' "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety" (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993))).

Under the Eighth Amendment standard, an inmate must allege that (1) she had a serious medical need, (2) the defendant was deliberately indifferent to that need, and (3) the deliberate indifference caused harm. *See Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023) (citing *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003)). Where an inmate challenges the adequacy of care rather than its complete denial, courts presume that care was adequate, and the plaintiff must show

[6] As a pretrial detainee, Jennifer's right to adequate medical care arose under the Due Process Clause of the Fourteenth Amendment. *See Natale*, 318 F.3d at 581. But courts (including this Court in its prior Opinion in this matter) have analyzed such claims using the same deliberate indifference standard that applies under the Eighth Amendment, and Plaintiff does not dispute the applicability of the Eighth Amendment standard. *Trussell*, 2025 WL 914923, at *16 (citing *Natale*, 318 F.3d at 581-82); (*see also* ECF No. 117 at 22-23 (noting that Third Circuit applied the Eighth Amendment standard to evaluate a detainee's inadequate medical care claim under the Fourteenth Amendment and relying on that framework to argue Plaintiff adequately pled a medical care claim against CFG Defendants)).)

that the provider violated professional standards of care. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 535-36 (3d Cir. 2017). Mere medical malpractice or disagreement over the proper course of treatment does not state an Eighth Amendment claim. *See id.*; *White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990). "Prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners," *Durmer v. O'Connell*, 991 F.2d 64, 67 (3d Cir. 1993) (citations omitted), and "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law," *United States ex rel. Walker v. Fayette Cnty., Pa.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) (citation omitted); *see also Estelle*, 429 U.S. at 107 (recognizing that whether additional forms of treatment are indicated is a "classic example of a matter for medical judgment"); *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (stating that courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment). Inadequate care resulting from an error in medical judgment is not actionable. *See Durmer*, 991 F.2d at 69.

Whether a plaintiff alleges a complete denial of medical care or inadequate medical treatment, he or she must show that the official exhibited deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To act with deliberate indifference to a serious medical need is to recklessly disregard "a substantial risk of serious harm." *Id.* at 839. "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009) (quoting *Farmer*, 511 U.S. at 843).

The plaintiff does not need to provide direct evidence that a defendant had the requisite "deliberate indifference" state of mind:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Cf.* [1 W.] LaFave & [A.] Scott, [Substantive Criminal Law] § 3.7, p. 335 [(1996)] ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of").

*Farmer*, 511 U.S. at 842-43 (some internal citations omitted). "Deliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson*, 850 F.3d at 535.

An official acts with deliberate indifference if he or she intentionally denies or delays access to care or interferes with prescribed treatment. *Pearson*, 850 F.3d at 534 (citing *Estelle*, 429 U.S. at 104-05). The Third Circuit has found "'deliberate indifference' in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

According to CFG Defendants, this is not a case where the inmate received no care, care was delayed, or symptoms were ignored or some symptoms were addressed and others ignored; instead, "despite Plaintiff's facially false allegations, the CFG Defendants treated, medicated, and attempted life-saving care on the Decedent, which Plaintiff's Amended Complaint conveniently omits the majority of this care rendered as set forth in the medical records specifically incorporated into the Amended Complaint," and "[t]he only allegations against the CFG Defendants are that

only one dose of Narcan was administered to the Decedent in response to her overdose." (ECF No. 110-3 at 19-20.) CFG Defendants assert that, even assuming Plaintiff's allegations are true, Plaintiff does not allege that they had the requisite culpable state of mind, CFG Defendants did provide medical care to Jennifer, and Plaintiff fails to allege any purported "reasons" to demonstrate that they acted with deliberate indifference. (ECF No. 110-3 at 20.) Plaintiff purportedly "disagrees with the decision by the CFG Defendants to administer Narcan to the Decedent during the course of treatment for the Decedent's overdose," which does not give rise to an inadequate medical care claim under the Eighth Amendment. (*Id.* (further claiming there is "simply no evidence of deliberate indifference").)

In their reply brief, CFG Defendants assert that Plaintiff's argument about the failure to administer additional doses of Narcan during the limited period of time before the paramedics' arrival is "contradicted by the facts in Plaintiff's Amended Complaint," and, "[e]ven if the CFG Defendants did not react in the most reasonable manner, the CFG Defendants clearly did not [wantonly] disregard the Decedent's medical needs." (ECF No. 118 at 12.) According to CFG Defendants, the FAC acknowledges that the CFG Defendants did not act with deliberate indifference to Jennifer's medical needs; Jennifer was provided with prompt medical care, including "life-saving attempts of CPR and the administering of Narcan;" there is not "a scintilla of evidence" to support Plaintiff's contention that Jennifer was not provided with adequate medical care; the record indicates that medical personnel performed their duties; failure to administer even a single dose of Narcan is not, on its own, deliberate indifference; there is more than one way to treat a drug overdose, there is nothing to indicate that the failure to administer more Narcan doses is, itself, deliberately indifferent, and the fact that alternative procedures might have better addressed Jennifer's particular needs does not establish deliberate indifference; and, as the FAC

points out, CFG Defendants were notified of the overdose, and LPN McKittrick "promptly responded" to the overdose, which "cannot show deliberate indifference toward the Decedent's medical needs." (*Id.* at 11-12.)

At the preliminary stage of this proceeding, "accept[ing] the factual allegations in [the FAC] as true, [and] draw[ing] all reasonable inferences in favor of the [P]laintiff" the Court concludes that the FAC "contain[s] enough facts to state a claim to relief [for inadequate medical care] that is plausible on its face,'" *Wilson*, 57 F.4th at 140 (citation omitted). Specifically, Plaintiff alleges sufficient facts to permit this Court to draw the reasonable inference for purposes of a Motion to Dismiss under Rule 12(b)(6) that LPN McKittrick's inactions violated professional standards of care and were deliberately indifferent to Jennifer's serious medical needs, *see Clark*, 55 F.4th at 178.[7] As Plaintiff succinctly explains, based on the detailed factual allegations in the FAC, Count Three "is not about second-guessing a medical judgment based on the selection of one reasonable treatment option among other reasonable ones, as the CFG Defendants suggest;" instead, [i]t is a claim about trained medical professionals who . . . observed a known detoxing detainee in an active overdose, and made a conscious choice not to timely administer [and-readminister] a life-saving treatment that they each had in their possession." (ECF No. 117 at 28-29.) Under the circumstances, "Plaintiff has met the pleading standard for establishing deliberate indifference," (*id.* at 29), and Defendants' arguments "appear better suited to a motion for summary judgment after the parties have an opportunity to conduct discovery," *Trussell*, 2025 WL 914923, at *19 (citations omitted).

Initially, Respondents do not dispute Plaintiff's specific allegations regarding the professional standards of care for treating a drug overdose, *e.g.*, "it is generally accepted in the

[7] CFG Defendants do not assert that Plaintiff fails to adequately allege that Jennifer had a serious medical need.

medical community that Narcan should be administered to an individual experiencing an overdose as quickly as possible," "[i]f someone is having a medical emergency that is not an opioid overdose, administering Narcan will not cause them any harm," its "immediate administration in suspected opioid overdose situations can be lifesaving," and "[n]o limit is placed on the number of Narcan doses that can be administered to an overdose victim" (with Narcan typically beginning to work within two to three minutes even with unconscious patients who are not breathing). (ECF No. 93 ¶¶ 84-85 (footnotes omitted).) In fact, CFG's 2021 Narcan Policy required the anti-overdose medication to be "repeatedly administered if there is minimal or no response to initial doses." (*Id.* ¶ 104.) As a medical professional, LPN McKitrick had a duty to comply with the applicable standard of care, "knew that Narcan was the only effective means of reversing the deadly effects of an overdose," and had "Narcan on her person" when she arrived at Jennifer's cell. (*Id.* ¶¶ 98-99, 101, 167.) Additionally, CFG Defendants acknowledge that Jennifer's condition required the administration of "life-saving care" (and they assert that they attempted to provide such care). (*See* ECF No. 110-3 at 19.) According to the FAC, Jennifer was wearing a tan jumper, "used only for detoxing detainees," her substance use disorder was noted in her file, and she was assigned to medical isolation. (ECF No. 93 ¶ 43.)

Despite such alleged facts, LPN McKittrick did not immediately administer Narcan when she arrived and instead waited to administer the medication until approximately 7:50 p.m., when RN Freeman finally directed her to administer Narcan. (*Id.* ¶¶ 101-03.) Corrections officers were notified of Jennifer's medical emergency at appropriately 7:41 p.m., Nurse Freeman arrived on the scene shortly before 7:43 p.m., and "LPN McKittrick arrived shortly thereafter—within seconds of RN Freeman." (*Id.* ¶¶ 95-98.) For Rule 12(b)(6) purposes, Plaintiff plausibly alleges that LPN McKittrick "delayed" administering the anti-overdose medication—for no apparent medical, or

non-medical reason—for approximately seven minutes after LPN McKittrick arrived. *See Parkell*, 833 F.3d at 337 (stating that "deliberate indifference" may be shown where the defendant, *inter alia*, "delays necessary medical treatment based on a non-medical reason"). Following this delay, "LPN McKittrick administered only one dose of Narcan to Jennifer, in violation of [not only the applicable standard of care but] CFG's own protocols, which require that Narcan be repeatedly administered if there is minimal or no response to initial doses." (*Id.* ¶¶ 94, 104; *see also id.* ¶¶ 94-105 (similarly alleging that RN Freeman and other responding medical personnel failed to administer Narcan and/or order Narcan to be administered to Jennifer).)

The FAC is silent as to what, if any, treatment LPN McKittrick and the other CFG medical personnel actually provided to Jennifer, apart from a single dose of Narcan administered "nine minutes after Jennifer was in the throes of an overdose." (*Id.* ¶ 103.) In their brief filed in support of the Motion to Dismiss, CFG Defendants assert that, "despite Plaintiff's facially false allegations, the CFG Defendants treated, medicated, and attempted life-saving care on the Decedent, which Plaintiff's Amended Complaint conveniently omits the majority of this care rendered as set forth in the medical records specifically incorporated into the Amended Complaint." (ECF No. at 19-20.) CFG Defendants state (in passing) that "the undisputed material facts show that the CFG Defendants responded to the Decedent's overdose by administering CPR, calling 9-1-1, and administering Narcan." (*Id.* at 12.) Similarly, CFG Defendants' reply brief notes that "the Decedent was provided with prompt medical care, including life-saving attempts of CPR and the administering of Narcan." (ECF No. 118 at 11.) In the FAC, Plaintiff alleges that CO Connell "began CPR" and, as noted above, LPN McKittrick administered one dose of Narcan ("nine minutes after Jennifer was in the throes of an overdose"). (ECF No. 93 ¶¶ 96, 103.) To the extent that CFG Defendants indicate that the medical records establish that any additional treatment was

provided to Jennifer, they fail to identify the specific treatment (except possibly a phone call to 9-1-1) provided or to submit the medical records with their filings in support of the Motion to Dismiss, which would, at least, permit the Court to evaluate the accuracy of their characterizations of such documentation.[8]

Accepting the foregoing factual allegations in the FAC regarding the treatment that was provided to Jennifer, or the lack thereof, and the applicable standards of care as true, and drawing all reasonable inferences from such allegations in Plaintiff's favor, Plaintiff plausibly alleges that "LPN McKittrick's decision to withhold a life-saving treatment from Jennifer within the limited window of opportunity to save Jennifer's life was clearly contrary to generally accepted standards of care and demonstrates that the care provided to Jennifer was so inadequate as to shock the conscience." (ECF No. 117 at 27 (citing *Parkell*, 833 F.3d at 337).) Based on the allegations in the FAC, it is reasonable for the Court to infer that, for a trained medical professional responding to an overdose emergency involving a detoxing detainee with a substance abuse disorder, the substantial risk of death or serious harm from a delay in administering Narcan, and the failure to re-administer the anti-overdose medication as required, was obvious. *Clark*, 55 F.4th at 178 (stating that "[a] claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged'" (citation omitted)); *see also Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

---

8 In the FAC, Plaintiff refers, *inter alia*, to Jennifer's "medical records and file" (*e.g.*, "[t]he corrections officers responsible for monitoring Jennifer knew or should have been informed of Jennifer's medical conditions and substance use disorder from her medical records and file showing her assignment to medical isolation, and low-bunk/low-tier designation"). (ECF No. 93 ¶ 43.) However, the medical records are not attached as an exhibit to the FAC, and CFG Defendants do not attach the documentation to their Motion to Dismiss filings or indicate that the records have been filed elsewhere on the docket.

Relying on Sixth Circuit case law, CFG Defendants assert that there is more than one way to treat a drug overdose, and nothing indicates that failure to administer Narcan is, itself, deliberately indifferent. (ECF No. 118 at 11-12 (citing *Graham ex rel. Est. of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004)). However, the Sixth Circuit acknowledged the possibility that medical care could be "so woefully inadequate as to rise to the level of a constitutional violation." *Graham*, 358 F.3d at 385; *see also Est. of Sacco v. Hillsborough House of Corr.*, 561 F. Supp. 3d 71, 83 (D.N.H. 2021) ("The Plaintiff can make this [deliberate indifference] showing 'by demonstrating that the defendant provided medical care that was "so inadequate as to shock the conscience,"' or that was 'so clearly inadequate as to amount to a refusal to provide essential care.'" (quoting *Zingg v. Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018)). Here, Plaintiff plausibly alleges that, given the allegations regarding the applicable standards of care, the alleged treatment provided to Jennifer, a detoxing detainee with a substance abuse disorder suffering an overdose, consisting of only CPR and one delayed dose of Narcan, was so inadequate as to rise to the level of deliberate indifference for purposes of a motion to dismiss under Rule 12(b)(6).[9]

Accordingly, for the foregoing reasons, the Court denies CFG Defendants' Motion to Dismiss as to Count Three as to LPN McKittrick. CFG Defendants may renew their arguments

---

9 In addition, CFG Defendants cite to *Williams v. Corecivic of Tennessee, LLC*, No. 25-5377, 2026 WL 323971 (6th Cir. Feb. 6, 2026), and *Estate of Wesley v. City of Inkster*, No. 25-10818, 2026 WL 592377 (E.D. Mich. Mar. 3, 2026), in support of their contention that failure to administer even a single dose of Narcan does not, on its own, constitute deliberate indifference. (ECF No. 118 at 11.) Both (non-binding) cases concerned claims regarding the actions of non-medical personnel (corrections or police officers). *See Williams*, 2026 WL 323971, at *4 (noting that corrections officer immediately called for the medical team after finding inmate on the floor); *Est. of Wesley*, 2026 WL 592377, at *5 (police officer responding to 911 call administered one dose of Narcan as the friend of the victim attempted CPR). In addition, the *Estate of Wesley* court disposed of the claim against the police officers under the "clearly established" prong of the qualified immunity defense (a defense CFG Defendants do not raise). *Est. of Wesley*, 2026 WL 5932377, at *3-6 ("The Court begins and ends with the clearly established prong.").

regarding this claim if they file for summary judgment after discovery is concluded.

### 2. CFG and CFG Policymakers

It is well established that a defendant in a § 1983 civil rights proceeding may not be held liable based solely on the defendant's supervisory capacity or vicariously for the actions of the defendant's subordinates; instead, a civil rights claim may only proceed where the named defendant was personally involved in the alleged violations of the plaintiff's rights. *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988). Because corporate contractors, like CFG, and their supervisory or policymaking employees, like CFG Policymaker Defendants, may not be held vicariously liable solely for the actions of their subordinates, supervisors and corporate contractors may only be held liable if they were directly involved in wrongful deeds, had actual knowledge of and acquiesced in the deeds of their subordinates, or they created a policy or custom which was the moving force behind the alleged wrong. *See Chavarriaga*, 806 F.3d at 222; *Natale*, 318 F.3d at 583-84.

In *Natale*, the Third Circuit considered a "policy or custom" claim against a private company (PHS) providing medical health services to a county correctional facility's inmates:

> What remains to be determined is whether, for § 1983 purposes, the actions of PHS employees can be attributed to PHS itself. PHS cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order for PHS to be liable, the Natales must provide evidence that there was a relevant PHS policy or custom, and that the policy caused the constitutional violation they allege. *See Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).
>
> Not all state action rises to the level of a custom or policy. A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." *Kneipp v. Tedder,* 95 F.3d 1199,

> 1212 (3d Cir.1996) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." *Bryan County,* 520 U.S. at 404, 117 S.Ct. 1382.
>
> There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Bryan County,* 520 U.S. at 417, 117 S.Ct. 1382 (Souter, J., dissenting). The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Id.* Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 417–18, 117 S.Ct. 1382 (quoting *City of Canton, Ohio v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also Berg v. County of Allegheny,* 219 F.3d 261, 276 (3d Cir.2000). (holding that plaintiff must "demonstrat[e] that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences").

*Natale*, 318 F.3d at 583-84; *see also Henry v. Buskirk*, No. 08-1348, 2011 WL 767540, at *4 (E.D. Pa. Feb. 24, 2011) ("A private corporation contracted by a prison to provide health care for inmates cannot be held liable on a *respondeat superior* theory; rather, it can only be held liable for constitutional violations if it has a custom or policiy [sic] exhibiting deliberate indifference to a prisoner's serious medical needs." (footnotes omitted) (first citing *Natale*, 318 F.3d at 583-84; and then citing *Monell.*, 436 U.S. at 690-92). Furthermore, the plaintiff must allege facts plausibly indicating the existence of "a causal link between [the municipal or corporate] policy or custom and the alleged constitutional deprivation." *Brown v. Muhlenberg Twp*, 269 F.3d 205 21 (3d Cir. 2001) (quoting *City of Canton*, 489 U.S. at 385).

The third "failure/inadequacy" "situation" or theory of liability requires demonstrating deliberate indifference, and the theory encompasses claims related to an alleged failure to train, supervise, or discipline subordinates. *See Forrest v. Parry,* 930 F.3d 93, 105-06 (3d Cir. 2019); *Young v. Monmouth Cnty.*, No. 24-4975, 2025 WL 354447, at *3 (D.N.J. Jan. 31, 2025). To plead a "failure to act affirmatively" claim, the plaintiff must allege facts showing "there was an obvious and clear need for the affirmative promulgation of a new policy to address deficiencies which, if left uncorrected, were so likely to cause a violation such as the one the plaintiff suffered that the defendant in question can be said to have been deliberately indifferent to the deficiency." *Young*, 2025 WL 354447, at *3 (first citing *Chavarriaga*, 806 F.3d at 222-23; and then citing *Natale*, 318 F.3d at 584),

Accordingly, claims for failures in training, supervision, and discipline require a plaintiff to establish that a municipal or corporate failure to train, supervise, or discipline "amounts to deliberate indifference to the rights of persons with whom the [subordinates] come into contact." *Kelley v. Reyes*, No. 19-17911, 2025 WL 618207, at *21 (D.N.J. Feb. 26, 2025) (quoting *City of Canton*, 489 U.S. at 388); *see also Young*, 2024 WL 354447, at *3. "This consists of establishing whether '[1] municipal [or corporate] policymakers know that employees will confront a particular situation, [2] the situation involves a difficult choice or a history of employees mishandling, and [3] the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" *Kelley*, 2025 WL 618207, at *21 (alteration added) (quoting *Forrest v. Parry*, 930 F.3d at 105).

The plaintiff must allege facts showing that the failure to act reflects a deliberate or conscious choice. *See Beers v. Cnty. of Northumberland*, No. 23-2555, 2024 WL 2874283, at *3 (3d Cir. June 7, 2024) (per curiam); *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019). "Additionally, 'the identified deficiency in a [governmental entity's or contractor's]

training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (alteration in original) (quoting *City of Canton*, 489 U.S. at 391); *see also Beers*, 2024 WL 2874283, at *3 (same). "Establishing a failure to train claim under Section 1983 is difficult and applies in narrow situations." *Cooper v. City of Paterson*, No. 23-3566, 2024 WL 1298917, at *5 (D.N.J. Mar. 27, 2024) (citing *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997); *City of Canton*, 489 U.S. at 387)); *see also Young*, 2025 WL 354447, at *3 (stating that a municipality's culpability is at its most tenuous where a claim rests on a failure to train and will only be tenable where the failure to train amounts to deliberate indifference to the rights of persons in contact with untrained personnel).

A pattern of similar constitutional violations is ordinarily required to demonstrate deliberate indifference for purposes of failure/inadequacy claims. *See Hightower v. City of Philadelphia*, 130 F.4th 352, 357 (3d Cir. 2025); *Thomas*, 749 F.3d at 223; *Young*, 2025 WL 354447, at *3. However, "[a] mere pattern of a handful of vaguely similar constitutional violations is generally insufficient to meet this requirement." *Young*, 2022 WL 354447, at *3 (quoting *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011)) (noting that, in *Connick*, the Supreme Court held that "having four convictions overturned for *Brady* violations over ten years was insufficient to support a failure to train claim where those violations were dissimilar to the specific *Brady* violation").

"Nevertheless, the Supreme Court posited in *Canton* that in certain situations, the need for training 'can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights' even without a pattern of constitutional violations." *Thomas*, 749 F.3d at 223 (quoting *City of Canton*, 489 U.S. at 390 n.10); *see also*

*Hightower*, 130 F.4th at 130 ("The Supreme Court has 'hypothesized' that 'in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference.' *Connick*, [563 U.S. at 63]."). Single-incident claims depend on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Thomas*, 749 F.3d at 223-24 (alteration in original) (quoting *Bryan Cnty.* 520 U.S. at 409). "[S]uch a claim "is not viable in the absence of an extremely obvious deficiency." *Young*, 2025 WL 354447, at *3 (citing *Connick*, 563 U.S. at 63-64).

Likewise, with respect to Plaintiff's claim against CFG Policymakers, there are two potential theories of supervisory liability. *See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Under the first theory, officials may be sued "if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, custom, or practice which directly caused [the] constitutional harm.'" *Id.* (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). The second theory of supervisory liability provides that a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his or her subordinates' violations. *See Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995). "Failure to" claims constitute a subcategory of supervisory policy or practice liability. *See Harris v. Smith*, No. 25-3372, 2025 WL 2237554, at *2 (D.N.J. Aug. 6, 2025).

CFG Defendants argue that "Plaintiff's allegations are merely general blanket and conclusory allegations and there are insufficient facts pled to establish any action or inaction on CFG or the CFG Policymaker Defendants part that violated his Constitutional rights." (ECF No.

110-3 at 15.) According to CFG Defendants, Plaintiff makes no allegations regarding CFG policies and procedures relating to the medical care provided to Jennifer, Jennifer's overdose was an unfortunate and tragic incident that was not the result of a defective CFG policy or procedure, and Plaintiff fails to identify a specific unconstitutional or defective policy, practice, custom, or procedure maintained by CFG and/or CFG Policymakers that caused Jennifer's fatal overdose, "as Plaintiff's main contention is in regard to the exposure [to] drugs in MCCI." (*Id.* at 15-16.) CFG Defendants assert that Plaintiff merely disagrees with the medical care they provided to Jennifer in response to the overdose (an overdose they claim CFG and CFG Policymakers "were not responsible for"), even though CFG Defendants immediately provided "life-saving care" as soon as they were notified of Jennifer's condition. (*Id.* at 16.) CFG Defendants indicate that, even if there was an error in professional judgment in administering Narcan, or a related constitutional deprivation regarding the medical care provided to Jennifer, Plaintiff alleges no cognizable *Monell* claim concerning a related policy or practice and, at best, the FAC merely establishes that, in this instance, CFG appropriately responded to a medical emergency and attempted to save Jennifer's life. (*Id.*) CFG Defendants further assert that, "[e]ven if the Court were to accept Plaintiff's claims, the right to be protected from voluntary consumption of illicit drugs is well beyond 'the minimal civilized measures of life's necessities.'" (*Id.* (first quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); and then citing *Smith v. Connections CSP, Inc.*, No. 17-1733, 2018 WL 1433840 (D. Del. Mar. 20, 2018)). Additionally, according to CFG Defendants, the FAC acknowledges that there were policies and procedures in place concerning the administration of Narcan and providing care for overdose patients, Jennifer did not overdose as a result of allegedly defective CFG policies and procedures, "[n]o policy or procedure can be 100% effective in preventing such an outcome," and CFG and CFG Policymakers were not responsible for "maintaining MCCI" but

were only responsible for providing medical services to the facility (*Id.* at 17.)

In their reply brief, CFG Defendants admit that Plaintiff asserts that "CFG Defendants' 2021 Narcan Policy was unconstitutional and resulted in the Decedent's death;" "[h]owever, [according to CFG Defendants] the basis for Plaintiff's claims are related to the alleged failure to administer additional doses of Narcan to the Decedent to save her. Plaintiff has not alleged that the 2021 Narcan Policy caused Plaintiff's harm. Rather, the Decedent's harm was caused by the Decedent's voluntarily taking an illicit drug that led to her overdose." (ECF No. 118 at 7.) With respect to their alleged failure to train, CFG Defendants similarly assert that this claim is unsupported because Plaintiff relies on the same factual averments raised against Monmouth County Defendants, Plaintiff has only asserted a "handful of vaguely similar situations involving illicit drugs at the MCCI," and Plaintiff cannot demonstrate that CFG Defendants failed to train the medical providers because Jennifer was provided with medical care ("Narcan and other life-saving measures"). (*Id.* at 8-9.)

Plaintiff alleges that CFG and CFG Policymakers are liable under two alternative theories of corporate/supervisory liability: (1) an unconstitutional policy, *i.e.*, CFG's 2021 Narcan Policy directing CFG personnel to "ONLY administer NARCAN if OPIATE use is the DEFINITIVE cause of the patient's condition" and re-administer Narcan within five minutes if necessary; and (2) the failure to train CFG medical staff to meet the serious medical needs of overdosing detainees. (*See* ECF No. 93 at ¶¶ 84-89, 110, 116-26, 129-31, 156-64, 174-79; ECF No. 117 at 13-21.) At this preliminary stage of the proceeding, the Court concludes that Plaintiff adequately alleges both an unconstitutional policy claim and a "failure to train" claim against CFG and CFG Policymakers.

Initially, CFG Defendants challenge the adequacy of Plaintiff's corporate/supervisory liability claims against CFG and CFG Policymakers on the grounds that, *inter alia*, "CFG

Defendants provided medical care to the Decedent immediately upon being notified of the Decedent's condition" and "Nurse McKittrick and Nurse Freeman administered Narcan and attempted other life-saving measures." (ECF No. 118 at 9 (citations omitted).) However, the Court has already concluded that Plaintiff alleges a facially plausible claim for inadequate medical care against LPN McKittrick under § 1983 and the Due Process Clause of the Fourteenth Amendment. *See supra* Section III.A.1. Furthermore, for substantially the same reasons, the Court determines that Plaintiff alleges a facially plausible inadequate medical care claim against RN Freeman.[10] For example, Plaintiff alleges that RN Freeman was the first member of the CFG healthcare team to respond to Jennifer's overdose (shortly before 7:43 p.m.), and, like LPN McKittrick, RN Freeman had Narcan in her "charge nurse bag." (ECF No. 93 ¶ 97.) RN Freeman never administered Narcan to Jennifer, (despite the alleged fact that LPN McKittrick took direction from RN Freeman as the "Code Leader" (and a registered nurse)) did not direct LPN McKittrick to administer Narcan immediately, did not order LPN McKittrick to administer the anti-overdose medication until approximately 7:50 p.m. ("nine minutes after Jennifer was in the throes of an overdose"), and finally failed to direct LPN McKittrick (or any other CFG employee) to administer an additional dose of Narcan. (*Id.* ¶¶ 97-105.)

With respect to Plaintiff's "unconstitutional policy" theory, Respondents do not sufficiently address Plaintiff's allegations and arguments regarding this theory. *See Plavix Mktg., Sales Pracs. & Prod. Liab. Litig.*, 974 F.3d at 231-32 (stating that the moving defendant has the burden of showing that the complaint fails to state a claim). As Plaintiff explains, the FAC alleges that CFG Policymakers promulgated the 2021 Narcan Policy, which was in effect at the time of

---

[10] RN Freeman has not filed a motion to dismiss the claims against her under Rule 12(b)(6); instead, she has filed an Answer to the FAC. *(See* ECF No. 103.) However, Plaintiff and CFG Defendants address Plaintiff's allegations of inadequate medical care against RN Freeman.

Jennifer's fatal overdose, and the 2021 Narcan Policy directed CFG personnel to only administer Narcan if "OPIATE" use is the "DEFINITIVE cause of the patient's condition, and to re-administer the anti-overdose medication if necessary. (ECF No. 117 at 14 (first citing ECF No. 93 ¶¶ 34-35, 116, 120; and then quoting ECF No. 117-2).) As alleged in the FAC, these policy directives were "wildly inconsistent" with the applicable standard of care, which require the immediate administration of Narcan to reverse the potentially lethal effects of a suspected drug overdose. (*Id.* at 14-15 (citing *inter alia* ECF No. 93 ¶¶ 84-87, 89, 117-19).) "Given the 2021 Narcan Policy governing the administration of Narcan, it is no wonder [according to Plaintiff] that neither RN Freeman nor LPN McKittrick gave Narcan until at least nine minutes after Jennifer's overdose began," and, "in a gross breach of the standard of medical care, LPN McKittrick administered only one dose of Narcan to Jennifer, and neither RN Freeman nor any of the LPNs present in Jennifer's cell administered an additional dose to her." (*Id.* at 15 (citing ECF No. 93 ¶¶ 103-05).) The deficient 2021 Narcan Policy (as well as the "abysmal failures" of RN Freeman and LPN McKittrick) allegedly denied Jennifer her last chance of survival. (*Id.* (citing ECF No. 117 ¶¶ 106-07, 110); *see also id.* at 14-17 (further asserting, *inter alia*, that, several months after Jennifer's death, CFG and CFG Policymakers revised the policy to omit the "ONLY administer"/"DEFINITIVE cause" phrase in its entirety and explicitly require Narcan be re-administered every two to three minutes (rather than within five minutes).)

According to Plaintiff, the FAC thereby alleges specific facts that the written policy unconstitutionally denied inmates or detainees care for their serious medical needs by, on its face, restricting the administration of a life-saving antidote to Jennifer, and turning "a preventable death into a certain tragedy." (ECF No. 117 at 16.) Under the present circumstances, Plaintiff plausibly alleges an unconstitutional policy or practice claim under the standard governing motions to

dismiss for failure to state a claim pursuant to Rule 12(b)(6). *Cf. Natale*, 318 F.3d at 584 ("There is, however, evidence that PHS [the medical contractor] turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights.").

With respect to her "failure to train" theory, Plaintiff relies on this Court's prior holding that her "detailed allegations regarding the pattern of drug overdoses and policy deficiencies at the MCCI were sufficient to state a failure-to-train claim against the Monmouth County Defendants." (ECF No. 117 at 18 (citing *Trussell*, 2025 WL 914923, at *24).) In its Opinion, the Court explained:

> Based on the detailed factual allegations regarding the prior (and ongoing) pattern of similar drug overdoses and the prevalence of drug smuggling, distribution, use, and (sometimes fatal) overdoses at the MCCI . . . the Court concludes that Plaintiff pleads plausible municipal and supervisory claims in Count Two for failure to train, supervise, or discipline. Specifically, unlike Egner's estate in *Young*, Plaintiff alleges that, before Jennifer's fatal overdose on September 20, 2022, four MCCI inmates overdosed in 2022 (and one of these overdoses was fatal). (ECF No. 43 at MCSO000625; ECF No. 61 at 2.) Two of the incidents occurred within the thirty-day period preceding Jennifer's overdose, and both Jennifer's and the September 1, 2022 overdoses took place in the same housing unit (F1). (ECF No. 43 at MCSO000625.) Even if these prior incidents are insufficient to constitute a pattern of constitutional violations, they raise a reasonable inference that Jennifer's fatal overdose "was a 'highly predictable' consequence of the failure to train . . . for single-incident liability." *Thomas*, 749 F.3d at 224. Furthermore, the drug overdoses occurred despite the various countermeasures purportedly adopted by Monmouth County, including the beginning of a supposed "new era" of contraband searches in 2016 with the adoption of full-body X-ray scanning of inmates (ECF No. 26 at 3 (quoting ECF No. 26 at 31)). "The high degree of predictability [in a single-incident case] may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Thomas*, 749 F.3d at 226 (alterations in original) (quoting *Bryan Cnty.*, 520 U.S. at 409-10).
>
> Additionally, Plaintiff "cannot be expected to know, without discovery, exactly what training policies were in place or how they

were adopted.'" *Huysers v. N.J. Dep't of Corr.*, No. 19-16786, 2021 WL 2680098, at *2 (D.N.J. June 30, 2021) (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 358 (3d Cir. 1999)). Accordingly, Plaintiff need not, at this preliminary stage of the case, identify the specific deficiencies in the programs to train, discipline, and supervise MCCI personnel with respect to drug screening and monitoring in the MCCI. *See Martinez v. City of Asbury Park*, No. 20-8710, 2021 WL 1343837, at *7 (D.N.J. Mar. 5, 2021) ("Plaintiff need not provide details about the Municipality Defendants' specific training programs or protocols at this stage of the case." (citing *Carter*, 181 F.3d at 358)); *Huysers*, 2020 WL 2764818, at *5.

The *Turner* and *Johnson* decisions are again instructive, In *Turner*, the complaint "cites several inmate overdoses, many occurring within the past five years" and "alleges that Sheriff Dart failed to adequately train Jail staff on drug screening methods, inmate supervision, drug treatment, and drug overdose response." [*Turner v. Cook Cnty. Sheriff's Office*, No. 19-5441, 2020 WL 1166186, at *3-4 (N.D. Ill. Mar. 11, 2020)] (citations omitted). Like the County Defendants, the sheriff claimed that the prior instances were insufficient to support plausible claims for relief, but the *Turner* court specifically rejected the sheriff's "quibbl[ing] with red herring factual details" as arguments that "might be more well-received on the motion for summary judgment" and that "fail to address Plaintiff's overarching allegations—that . . . Jail staff are not appropriately trained or supervised as to drug screening or overdose treatment," resulting in the decedent's fatal overdose. *Id.* at *4. Similarly, the *Johnson* court concluded that the plaintiffs sufficiently alleged inadequate training regarding inmate supervision, monitoring, and observation because, *inter alia*, "Plaintiffs have supported their allegation with details of prior incidents of inmate deaths in the jail." [*Est. of Johnson v. Cnty. of Sacramento*, No. 23-1304, 2024 WL 279137, at *5 (E.D. Cal. Jan. 24, 2024)] (citation omitted). "Although the specific facts of the prior incidents . . . are dissimilar, the conduct is the same: inadequate supervision, monitoring and observation. Plaintiffs also have alleged defendants routinely fail to hold jail staff accountable and were on notice regarding the need to train staff in these areas related to their work." *Id.* (citation omitted).

The Court concludes that, based on this case law and the alleged pattern of drug smuggling, distribution, use, and overdoses in the facility, Plaintiff's "allegations [regarding the failure to train, supervise, or discipline] are sufficient to establish notice of the problem, its consequences, and a failure to act." *Turner*, 2020 WL 1166186, at *4. Accordingly, the Motion to Dismiss is denied as to

Count Two of the Complaint.

*Trussell*, 2025 WL 9194923, at *24-25 (footnote omitted). Likewise, the Court concludes that Plaintiff alleges a plausible failure-to-claim claim against CFG and CFG Policymakers. (ECF No. 117 at 19-21.)

CFG Defendants contend that the "failure to train" claim is unsupported because Plaintiff attempts to rely on the same factual averments raised against "the Monmouth County Co-Defendants" and that Plaintiff "has only asserted a handful of vaguely similar situations involving illicit drugs at the MCCI." (ECF No. 118 at 8-9.) Nevertheless, in the FAC, Plaintiff alleges that, "[b]etween January 2018 and August 2022, Narcan was administered to detainees experiencing overdoses or suspected overdoses on at least fourteen separate occasions," and, "[i]n 2022, there were dozens of incidents involving drugs, including eleven instances of pretrial detainees who suffered overdoses at the MCCI—three of which occurred before Jennifer's overdose on September 20, 2022." (ECF No. 93 ¶¶ 65-66.) "Even if these prior incidents are insufficient to constitute a pattern of constitutional violations, they raise a reasonable inference that Jennifer's fatal overdose "was a 'highly predictable' consequence of the failure to train . . . for single-incident liability." *Trussell*, 2025 WL 914923, at *24 (alteration in original) (quoting *Thomas*, 749 F.3d at 224); *see also Turner*, 2020 WL 1166186, at *4 (permitting claim alleging, among other things, a failure to train jail staff on "drug overdose response" because the plaintiff adequately alleged "that inmate overdoses regularly occur, Sheriff Dart and Jail staff know that, the Jail's policies (if they exist) do not adequately address the problem, Jail staff are not appropriately trained or supervised as to drug screening or overdose treatment, and because of all that, Ms. Scott overdosed and died."). CFG Defendants' arguments "might be more well-received on the motion for summary

judgment."[11] *Trussell*, 2025 WL 9194923, at *25 (quoting *Turner*, 2026 WL 1166186, at *4).

CFG Defendants argue that the right to be protected from voluntary consumption of illicit drugs is beyond the minimal civilized measures of life's necessities protected by the Constitution and that Jennifer's harm was caused by her voluntarily taking an illicit drug resulting in her overdose. (*See* ECF No. 110-3 at 16-17; ECF No. 118 at 8.) In its prior Opinion disposing of the Monmouth County Defendants' Motion to Dismiss, the Court specifically concluded that "Plaintiff's Complaint 'contain[s] enough facts to state a claim to relief that is plausible on its face'

---

[11] In *Mendes v. State of N.J. Department of Corrections*, No. 26-1345, 2026 WL 881399 (D.N.J. Mar. 31, 2026), a district court in the District of New Jersey recently considered the facial plausibility of NJCRA Eighth Amendment claims brought against NJDOC's medical contractor filed in connection with a prisoner's fatal overdose at Northern State Prison, *id.* at *1, 8-9. Acknowledging that the NJCRA is interpreted analogously to § 1983, the *Mendes* court concluded that, "[t]aken as true," the following allegations were sufficient to allege that the "constitutional violations . . . resulted from policies or procedures attributable to Rutgers":

> Here, Mendes alleges that Rutgers "provide[s] medical services to incarcerated individuals at Northern State" and was "responsible for ensuring that John/Jane Doe Rutgers Agents followed those protocols and were properly supervised and trained to respond to a suspected drug overdose." She further alleges that "Rutgers [ ] systematically ignored or downplayed the condition of inmates associated with drug overdosing and failed to properly provide further doses of Narcan when indicated, including to [Kellerman], showing deliberate indifference to his health and welfare which ultimately resulted in his death." Additionally, Mendes alleges that "[o]fficers and medical personnel routinely failed to respond with the urgency and preparedness required under NJDOC and Rutgers [ ] policies for which medical emergencies experienced by incarcerated individuals, particularly those with known histories of substance use, which are prevalent in prison." Mendes also alleges that Rutgers failed "to provide sufficient medical resources, training, and emergency preparedness," which led to delays in responding to Kellerman's overdose, "leading to his preventable death."

*Id.* at *8-9 (citations omitted). *Mendes* supports this Court's denial of the Motion to Dismiss as to Plaintiff's "failure to train" claim against the medical contractor and its alleged policymakers in the present matter.

against Monmouth County under *Monell* for failure to protect Jennifer from a serious risk of harm [with respect to unfettered access to illicit drugs and a serious risk of a potentially fatal overdose at the MCCI] as well as for failure to train, supervise, and discipline MCCI personnel [regarding, *inter alia,* their constitutional duties to protect detainees from the substantial risk of harm posed by the omnipresence of illicit drugs in the MCCI]." *Trussell,* 2025 WL 9194923, at *7 (alterations in original). The Court likewise determined that Plaintiff "adequately allege[d] a plausible claim for failure to train, supervise, or discipline against the [Monmouth County] Policymaker Defendants and that the [Monmouth] County Defendants d[id] not meet their burden to show that the [Monmouth County] Policymaker Defendants [were] entitled to qualified immunity on this 'failure-to' claim."[12] *Id.*

In addition, Plaintiff seeks to hold CFG Defendants liable for alleged failures with respect to the medical treatment that was provided to Jennifer (or the lack thereof) after she suffered an overdose as a result of obtaining and ingesting an illicit drug. Officials have a constitutional obligation to provide basic medical treatment to inmates, and CFG contracted with Monmouth County to provide such services to inmates incarcerated at the MCCI. *See Perotti*, 664 F. App'x at 144; (ECF No. 93 ¶ 36). The fact that such medical treatment is required to treat a serious (life-threatening) medical condition resulting from a voluntary self-inflicted illegal act by the inmate

[12] CFG Defendants cite to the district court ruling in *Smith,* (ECF No. 110-3 at 16-17), which stated that the plaintiff's "alleged exposed [sic] to illegal drugs in a prison does not violate his constitutional rights," *Smith*, 2018 WL 1433840, at *4 (citations omitted). However, in its prior Opinion in this matter, the Court distinguished between mere exposure to drugs, which is insufficient to satisfy the objective prong of a "failure to protect" claim, and "[t]he risk of injury from unfettered access to deadly drugs in a prison [that] is 'not one that today's society chooses to tolerate.'" *Trussell*, 2025 WL 914923, at *9 (alterations added) (quoting *Zakora v. Chrisman*, 44 F.4th 452, 470 (6th Cir. 2022)). Relying on the alleged dangers posed by fentanyl, the prevalence of drugs in the MCCI, MCCI drug overdoses, and failures on the part of MCCI officials to investigate or responds to the drug problem at the MCCI, "[t]he Court concludes that Plaintiff's Complaint alleges 'the kind of "unfettered access to drugs in a prison"' that is sufficient to satisfy the objective prong of an Eighth Amendment claim." *Id.* at *9-14 (citation omitted).

does not relieve CFG Defendants of their constitutional obligation.

Accordingly, the Court denies the CFG Defendants' Motion to Dismiss as to the unconstitutional policy and "failure to train" claims against CFG and CFG Policymaker Defendants in Counts Two and Three.

### B. The NJCRA Claim

In Count Four of the FAC, Plaintiff alleges a claim for a violation of the NJCRA against Monmouth County, Monmouth County Policymakers, CFG, CFG Policymakers, RN Freeman, and LPN McKittrick. (ECF No. 93 ¶¶ 180-85.) It is uncontested that the NJCRA is interpreted analogously to § 1983 and that the analysis of Plaintiff's claims is the same under both civil rights statutes. (ECF No. 110-3 at 20-21; ECF No. 117 at 11 n.4); *Trussell*, 2026 WL 914923, at *30. Accordingly, for the same reasons that the Court denies the CFG Defendants' Motion to Dismiss as to the § 1983 claims (Counts Two and Three), *see supra* Section III.A., the Court denies the Motion to Dismiss as to the equivalent civil rights claim under state law (Count Four).

### C. Common Law Negligence

In Count Eight, Plaintiff alleges a negligence claim under New Jersey common law against CFG, CFG Policymakers, RN Freeman, LPN McKittrick, and John/Jane Doe CFG Agents. (ECF No. 93 ¶¶ 210-18.) CFG, CFG Policymakers, RN Freeman, LPN McKittrick, and John/Jane Doe CFG Agents (who were acting as employees of CFG and within the scope of that employment) allegedly owed Jennifer a duty to render adequate medical care while she in the custody of the MCCI, while CFG and CFG Policymakers allegedly had a duty to establish policies, practices, and/or procedures to ensure staff (including RN Freeman, LPN McKittrick, and John/Jane Doe CFG Agents) correctly assessed and properly treated MCCI detainees. (*Id.* ¶¶ 211, 215.) Nonetheless, Plaintiff alleges that RN Freeman and LPN McKittrick breached their duties by

failing to administer Narcan in a timely fashion and to administer additional doses of the anti-overdose medication to Jennifer during her overdose, in contravention of widely known and accepted medical standards, including CFG's own policies. (*Id.* ¶ 212.) Plaintiff further alleges that CFG Policymakers breached their duty by (1) failing to train, supervise, and/or monitor RN Freeman and LPN McKittrick to ensure that they timely administered Narcan and then administered repeated doses to overdosing detainees, and (2) by adopting the 2021 Narcan Policy permitting CFG to administer repeated doses only if there was "definitive evidence" of an opiate overdose. (*Id.* ¶ 213.) As a result of the alleged negligence, Jennifer was not timely administered Narcan, did not receive additional doses of Narcan, and died in MCCI custody; Jennifer sustained economic and compensatory damages (including conscious pain and suffering), and her children (L.R.K. and B.A.K.) suffered damages, including compensatory damages and the loss of love, advice, counsel, companionship, guidance, and financial support. (*Id.* ¶¶ 214, 216-18 (further seeking punitive damages)).

The parties agree on the elements of a negligence claim under New Jersey common law. "To sustain a cause of action for negligence, a plaintiff must establish four elements: '(1) a duty of care; (2) a breach of that duty; (3) proximate cause; and (4) actual damages.'" *Townsend v. Pierre*, 221 N.J. 36, 51 (2015) (quoting *Polzo v. Cnty. of Essex*, 196 N.J. 569, 584 (2008)). In the medical malpractice context, a negligence claim requires allegations of (1) the applicable standard of care, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the injury. *See Nicholas v. Mynster*, 213 N.J. 463, 478 (2013).

CFG Defendants argue that the medical records demonstrate that Jennifer received adequate medical care and treatment during her brief period of incarceration at MCCI, *i.e.*, she was placed on the COWS/CIWA protocol and prescribed detox medication, and her medical history

and substance use disorder were documented. (ECF No. 110-3 at 22.) Acknowledging that Plaintiff alleges a failure to timely administer Narcan and/or to administer additional doses, CFG Defendants assert that "the allegations relating to Plaintiff's Decedent being administered Narcan are contrary to the evidence in this case" and "any allegations [a]rising from Plaintiff's treatment cannot establish a prima facie case of negligence against the CFG Defendants as they are not credible and contrary to the evidence [and not supported by the evidence]." (*Id.* at 22-23.)

Likewise, in their reply, CFG Defendants assert that "Plaintiff's opposition consists of inconsistencies in an attempt to cover for the fact that the claims against the CFG Defendants contained in the Amended Complaint are unsupported by facts," and "Plaintiff cannot concede that the CFG Defendants responded to Plaintiff's Decedent and then seek to rely upon those same life-saving attempts to support Plaintiff's claim for negligence against the CFG Defendants." (ECF No. 118 at 13.) CFG Defendants further contend in passing that Plaintiff fails to articulate the deviation from the standard of care in relation to Jennifer's condition. (*Id.*)

For substantially the same reasons that the Court has denied the Motion to Dismiss with respect to the claims under § 1983 and the NJCRA, *see supra* Sections III.A. and III.B., the Court denies the CFG Defendants' Motion to Dismiss as to the common law negligence claim. For example, CFG Defendants do not explain how "the allegations related to Plaintiff's Decedent being administered are contrary to the evidence in this case" and fail to submit a copy of "the medical records" for the Court's review. In addition, to the extent CFG Defendants dispute the "credibility" of Plaintiff's allegations (such as her allegations that only a single dose of Narcan was administered, approximately nine minutes after the medical emergency was reported), it is well established that the Court must "accept the factual allegations in the complaint as true, [and] draw all reasonable inferences in favor of the plaintiff." *Wilson*, 57 F.4th at 140 (quoting *Watters*,

975 F.3d at 412). Furthermore, Plaintiff's FAC includes several specific allegations regarding the applicable standards of care for treating a drug overdose, *e.g.*, "[i]t is generally accepted in the medical community that Narcan should be administered to an individual experiencing an overdose as quickly as possible." (ECF No. 93 ¶¶ 84-85.) In turn, Plaintiff alleges that LPN McKittrick did not immediately administer Narcan and instead waited until approximately 7:50 p.m., when RN Freeman finally directed her to administer Narcan—and then only administered one dose of the medication—in violation of the applicable standard of care and the 2011 Narcan Policy. (*Id.* ¶¶ 94, 101-03; *see also id.* ¶¶ 94-105 (similarly alleging that RN Freeman and other responding medical personnel failed to administer Narcan and/or order Narcan to be administered to Jennifer in violation of the standard of care and CFG policy).)

Accordingly, the Court concludes that Plaintiff alleges a facially plausible negligence claim against CFG Defendants.[13]

## IV. CONCLUSION

For the reasons set forth above, and other good cause shown, the CFG Defendants' Motion to Dismiss is **DENIED**. An appropriate Order follows.

DATED: October 27, 2026

**GEORGETTE CASTNER**
**United States District Judge**

---

13 CFG Defendants further move to dismiss Counts Eleven (Wrongful Death) and Twelve (Survival Action) on the grounds that Plaintiff fails to allege facts plausibly indicating that Jennifer's death was caused by CFG Defendants' wrongful act, neglect, or default. (ECF No. 110-3 at 23-24 ("Here, since Plaintiff's allegations are not supported by the evidence to state a cause of negligence against the CFG Defendants, Plaintiff's wrongful death and survival action claims must be dismissed as Plaintiff's allegations are not supported by the evidence.").) Because the Court denies their Motion to Dismiss as to the state law negligence claim, it further denies CFG Defendants' Motion to dismiss the related state law wrongful death and survival action claims.